# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVID MICHAEL MULLINS,

       Plaintiff,

v.                                 Civil Action No. 2:25-cv-01366-MJH

DUQUESNE UNIVERSITY;

ALICIA SIMPSON, individually;

ADAM WASILKO, individually;

ANNE MULLARKEY SAWA, individually;

DANIEL SELCER, individually;

KRISTINE BLAIR, individually,

       Defendants.

---

## SECOND AMENDED COMPLAINT

---

## NOTE REGARDING REDLINE VERSION

Plaintiff respectfully submits this clean Second Amended Complaint in lieu of a redlined version. The revisions include: (1) addition of a fifth individual-capacity defendant (Dean Kristine Blair) based on conduct occurring October 20-23, 2025; (2) a new fraud pattern (Pattern 4) with extensive factual development; (3) expansion of Pattern 3 to include Blair's role; (4) comprehensive integration of Blair throughout Counts IV and V; and (5) corresponding updates to the Introduction and Statement of Facts.

The Court graciously accepted Plaintiff's October 6, 2025 Amended Complaint in clean format. Though this revision is not as substantial as the previous, it remains significant, addressing conduct that occurred after the prior Amended Complaint was filed. To make processing the revisions as convenient as possible for the Court, Plaintiff has provided a detailed summary of principal changes in the accompanying Motion for Leave to Amend and respectfully requests the Court's flexibility once more. As a pro se indigent litigant with limited drafting resources, Plaintiff submits this complete, clean version for the Court's consideration.

## INTRODUCTION

**1.** This case arises from Duquesne University's deliberate indifference to sex-based harassment that left Plaintiff homeless, unsafe, and denied equal access to education. The University possessed actual knowledge through its Title IX Coordinator's explicit acknowledgment that Plaintiff's report warranted Title IX supportive measures and emergency housing. Despite this acknowledgment, the Coordinator withdrew jurisdiction by administrative fiat—without new facts, without legal basis, and in direct violation of the University's mandatory obligations under Title IX.

**2.** Under *Davis v. Monroe County Board of Education*, 526 U.S. 633, 644-45 (1999), a school violates Title IX when it has actual knowledge of sexual harassment and responds with deliberate indifference. Deliberate indifference means a response that is "clearly unreasonable in

1

light of the known circumstances." *Id.* at 648. Here, the Title IX Coordinator's jurisdictional reversal was not merely unreasonable—it was facially arbitrary, contradicting her own prior assessment and leaving Plaintiff without any institutional recourse.

**3.** Between June and July 2025, Plaintiff reported escalating harassment by a female student, explicitly invoked Title IX, and provided extensive documentation including contemporaneous Signal messages, witness statements, and explicit invocations of sex-based discrimination. Multiple mandatory reporters—including senior administrators and the Title IX Coordinator herself—received actual notice. The Coordinator initially acknowledged the matter required Title IX response and housing assistance.

**4.** Then, on August 13-14, 2025, Coordinator Alicia Simpson executed an abrupt jurisdictional reversal. In response to Plaintiff's detailed emergency removal request and explicit refusal to attend further meetings, Simpson declared the entire matter "outside Title IX jurisdiction" and referred Plaintiff to Student Conduct—the very office whose Deputy Title IX Coordinator would proceed to threaten Plaintiff with disciplinary charges for seeking help. This withdrawal occurred without any change in underlying facts, without legal justification, and in direct contradiction to Simpson's prior acknowledgment of Title IX applicability.

**5.** This jurisdictional flip-flop constitutes textbook deliberate indifference: an institutional response so unreasonable that it amounts to an official policy of no response at all. The Coordinator's message was clear: decline our meetings, lose your federal rights. This conditioning of Title IX protections on complainant participation in discretionary processes violates both the letter and spirit of federal civil rights law.

**6.** Simpson's abdication directly enabled retaliation. After improperly delegating Plaintiff's Title IX complaint to Student Conduct, Deputy Title IX Coordinator Anne Mullarkey Sawa threatened Plaintiff with disciplinary charges for his protected activity—the precise retaliation chain that proper Title IX administration prevents. 34 C.F.R. § 106.71 (2020).

**7.** The deliberate indifference extended beyond the Title IX Coordinator. Dean Adam Wasilko initially deflected Plaintiff's June 30 emergency housing request with false claims that reported conduct didn't constitute violations. When Plaintiff corrected this mischaracterization with explicit Title IX invocations and sex discrimination allegations, Wasilko conditioned assistance on additional "engagement" rather than implementing protective measures. Department Chair Daniel Selcer falsified meeting records to conceal Plaintiff's substantive Title IX objections and imposed arbitrary limitations on educational access.

**8.** This Second Amended Complaint names five individual Defendants—Alicia Simpson, Adam Wasilko, Anne Mullarkey Sawa, Daniel Selcer, and Kristine L. Blair—sued in their individual capacities for fraud and civil conspiracy. Their coordinated conduct created a deliberate institutional indifference that deprived Plaintiff of housing, safety, and equal educational access for months.

**9.** As a direct result of this deliberate indifference, Plaintiff has been homeless since June 30, 2025, denied basic protective measures, excluded from in-person educational participation, and forced to flee from his harasser when she appeared outside his seminar on September 17, 2025—the second day of his forced unsafe return to campus. The harm was foreseeable, documented, and entirely preventable through compliance with basic Title IX obligations.

**10.** On October 6, 2025, Plaintiff filed an Amended Complaint in this Court alleging the same Title IX deliberate indifference and retaliation counts and the same ADA refusal of accommodation count against Duquesne University. Fraud and civil conspiracy were also alleged against four individual defendants: Simpson, Wasilko, Sawa, and Selcer.

**11.** On October 20, 2025, Plaintiff reported a conflict of interest to Dean Kristine L. Blair regarding Professor Daniel Selcer, whom Plaintiff had cross-examined under oath during an October 15 TRO hearing in this case. Plaintiff reported that Selcer—a named defendant in active federal litigation—was evaluating Plaintiff in a required PhD teaching seminar, creat-

ing an obvious conflict requiring independent review. Plaintiff requested guidance through University conflict procedures or an alternative arrangement.

**12.** Plaintiff's October 20 email to Blair was procedurally incorrect—Blair had no authority under TAP No. 33 to adjudicate conflicts, and the policy designates specific officials (Senior Vice President Frist, University Secretary McCloskey, or President) to receive such reports. Additionally, Plaintiff used imprecise terminology in his initial email. Despite these procedural errors, the substance was clear: a faculty member (Covered Party) with a severe conflict (litigation adversary) was exercising evaluative power over Plaintiff during active federal proceedings.

**13.** On October 22, 2025, at 8:35 AM, Blair replied in writing that she had "consulted Dr. Selcer as instructor" and that "both Dr. Selcer and I strongly concur it is appropriate for you to remain enrolled." Blair directed Plaintiff to return to Selcer's class that same day and warned that "you will not pass should you not resume attendance." This consultation with the conflicted party himself was the opposite of the independent review TAP No. 33 § IV.4 mandates.

**14.** At 9:58 AM that same day, Plaintiff responded by correcting his procedural error: he cited specific TAP No. 33 provisions (Sections IV.3 and IV.4), identified the proper designated reviewers by name and title (Matthew J. Frist, Reverend James P. McCloskey, President Ken Gormley), and copied all designated officials on his response—thereby properly invoking the community reporting mechanism under Section IV.3 and requesting mandatory independent review under Section IV.4.

**15.** Rather than referring the matter to proper reviewers after being explicitly corrected with specific policy citations, Blair doubled down. At 2:20 PM on October 22, she sent a second email—this time copying Matthew Frist (the designated reviewer)—but instead of requesting his independent assessment, Blair announced her final determination to him:

"Please be advised that TAP 33 does not apply to this situation... As such, there is no change to the email that I sent to you this morning."

16. Blair offered two grounds: (1) students are not "Covered Parties" under TAP 33; and (2) the scenario doesn't constitute a conflict of interest. Both grounds directly contradict TAP No. 33's plain language. Section IV.3 explicitly authorizes "any member of the University community" to report conflicts—the policy does not limit reporting to Covered Parties. And a faculty member grading a plaintiff suing him for personal damages seven days after being cross-examined under oath obviously constitutes a conflict under any reasonable interpretation.

17. Blair's correspondence demonstrates that she: consulted directly with the conflicted party about his own conflict; bypassed mandatory independent review procedures; misrepresented policy provisions that explicitly authorized Plaintiff's report (Section IV.3); threatened academic failure to compel compliance; and documented this coordination in writing to both Plaintiff and defendant Selcer during active federal litigation.

18. Dean Blair's written coordination with a named litigation defendant during active federal proceedings exemplifies the institutional confidence produced by Duquesne's retaliation regime. Across both federal frameworks (Title IX and the ADA) as well as internal policy (TAP No. 33) administrators operate under the settled assumption that procedural violations will carry no consequence because prior retaliation has effectively deterred student complaints. Plaintiff's continued assertion of his procedural rights is the rare exception that confirms this pattern: the University's retaliation regime is so effective that few students could endure the material and psychological cost that Plaintiff has borne under the defendants' coordinated retaliation, fraud, and conspiracy.

## PARTIES

**19.** Plaintiff David Michael Mullins is a graduate student at Duquesne University and a resident of Pennsylvania.

**20.** Defendant Duquesne University is a private university in Pittsburgh, Pennsylvania, that receives federal financial assistance and is subject to Title IX and the ADA.

**21.** Defendant Alicia Simpson served as Title IX Coordinator with responsibility for coordinating federal compliance and implementing supportive measures. She is sued individually for fraud and civil conspiracy in fabricating meeting requirements and concealing federal oversight.

**22.** Defendant Adam Wasilko served as Dean with responsibility for graduate student welfare and emergency housing decisions. He is sued individually for fraud and civil conspiracy in systematically obstructing federal compliance and concealing OCR involvement.

**23.** Defendant Anne Mullarkey Sawa served as Student Conduct Administrator and Deputy Title IX Coordinator. She is sued individually for fraud, civil conspiracy, and retaliation in threatening disciplinary charges for protected civil rights activity.

**24.** Defendant Daniel Selcer served as Department Chair with responsibility for graduate student academic access. He is sued individually for fraud and civil conspiracy in falsifying meeting records and concealing his discriminatory motives regarding educational accommodations.

**25.** Defendant Kristine L. Blair served as Dean of the McAnulty College and Graduate School of Liberal Arts with responsibility for graduate student academic standing and program requirements. She is sued individually for fraud and civil conspiracy in consulting directly with defendant Selcer to adjudicate Plaintiff's conflict-of-interest disclosure, misrep-

resenting the applicability of TAP No. 33 conflict procedures, and threatening academic failure to coerce continued contact with a litigation opponent and to keep defendant under Selcer evaluative and professional authority.

## STATEMENT OF FACTS

**26.** Plaintiff is a graduate student at Duquesne University. In early June 2025, Plaintiff moved into an apartment after finding a roommate, Elizabete Mezinska, through a departmental listserv.

### June 2025: Gender-Based Harassment Begins

**27.** Within days of Plaintiff's arrival, Mezinska began making unsolicited intimate disclosures and issuing personal directives—such as instructing Plaintiff on laundry and tornado-shelter protocols—while casting herself in a "caretaker" role.

**28.** Mezinska's systematic gender-based control was contemporaneously documented in Signal messages between Plaintiff and Mezinska from June 23-30, 2025. These messages reveal a pattern of imposed maternal authority over Plaintiff's basic needs and personal activities. On June 23, Mezinska assumed control over Plaintiff's nutrition, messaging: "your gatorade powder just got here; i put it on top of fridge by your soylent. also labeled mine (in cabinet) so they don't get mixed up." On June 24, she interrogated Plaintiff about personal activities, demanding: "hey sup did you fill the tub? are you doing smth with it rn?" This pattern demonstrated stereotypical assumptions about her role as feminine caretaker and his need for her guidance.

**29.** Simultaneously, Mezinska engaged in deliberate environmental manipulation regarding shared living conditions. Despite knowing the air conditioning was capable of cooling the apartment adequately, she provided false "technical reasons why the A/C supposedly couldn't be used" while Plaintiff suffered through extreme heat, experiencing "rough days because of the heat wave." On June 25, she lowered the temperature for her own comfort, exposing the systematic deception designed to maintain her control over his basic comfort

needs.

**30.** On June 26, 2025, Plaintiff contemporaneously recognized and confronted this systematic pattern, messaging Mezinska in Signal: "what happened around the A/C wasn't just frustrating—it crossed a red line. The way I was misled, made to suffer, and subtly manipulated was, in my view, borderline sociopathic... If I see any trace of this again—deception, power games, or disregard for my well-being—things will change between us instantly and irreversibly." This contemporaneous description demonstrates Plaintiff's real-time recognition of gender-based manipulation and control tactics that he characterized as "power games."

**31.** Plaintiff repeatedly described this behavior to friends and faculty at the time using terms such as "stalking," "controlling," and "sexual bullying," and reported that it was impeding his ability to complete academic work. Plaintiff contemporaneously reported to Dr. Lanei Rodemeyer on June 27, 2025, that "the situation is now interfering not only with my ability to focus and complete outstanding work (two incompletes from last semester) but also with the spirit of mutual respect and collegiality essential to our graduate community."

**32.** After the A/C conflict, Plaintiff ceased social pleasantries and did not acknowledge enthusiastic and cheery overtures from Mezinska ("Wow, you ordered takeout, let me get it for you,"). Mezinska's immediate retaliation for Plaintiff's rejection of her imposed gender roles included locking him out of the apartment on June 28, 2025, violating his lease rights. On June 29, she attempted to reassert financial and environmental control by demanding Plaintiff pay rent for the next month immediately, to which Plaintiff replied he had several days left according to the lease. This escalation demonstrated punishment for rejecting stereotypical subordinate, dependent roles she had attempted to impose.

**33.** Shortly thereafter, Mezinska escalated by locking Plaintiff out of the apartment. When Plaintiff returned and knocked, she opened the door, but as he proceeded upstairs, she followed him while repeatedly demanding to know why he had forgotten his key.

**34.** On June 30, 2025, after Plaintiff reported the lockout to the landlord, who issued a formal warning to Mezinska, Mezinska confronted him late at night in the kitchen and demanded an explanation for David's decision to speak with the landlord. Plaintiff stated that he did not feel safe and did not want to talk, yet Mezinska followed him upstairs to his bedroom door, persisted in confronting him, and ceased only when Plaintiff indicated he was filming and locked his door.

**35.** In early July, pursuant to a directive from the Department Chair, Plaintiff vacated the apartment. During the move, Mezinska again followed him up and down the stairs, demanding to know where he was going and whom he was speaking with, including interrogating the individual assisting him. The assisting departmental colleague observed the conduct and later provided a sworn written statement.

### June 30 - July 24: Institutional Failures and Plaintiff's Ignorance of Rights

**36.** By late June and continuing through July, Plaintiff notified multiple University officials—including his Director of Graduate Studies, the Department Chair, Dean Wasilko, and Deputy Title IX Coordinator Sawa—about the air conditioning deception, the lockout, the June 30 confrontation, and related control behaviors. Despite these reports, no referral to the Title IX Coordinator was made, and the Title IX office itself made no contact with Plaintiff. No protective housing or other supportive measures were offered.

**37.** On July 20, 2025, Plaintiff informed Dr. Selcer and Dr. Rodemeyer that he had "maybe six conversations with her in total" and that "Elizabete expressed strong enthusiasm for the idea that, in her view, the Second Amendment should mean firearm regulations should be less of a hassle than they are."

**38.** On July 23, 2025, Plaintiff provided university officials, including Dr. Lanei Rodemeyer (Director of Graduate Studies) and Dr. Daniel Selcer, with detailed documentation including

"a brief timeline of events" and "full Signal chat transcript between myself and Elizabete from June 23-30," which Plaintiff described as "the primary record for everything that happened during the most critical week." Dr. Rodemeyer confirmed receipt and review, stating: "I received and read through the timeline and the addendum with your text exchange." This provided the University with direct, actual knowledge of the systematic gender-based harassment pattern, including Plaintiff's contemporaneous recognition of Mezinska's "power games" and "manipulation."

**39.** Still, no referral was made to the Title IX office at that time, and Plaintiff was not connected to the Title IX Coordinator until weeks later, and only after he had already been denied emergency housing assistance and had escalated his request for help to higher administrators.

**40.** Despite Dr. Rodemeyer's explicit acknowledgment that she had received and read the complete documentation of systematic harassment, including Plaintiff's contemporaneous descriptions of "power games," "borderline sociopathic" manipulation, and escalating physical intimidation, university officials failed to implement any protective measures and instead responded that they "will also need to see what happens with Student Conduct and the police department. We don't want to make conflicting decisions." This response prioritized bureaucratic coordination over Title IX obligations, effectively allowing the hostile environment to continue.

**41.** Plaintiff immediately reported the June 30 incident to the University and requested emergency housing. Dean Wasilko responded by asking if Plaintiff had considered "transitional housing." This was not an offer of housing but a deflection that delayed any protective action despite the urgency of Plaintiff's request.

**42.** On or about July 20-21, Plaintiff was informed that key administrators were unavailable. Dean Wasilko was out of office that week, and Deputy Title IX Coordinator Anne Mullarkey

Sawa—who later threatened Plaintiff with discipline—was out until July 25. During this period, no administrator provided protective housing or other measures, even though Plaintiff had first requested emergency housing on June 30.

**43.** On July 23, Plaintiff explicitly raised sex discrimination, writing: "I can't help but wonder whether your response would have been the same had the genders in this situation been reversed."

**44.** The following day, after nearly a month of emergency housing requests, Plaintiff was told no rooms were available. In response, Plaintiff escalated on July 24 by formally invoking Title IX and demanding immediate housing and safety measures.

## July 24 - Present: Escalation, Retaliation, and Continued Denial

**45.** Only after this escalation did the Title IX office contact Plaintiff for the first time, sending a generic form letter that contained a single line about scheduling a meeting. Plaintiff immediately replied, welcoming the contact and proposing a same-day Zoom meeting to prevent further delay. The Title IX Coordinator refused, offering only later dates, notwithstanding weeks of escalating reports and her prior inclusion on escalation emails. Plaintiff reiterated that he could not wait and gave the University 48 hours to act. No meeting occurred and no protective measures were implemented.

**46.** On July 25, after Plaintiff's second 48-hour demand for housing, Title IX investigation, and supportive measures, Dean Wasilko removed senior leadership from the email chain and wrote: "We cannot assist unless you engage," conditioning any support on additional meetings. Plaintiff reasonably interpreted this as retaliatory and escalated to OCR the next day (July 26).

**47.** On July 28, Wasilko reiterated that Duquesne would not provide housing or assistance

absent further "engagement," despite OCR's involvement and Plaintiff's extensive documentation.

**48.** By mid-August, Plaintiff's circumstances had deteriorated sharply. On August 12, he documented that his temporary Airbnb housing was ending, his bank balance was negative, and McGinley Hall had available space. Still, no housing or financial support was provided.

**49.** On August 13, Plaintiff submitted a formal emergency removal request and again demanded the full package of Title IX supportive measures, including housing, registrar separation, a no-contact order, Public Safety notice, and space reassignment. Administrators proposed a fact-finding meeting, which Plaintiff declined. The Title IX Office then responded that without a meeting, no investigation, supportive measures, or Title IX jurisdiction could be considered. The office went further, stating that even if every claim Plaintiff had raised over the prior months were true, the matter was "outside Title IX jurisdiction" and would instead be referred to Student Conduct.

**50.** Between August 13 and 18, Student Conduct Head and Deputy Title IX Coordinator Sawa threatened Plaintiff with disciplinary charges if he continued emailing administrators about his safety. With Title IX having disclaimed jurisdiction and Student Conduct threatening disciplinary action, Plaintiff attempted to seek protection through the ADA to ensure continued educational access for the coming semester.

**51.** On August 21, Plaintiff submitted a physician's letter documenting that proximity to Mezinska would significantly worsen his medical condition and impair his academic functioning. That same day, he described the abuse as "sexual bullying" during a departmental meeting.

**52.** On August 25, the Department Chair announced that Plaintiff would be permitted to attend classes remotely for three weeks only if he "fully engaged" with Title IX, Student Conduct, and Public Safety. He further mischaracterized Plaintiff as unwilling to attend in

person, despite Plaintiff's repeated statements that he would do so if minimal safety measures were implemented.

**53.** On September 3, the Department Chair issued a "final directive": Plaintiff would be allowed Zoom access until September 12 and required to attend in person beginning September 15.

**54.** On September 17, 2025—the second day of Plaintiff's required in-person return—Mezinska appeared uninvited outside Plaintiff's seminar room. She was not enrolled in the course and had no academic reason to be present. A fellow student independently confirmed the encounter in writing. Plaintiff fled in a panic, underscoring both the reasonableness of his fear and the University's failure to implement even minimal protective measures.

**55.** At no point did Mezinska file reciprocal complaints. All contemporaneous reports of harm originated with Plaintiff. Despite months of escalating reports, documented threats, medical corroboration, and explicit requests, and in full knowledge of the systematic gender-based harassment documented in the Signal transcript, Duquesne and the individually-named Defendants failed to provide the emergency housing, safety protections, or accommodations required by Title IX and the ADA. As a direct result of the University's and individual Defendants' inaction and fraudulent conduct, Plaintiff was left homeless, financially destitute, and deprived of equal access to his education.

**56.** On October 15, 2025, Plaintiff cross-examined Defendant Selcer under oath during a TRO hearing in this federal case.

**57.** On October 20, 2025, Plaintiff submitted a formal conflict-of-interest report to Dean Kristine Blair regarding Professor Daniel Selcer. Plaintiff reported that Selcer—who teaches Plaintiff's required PhD teaching seminar—is a named defendant in Plaintiff's active federal civil case and that Plaintiff had cross-examined him under oath five days earlier. Plaintiff requested guidance through University conflict procedures or an alternative arrangement to

14

fulfill the PhD requirement.

**58.** Plaintiff's October 20 email to Blair was procedurally incorrect. Blair, as Dean, had no authority under TAP No. 33 to receive or adjudicate conflict reports. Additionally, Plaintiff used imprecise terminology, referring to his own status as a "Covered Party" and using language suggesting he was "disclosing" a conflict. Under TAP No. 33's structure, only a Covered Party can "disclose" their own conflict of interest (Sections IV.1-2 govern self-disclosure by Covered Parties). Any university community member, however, may "report" another person's conflict under Section IV.3. Plaintiff, whether as student or as employee, was reporting Selcer's conflict, not disclosing his own.

**59.** Despite these initial procedural and terminological errors, the substance of Plaintiff's October 20 report was clear: a faculty member (Covered Party) with a severe conflict of interest (litigation adversary whom Plaintiff was suing and had cross-examined under oath five days earlier) was exercising evaluative power over Plaintiff during active federal proceedings. This situation obviously required independent conflict review.

**60.** TAP No. 33 § IV.3 explicitly authorizes such reports: "Any member of the University community who discovers events or circumstances that appear to be in violation of this policy should promptly report their discovery to the appropriate Vice President, Secretary of the University, or President." Plaintiff is a member of the University community (both as student and as employee in a teaching position). The policy's community reporting mechanism exists precisely because conflicts of interest by faculty and administrators harm the entire university community, not just other Covered Parties.

**61.** Once a conflict is reported—whether by a Covered Party disclosing their own conflict (Sections IV.1-2) or by a university community member reporting another's conflict (Section IV.3)—TAP No. 33 § IV.4 mandates specific review procedures: "Potential conflicts of interest that are disclosed, whether annually or as they arise, will be reviewed by the Senior

Vice President for Finance and Business or their designee and/or external investigators to determine the appropriate, situation-specific plan designed to manage, reduce, or eliminate the conflict." Section IV.4 uses "disclosed" broadly to encompass both self-disclosures and community reports. This language is mandatory. The review must be conducted by the Senior Vice President (Matthew Frist) or his designee or external investigators—not by any Dean, and certainly not by consulting with the person whose conflict was reported.

**62.** Blair's Proper Response Should Have Been: Upon receiving Plaintiff's October 20 report—even though improperly directed to her—Blair's duty was to: acknowledge receipt; inform Plaintiff of the proper TAP No. 33 designated reviewers; immediately refer the matter to Frist or other designated officials for mandatory independent review; and implement interim protective measures (alternative arrangements, temporary reassignment) pending independent review, given the extraordinary circumstances of a faculty member grading a plaintiff suing him during active litigation.

**63.** Instead of referring the matter to the designated reviewers, Dean Blair consulted directly with Professor Selcer—the conflicted party whose conflict Plaintiff had reported—about whether Selcer had a conflict of interest.

**64.** On October 22, 2025, at 8:35 AM—seven days after Plaintiff cross-examined Selcer under oath—Dean Blair sent Plaintiff an email documenting this improper coordination: "In preparing my response to your query, I did need to consult Dr. Selcer as instructor to secure some additional details. Both Dr. Selcer and I strongly concur that it is appropriate for you to remain enrolled in your required teaching seminar."

**65.** This email documents direct coordination between two defendants during active federal litigation. Blair consulted with the person whose conflict had been reported—the opposite of the independent review TAP No. 33 mandates—and announced their joint decision ("Both Dr. Selcer and I strongly concur").

66. Blair's directive required Plaintiff to return to Selcer's class immediately (that same day), meet privately with Selcer (with optional third-party attendance "to the extent her schedule permits"), submit to Selcer's grading authority, and complete all assignments under Selcer's evaluation. Blair threatened that failure to comply would result in a failing grade and inability to teach in Fall 2026, conditioning Plaintiff's degree progress and teaching eligibility on subordination to a litigation adversary.

67. Plaintiff responded on October 22, 2025, at 9:58 AM, correcting his initial procedural error by: identifying the proper designated reviewers by name and title (Matthew J. Frist, Senior Vice President for Finance and Business; Reverend James P. McCloskey, University Secretary; President Ken Gormley); citing specific TAP No. 33 policy provisions (Sections IV.3 and IV.4); explicitly objecting to Blair's procedural violations; copying all designated officials on this response, thereby properly invoking the community reporting mechanism under Section IV.3 and requesting the mandatory independent review under Section IV.4; and explicitly declining private meetings with Selcer due to ongoing litigation.

68. Plaintiff's October 22, 9:58 AM response corrected any ambiguity from his initial October 20 email and made clear: TAP No. 33 § IV.3 authorizes "any member of the University community" to report conflicts; Plaintiff was reporting Selcer's conflict (not disclosing his own); the proper reviewers are Frist, McCloskey, and President (not Blair); and Blair's consultation with Selcer violated the mandatory independent review requirement.

69. Later that same day (October 22, 2025, at 2:20 PM), after receiving Plaintiff's detailed objection citing specific TAP 33 provisions and identifying the proper designated reviewers by name, Dean Blair sent a second email copying Matthew Frist, Senior Vice President for Finance and Business—the very official TAP No. 33 designates to conduct independent conflict reviews.

70. Rather than referring the matter to Frist for the required independent review, Blair's

email informed Frist of her unilateral determination: "Please be advised that TAP 33 does not apply to this situation... As such, there is no change to the email that I sent to you this morning at 8:35 a.m."

**71.** Blair offered two grounds for her determination: (1) "As a student, you are not a 'Covered Party' as defined by TAP 33"; and (2) "The scenario... does not fall within the limited definition of a 'Conflict of Interest' in TAP 33."

**72.** Both grounds directly contradict TAP No. 33's plain language. Blair's argument that students cannot invoke TAP 33 fundamentally misunderstands (or deliberately misrepresents) the policy's structure. Section IV.3 explicitly authorizes "any member of the University community" to report conflicts. The policy does not limit reporting to Covered Parties—it explicitly widens the reporting mechanism to include anyone in the university community. Whether Plaintiff is a "Covered Party" is irrelevant to his right to report under Section IV.3. Moreover, the critical issue is not Plaintiff's status but Defendant Selcer's status. Selcer is indisputably a Covered Party (faculty member). When a Covered Party has a conflict of interest, TAP 33 applies.

**73.** Blair's second ground—that a faculty member grading a plaintiff who is suing him for fraud and conspiracy in federal court seven days after being cross-examined under oath does not constitute a conflict of interest—is facially absurd. TAP No. 33 § I prohibits Covered Parties from permitting their interests to "conflict, or appear to conflict" with the University's interests. This scenario constitutes both an actual conflict and an unmistakable appearance of conflict under any reasonable interpretation.

**74.** The fact that Blair copied Frist on her October 22, 2:20 PM email but did not request his independent review demonstrates the coordinated strategy: she provided the form of transparency (copying the oversight official) while maintaining the substance of coordinated control (unilateral determination made with Selcer, announced as final to Frist rather than

requesting his independent assessment). If Blair genuinely believed TAP 33 didn't apply, there would be no reason to copy Frist. Copying him while announcing "no change" shows Blair was performing compliance theater—making it appear proper procedures were followed while actually defying them.

**75.** This coordination occurred while Plaintiff's federal complaint—alleging conspiracy by Duquesne administrators to bypass procedures and deny federal rights—was pending, demonstrating that the conspiratorial conduct continues unabated even under federal judicial scrutiny.

**76.** On October 23, 2025, one day after Plaintiff objected to the Blair-Selcer directive with specific policy citations, Plaintiff was forced to attend Defendant Selcer's class under threat of failing grade and loss of teaching eligibility. Although Plaintiff had immediately recognized that Blair's interpretation violated TAP No. 33's plain language, Plaintiff was forced to rely on Blair's positional authority as Dean when she issued a directive threatening academic failure. Being forced to return to campus and sit in a classroom with a defendant Plaintiff is actively suing in federal court—whom Plaintiff had cross-examined under oath eight days earlier—caused severe psychological distress.

**77.** After class ended (approximately 5:45 PM), Plaintiff experienced what he described as an "anxiety freefall." For approximately fifteen minutes, Plaintiff paced aimlessly around and through the Duquesne Union Building, unable to settle, unable to process the psychological toll of being coerced into proximity with a litigation adversary. Plaintiff was not walking to a destination—he was pacing in circles, trying to manage severe anxiety in the only way his body would allow.

**78.** While in this vulnerable psychological state, at approximately 6:00 PM in the Union Building lobby near the front doors, Defendant Daniel Selcer approached Plaintiff and initiated conversation: "Oh, hey, David" (or words to that effect). Plaintiff immediately

responded: "I don't want to talk, thank you" and began walking away. As Plaintiff walked away, Defendant Selcer called after him: "We need to set something up..."—a clear reference to the private meetings Dean Blair had ordered Plaintiff to attend in her October 22 directive, the same meetings Plaintiff had explicitly declined citing improper contact during litigation.

79. This approach demonstrates the enforcement mechanism of the Blair-Selcer conspiracy: when written directives and threats fail to secure compliance, defendants apply direct personal pressure. Plaintiff was forced to campus under threat, experienced severe anxiety from the coerced attendance, and while in that vulnerable state was approached by the defendant to pressure the compliance Plaintiff had refused. This exploitation of manufactured vulnerability demonstrates consciousness of wrongdoing and willful infliction of psychological harm.

## COUNT I — TITLE IX: SEX DISCRIMINATION
## (DELIBERATE INDIFFERENCE)
### (Against Duquesne University Only)

**80.** Plaintiff repeats and incorporates the allegations in Paragraphs 1-79 of the Complaint as though fully set forth herein.

### A. Legal Standard: Deliberate Indifference

**81.** Under Title IX, a school violates the statute when it has actual knowledge of sexual harassment in its programs and responds with deliberate indifference. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 633, 644-45 (1999). Deliberate indifference means a response that is "clearly unreasonable in light of the known circumstances." *Id.* at 648-49. The institution need not remedy the harassment completely, but its response must not be "clearly unreasonable." *Id.*

**82.** The Third Circuit applies this standard by examining: (1) whether the institution had actual knowledge of sexual harassment; (2) whether the institution's response was clearly unreasonable; and (3) whether the harassment was so severe, pervasive, and objectively offensive that it denied equal access to educational opportunities. *Doe v. Univ. of the Sciences*, 961 F.3d 203, 209-10 (3d Cir. 2020).

**83.** Actual knowledge exists when "an official of the recipient who has authority to institute corrective measures" has notice of the harassment. 34 C.F.R. § 106.30(a) (2020). Title IX Coordinators, by definition, possess such authority. Moreover, actual knowledge is established when the coordinator explicitly acknowledges that a matter warrants Title IX response and supportive measures.

## B. Harassment Was Sex-Based Under Title IX

**84.** The harassment Plaintiff experienced constituted sex-based harassment under 34 C.F.R. § 106.30(a) (2020) and Third Circuit precedent applying *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), sex-stereotyping theory to Title IX.

**85.** Mezinska's harassment was explicitly gender-based, involving systematic imposition of stereotypical feminine caretaking roles and maternal authority over Plaintiff's basic autonomy. The contemporaneous Signal messages demonstrate this pattern, including her assumption of control over his nutrition ("your gatorade powder just got here; i put it on top of fridge by your soylent. also labeled mine (in cabinet) so they don't get mixed up") and monitoring of personal activities ("hey sup did you fill the tub? are you doing smth with it rn?").

**86.** Under *Price Waterhouse* sex-stereotyping theory as applied in Title IX cases, Mezinska's conduct constituted punishment for Plaintiff's rejection of stereotypical gender roles. Her systematic "power games" and "subtle manipulation" (as contemporaneously described by Plaintiff on June 26, 2025) were designed to impose a dependent, subordinate role wherein she assumed maternal authority over his basic needs, comfort, and household decisions. When Plaintiff asserted independence and called out this manipulation, Mezinska escalated through lockouts, financial coercion, and ultimately physical intimidation. See *Doe v. Univ. of the Sciences*, 961 F.3d at 209-10 (recognizing sex-stereotyping claims under Title IX).

**87.** The gender-based nature of this harassment is further evidenced by Mezinska's assumption that Plaintiff required her feminine guidance for elementary tasks (nutrition management, personal activity oversight, environmental comfort decisions) combined with her immediate retaliation when he rejected these imposed caretaking roles. This systematic pattern of control, manipulation, and punishment for rejecting gender stereotypes constitutes sex-based harassment under Title IX.

**88.** Plaintiff explicitly invoked Title IX on July 23-24, 2025, described the conduct as "sexual bullying" during an August 21 department meeting, and contemporaneous communications confirm that Plaintiff understood and reported the conduct as sex-based. On July 23, Plaintiff wrote: "I can't help but wonder whether your response would have been the same had the genders in this situation been reversed."

### C. Actual Knowledge: The Coordinator's Explicit Acknowledgment

**89.** Duquesne University possessed actual knowledge through Title IX Coordinator Alicia Simpson's explicit acknowledgment that Plaintiff's case warranted Title IX response and supportive measures including emergency housing.

**90. Timeline of Actual Knowledge:**

**91.** *June 30 - July 24, 2025: Multiple Mandatory Reporter Notices:* By July 23, 2025, University officials including Department Chair Selcer, Director of Graduate Studies Rodemeyer, Dean Wasilko, and Deputy Title IX Coordinator Sawa had received: detailed written account of June 30 incident; complete Signal transcript documenting systematic gender-based harassment; explicit statements of ongoing fear for safety; explicit invocation of Title IX and sex-based discrimination; and formal demands for emergency housing and supportive measures.

**92.** Each of these officials constituted a mandatory reporter with "authority to institute corrective measures" under 34 C.F.R. § 106.30(a) (2020). Their notice independently triggered the University's Title IX obligations.

**93.** *July 24, 2025: Direct Notice to Title IX Coordinator:* On July 24, 2025, at 10:55 AM, Plaintiff directly escalated to Title IX Coordinator Simpson, explicitly invoking Title IX and demanding immediate supportive measures including emergency housing. Plaintiff copied

President, Provost, and Legal Affairs.

**94.** *Simpson's Initial Response Establishing Actual Knowledge:* On July 24, 2025, at 12:57 PM—within 2 hours of Plaintiff's escalation—Simpson responded, acknowledging receipt and proposing to meet to "discuss the report, gather additional information, go over your options under our policies, and discuss any supports or resources you may need."

**95.** This response, while conditioning further action on a meeting, explicitly acknowledged: (1) Plaintiff had made a "report" within Simpson's Title IX purview; (2) Plaintiff had "options under our policies"; (3) "supports or resources" were potentially available; and (4) Simpson's office had jurisdiction to address the matter.

**96.** Simpson's acknowledgment of jurisdiction and potential supportive measures constituted actual knowledge as a matter of law. The Title IX Coordinator—the official specifically designated with authority to coordinate Title IX compliance—explicitly recognized that Plaintiff's report fell within Title IX's scope and warranted institutional response.

**97.** *July 24 - August 13: Continued Institutional Knowledge:* Between July 24 and August 13, Plaintiff provided additional documentation, explicitly cited Title IX regulations, reported ongoing homelessness, and submitted a formal emergency removal request. All correspondence continued to copy senior officials and OCR. The institution's actual knowledge was continuous and repeatedly reinforced.

## D. Deliberate Indifference: The Jurisdictional Reversal

**98.** Despite possessing actual knowledge through the Coordinator's explicit acknowledgment, Duquesne University responded with deliberate indifference—a response so clearly unreasonable that it amounted to no response at all.

**99. The August 13-14 Jurisdictional Reversal:**

**100.** On August 13, 2025, Plaintiff submitted a comprehensive emergency removal request explicitly invoking Title IX, providing detailed documentation, and declining to attend additional meetings. Plaintiff had already provided: months of escalating reports; extensive written documentation; explicit Title IX invocations with regulatory citations; medical documentation; and formal demands for supportive measures.

**101.** On August 13-14, 2025, Title IX Coordinator Simpson and Deputy Title IX Coordinator Sawa issued a joint response that executed a complete jurisdictional reversal. The response stated:

> "Therefore, based on information provided by you at this time, the Title IX Office does not have jurisdiction over your report and cannot take action or provide assistance as requested. Instead, I strongly encourage you to meet with Public Safety and Dr. Sawa in Student Conduct."

**102.** This jurisdictional disclaimer represented a 180-degree reversal from Simpson's July 24 acknowledgment that the matter warranted Title IX response. Between July 24 and August 13:

- **No new facts emerged.** Plaintiff's allegations remained consistent: sex-based harassment, explicit Title IX invocations, requests for supportive measures and emergency housing.

- **No legal basis existed.** Title IX jurisdiction is determined by the nature of the alleged conduct (sex-based harassment affecting educational access), not by complainant participation in discretionary meetings.

- **No explanation was provided.** Simpson did not identify what changed between her July acknowledgment and her August disclaimer.

**103.** The only intervening event was Plaintiff's explicit refusal to attend further meetings and his escalation to OCR. The clear implication: decline our meetings, lose your Title IX rights.

**104. Why This Constitutes Deliberate Indifference:**

**105.** Simpson's jurisdictional reversal was "clearly unreasonable in light of the known circumstances" for multiple independent reasons:

**106.** *1. Contradicted Prior Institutional Assessment:* The Coordinator's own prior acknowledgment established that the matter warranted Title IX response. Reversing this assessment without new facts or legal justification is per se unreasonable.

**107.** *2. No Legitimate Basis for Jurisdictional Change:* Title IX jurisdiction depends on whether alleged conduct could constitute sex discrimination affecting educational access. 34 C.F.R. § 106.30(a) (2020). Plaintiff's allegations—sex-based harassment, explicit Title IX invocations, documented hostile environment—clearly met this threshold on July 24. They still met it on August 13. Complainant participation in meetings cannot change the jurisdictional analysis.

**108.** *3. Impermissible Conditioning of Rights:* By withdrawing jurisdiction after Plaintiff declined meetings, Simpson conditioned Title IX protections on complainant participation in discretionary institutional processes. This converts mandatory federal protections into discretionary institutional favors—a transformation Title IX does not permit.

**109.** *4. Abdication of Mandatory Duty:* Under 34 C.F.R. § 106.30(a) (2020), once a Title IX Coordinator has actual knowledge of potential sexual harassment, the institution must respond. The response need not satisfy the complainant or remedy all harassment, but it cannot be a complete abdication of responsibility. Simpson's jurisdictional disclaimer was precisely such an abdication.

110. *5. Foreseeably Harmful:* By disclaiming jurisdiction and referring Plaintiff to Student Conduct—whose Deputy Coordinator (Sawa) had already threatened Plaintiff with disciplinary charges—Simpson created a foreseeably harmful situation. The jurisdictional reversal left Plaintiff without any institutional recourse for Title IX protections while simultaneously exposing him to retaliation from the office to which he was referred.

111. *6. Contrary to Institutional Representations:* Simpson's August disclaimer directly contradicted her office's representations to Plaintiff and OCR. As late as July 24, Simpson acknowledged Title IX applicability. The reversal without explanation demonstrates institutional bad faith.

112. **The Chilling Effect:** Simpson's jurisdictional reversal created a profound chilling effect on Plaintiff's ability to seek institutional remedies. After the Title IX Coordinator explicitly disclaimed jurisdiction, Plaintiff reasonably concluded that:

- Further Title IX requests would be futile (the Coordinator had already abdicated);

- Continued contact with administrators would trigger the disciplinary threats Sawa had made;

- The institution had determined he was not entitled to Title IX protections;

- OCR intervention was his only remaining recourse.

113. This chilling effect is itself evidence of deliberate indifference. A reasonable institutional response would reassure complainants of their rights and available protections. Simpson's response did the opposite—it explicitly withdrew institutional protection and threatened retaliation for continued advocacy.

**E. Severe, Pervasive, and Objectively Offensive Harassment Denying Equal Access**

**114.** The harassment Plaintiff experienced was sufficiently severe, pervasive, and objectively offensive to deny him equal access to educational opportunities.

**115. Severity and Pervasiveness:** The harassment included: systematic gender-based control over basic needs and activities (documented in Signal messages June 23-30); deliberate environmental manipulation (air conditioning deception); physical intimidation and lockouts (June 28); pursuit and confrontation in living space (June 30); appearance outside seminar room on campus (September 17); and months of continuing hostile environment without protective measures.

**116. Objective Offensiveness:** A reasonable person in Plaintiff's circumstances would find this conduct offensive. Multiple witnesses corroborated Plaintiff's accounts. Dr. Rodemeyer acknowledged reviewing the Signal transcript and timeline. The conduct was sufficiently concerning that Plaintiff's landlord issued a formal warning to Mezinska after the June 28 lockout.

**117. Denial of Equal Access:** The harassment directly and foreseeably denied Plaintiff equal access to education:

- **Housing Crisis:** The June 30 confrontation forced Plaintiff to vacate his housing. From June 30 through present, Plaintiff has been homeless—moving between temporary accommodations, unable to secure stable housing, financially devastated.

- **Educational Exclusion:** Without stable housing or protective measures, Plaintiff cannot safely access campus. On September 17, 2025—the second day of forced in-person return after temporary Zoom access was terminated—Mezinska appeared out-

side Plaintiff's seminar room. Plaintiff fled in a dissociative panic, unable to complete the seminar. Since then, Plaintiff has been unable to attend seminars safely.

- **Loss of Critical Educational Opportunities:** Due to Department Chair Selcer's restrictions on Zoom access, Plaintiff lost access to critical seminars including the Kant seminar with his advisor and the Hegel seminar on logic. These educational opportunities cannot be recovered.

- **Isolation from Graduate Community:** Six graduate student declarations confirm Plaintiff's complete absence from Philosophy Graduate Lounge, departmental events, and informal academic spaces essential to PhD education. This isolation directly results from lack of protective measures making campus unsafe.

- **Medical Harm:** Dr. Jacob McBride's October 1, 2025 letter documents that forced proximity to Mezinska caused Plaintiff to deplete his prescribed Lexapro medication early in September, that ongoing homelessness has been "very stressful and likely worsens his mental health conditions," and that this worsening "is expected to negatively impact his graduate education."

**118.** The causal chain is direct and documented: harassment → no protective measures → housing crisis → inability to access campus safely → educational exclusion and medical harm.

## F. Conclusion

**119.** Plaintiff has plausibly alleged all elements of a Title IX deliberate indifference claim:

1. **Actual Knowledge:** Title IX Coordinator Simpson explicitly acknowledged the matter warranted Title IX response and supportive measures.

2. **Deliberate Indifference:** Simpson's subsequent jurisdictional reversal without new facts or legal justification was clearly unreasonable—indeed, facially arbitrary and in bad faith.

3. **Severe, Pervasive, Objectively Offensive Harassment:** The documented gender-based harassment was sufficiently serious to constitute a hostile environment.

4. **Denial of Equal Access:** The harassment, combined with institutional deliberate indifference, directly caused Plaintiff's homelessness, educational exclusion, and documented medical harm.

**120.** Plaintiff states a claim for relief under Title IX against Duquesne University.

## COUNT II — TITLE IX: RETALIATION

## (Against Duquesne University Only)

**121.**  Plaintiff repeats and incorporates the allegations in Paragraphs 1-120 of the Complaint as though fully set forth herein.

### A. Legal Standard

**122.**  Title IX prohibits retaliation against any person for opposing practices made unlawful by Title IX or for participating in Title IX proceedings. 34 C.F.R. § 106.71 (2020); 20 U.S.C. § 1681(a).  The Third Circuit applies a three-part test: (1) protected activity; (2) adverse action; and (3) causal connection between the protected activity and adverse action. *Doe v. Univ. of the Sciences*, 961 F.3d at 214.

**123.**  Protected activity includes "oppos[ing] any act or practice made unlawful by" Title IX. 34 C.F.R. § 106.71 (2020).  This protection extends to informal complaints, reports to administrators, and advocacy for Title IX rights.  Adverse action includes any action that would deter a reasonable person from engaging in protected activity.  Causation may be established through temporal proximity, evidence of discriminatory animus, or deviation from normal procedures.

### B. Protected Activity

**124.**  Plaintiff engaged in extensive Title IX-protected activity between June 30 and August 2025:

**125. June 30 - July 23:** Reported harassment to multiple university officials; explicitly invoked Title IX and sex-based discrimination ("I can't help but wonder whether your re-

31

sponse would have been the same had the genders in this situation been reversed"); requested protective measures including emergency housing; and provided detailed documentation including Signal transcripts.

**126. July 24:** Formal escalation directly to Title IX Coordinator Simpson, copying President, Provost, Legal Affairs; explicit Title IX invocation with regulatory citations; formal demand for supportive measures with 48-hour deadline; and explicit warning of OCR escalation if demands not met.

**127. July 26:** Filed formal complaint with U.S. Department of Education Office for Civil Rights (OCR); copied OCR on all subsequent correspondence with university; and continued advocating for Title IX rights despite institutional resistance.

**128. August 13:** Submitted comprehensive emergency removal request; explicitly invoked Title IX with regulatory citations; declined to attend further meetings, citing futility and retaliation concerns; and continued demanding federally mandated supportive measures.

**129. August 21:** During departmental meeting, described case as "platonic ideal of Title IX"; used explicit terminology "sexual bullying"; reported Deputy Title IX Coordinator Sawa's retaliation threat; and explained Title IX supportive measures framework to mandatory reporters.

**130.** All of this constitutes protected activity. Plaintiff opposed sex discrimination, invoked Title IX rights, reported harassment, requested supportive measures, escalated to federal enforcement authority, and continued advocating despite institutional resistance.

## C. Adverse Actions

**131.** The University took multiple adverse actions that would deter a reasonable person from engaging in Title IX activity:

### 1. Simpson's Jurisdictional Reversal (August 13-14)

**132.** The most severe adverse action was Title IX Coordinator Simpson's explicit withdrawal of Title IX jurisdiction after Plaintiff declined meetings and escalated to OCR. This action:

- Occurred immediately after Plaintiff's refusal to attend meetings and his escalation to OCR (temporal proximity establishing causation);

- Represented complete reversal from Simpson's July 24 acknowledgment of Title IX applicability;

- Occurred without any change in underlying facts or legal justification;

- Explicitly conditioned Title IX protections on complainant participation in discretionary meetings;

- Left Plaintiff without any institutional recourse for Title IX protections;

- Communicated that declining institutional processes results in loss of federal rights.

**133.** A reasonable person in Plaintiff's position would understand this message: "Participate in our meetings or lose your Title IX protections." This is quintessential retaliation—punishing protected refusal to participate by withdrawing federal protections.

### 2. Sawa's Explicit Disciplinary Threat (August 15)

**134.** Two days after Simpson's jurisdictional reversal, Deputy Title IX Coordinator and Student Conduct Head Anne Mullarkey Sawa threatened Plaintiff with disciplinary charges if he continued contacting university officials about his safety:

"I am providing you with notice that you must stop sending mass emails to University officials and offices about your concerns... To be clear, if you want assistance from the University, you are expected to communicate directly with the resources offered to you and to do so in a respectful and civil manner. Failure to do so may result in charges against you for violating the Student Code of Conduct."

**135.** This threat occurred:

- Immediately after Plaintiff's protected escalations to senior officials and OCR;

- From an official with authority to file conduct charges;

- With explicit conditioning: cease protected advocacy or face discipline;

- After Simpson had already withdrawn Title IX jurisdiction, leaving Plaintiff with no alternative recourse.

**136.** This explicit threat to punish continued advocacy is per se retaliatory. 34 C.F.R. § 106.71 (2020) prohibits "intimidat[ing], threaten[ing], coerc[ing], or discriminat[ing] against any individual for the purpose of interfering with any right or privilege secured by" Title IX. Sawa's threat falls squarely within this prohibition.

### 3. Selcer's Conditional Educational Access (August 25 - September 3)

**137.** After Simpson withdrew jurisdiction and Sawa threatened discipline, Department Chair Daniel Selcer imposed conditions on Plaintiff's educational access:

**138. August 25:** Selcer "authorized" Plaintiff to attend seminars remotely for three weeks only, explicitly conditioned on Plaintiff "fully engaging" with Title IX, Student Conduct, and

Public Safety—the very offices that had disclaimed jurisdiction and threatened him. This "authorization" was:

- Temporally limited (three weeks, creating artificial crisis point);

- Explicitly conditioned on "engagement" with offices that had retaliated;

- Characterized as discretionary "authorization" rather than accommodation;

- Used to restrict Plaintiff's ability to switch seminars or audit additional courses.

**139. September 3:** After Plaintiff issued detailed corrections documenting Title IX violations and retaliation, Selcer removed all oversight officials (OCR, Rodemeyer, Dean Blair) and issued "final directive" requiring in-person attendance beginning September 15. Selcer explicitly stated corrections were "not a request for dialogue."

**140.** These actions conditioned educational access on cessation of protected advocacy and punished Plaintiff's refusal to "engage" with retaliatory processes.

### 4. Forced Unsafe Return (September 15) and Resulting Harm (September 17)

**141.** On September 15, Plaintiff was forced to return to campus in person without any protective measures. On September 17—the second day of forced return—Mezinska appeared outside Plaintiff's seminar room. Plaintiff fled in dissociative panic, unable to complete the seminar.

**142.** This foreseeable harm directly resulted from the coordinated retaliation: Simpson withdrew Title IX protections → Sawa threatened discipline for continued advocacy → Selcer terminated remote access and required unsafe in-person return → foreseeable encounter with harasser occurred.

**D. Causal Connection**

**143.** The causal connection between Plaintiff's protected activity and the adverse actions is overwhelming:

**144. Temporal Proximity:**

- July 24: Plaintiff issues formal Title IX demand with 48-hour deadline

- July 25: Dean Wasilko conditions assistance on "engagement"

- July 26: Plaintiff escalates to OCR

- July 28: Wasilko reiterates refusal unless Plaintiff "engages"

- August 13: Plaintiff declines meetings and submits emergency removal request

- August 13-14: Simpson withdraws Title IX jurisdiction

- August 15: Sawa threatens disciplinary charges

- August 25: Selcer conditions educational access on "full engagement"

- August 25: Plaintiff issues detailed corrections citing federal law

- September 3: Selcer removes oversight and issues "final directive" refusing to address corrections

**145.** The pattern is clear: each protected activity triggers immediate adverse institutional response.

**146. Explicit Conditioning:** Multiple defendants explicitly conditioned assistance or access on cessation of protected activity:

- Wasilko: "We cannot assist unless you engage"

- Simpson: Withdrew jurisdiction after Plaintiff declined meetings

- Sawa: "Failure to [communicate directly] may result in charges"

- Selcer: Remote access conditioned on "fully engaging" with retaliatory offices

**147. Deviation from Normal Procedures:** Simpson's jurisdictional reversal deviated from normal Title IX procedures. Coordinators do not withdraw jurisdiction based on complainant participation in meetings. The only explanation for this deviation is retaliation for Plaintiff's protected refusal and OCR escalation.

**148. Pattern of Escalating Retaliation:** The adverse actions escalated in severity:

1. Initial conditioning (Wasilko, July 25-28)

2. Jurisdictional withdrawal (Simpson, August 13-14)

3. Explicit disciplinary threat (Sawa, August 15)

4. Conditional educational access (Selcer, August 25)

5. Forced unsafe return (September 15)

6. Foreseeable harm (September 17 encounter)

**149.** Each step punished Plaintiff's continued advocacy and created conditions forcing him to choose between federal rights and educational access.

**E. The Chilling Effect**

**150.** The coordinated retaliation created a profound chilling effect. After Simpson withdrew jurisdiction and Sawa threatened discipline, Plaintiff reasonably concluded:

- Further Title IX advocacy would be futile (Coordinator had abdicated);

- Continued contact with administrators would trigger discipline (Sawa's threat);

- Educational access depended on silencing advocacy (Selcer's conditions);

- Only external enforcement (OCR) offered any recourse;

- The institution had determined he was not entitled to protection.

**151.** This chilling effect is itself evidence of retaliation. The purpose and effect of defendants' actions was to interfere with Plaintiff's Title IX rights by making continued advocacy so costly (loss of jurisdiction, threat of discipline, loss of educational access) that a reasonable person would be deterred.

**F. Institutional Liability**

**152.** Duquesne University is liable for this retaliation under Title IX because:

- The retaliatory actions were taken by officials with actual or apparent authority (Title IX Coordinator, Deputy Coordinator, Dean, Department Chair);

- The actions were taken in the course of performing official university duties (Title IX administration, student conduct, academic program management);

- The pattern of coordinated retaliation suggests institutional policy or widespread practice;

- Senior officials (President, Provost, Legal Affairs, Dean Blair) had notice of the retaliation through Plaintiff's escalations but failed to intervene, ratifying subordinates' retaliatory conduct.

## G. Conclusion

**153.** Plaintiff has plausibly alleged all elements of Title IX retaliation:

1. **Protected Activity:** Extensive Title IX advocacy including formal complaints, OCR escalation, and refusal to participate in retaliatory processes.

2. **Adverse Actions:** Jurisdictional withdrawal, explicit disciplinary threats, conditional educational access, forced unsafe return, and resulting harm.

3. **Causal Connection:** Overwhelming temporal proximity, explicit conditioning, deviation from procedures, and pattern of escalating retaliation.

**154.** The coordinated retaliation—from Title IX Coordinator to Deputy Coordinator to Department Chair—created precisely the chilling effect Title IX's anti-retaliation provisions were designed to prevent. Plaintiff states a claim for relief under Title IX against Duquesne University.

## COUNT III — ADA: FAILURE TO ACCOMMODATE

### (Against Duquesne University Only)

**155.** Plaintiff repeats and incorporates the allegations in Paragraphs 1-154 as though fully set forth herein.

### A. Protected Status and Notice

**156.** Plaintiff has been formally diagnosed with Attention-Deficit/Hyperactivity Disorder ("ADHD"), a mental impairment that substantially limits major life activities including concentration, learning, and regulation of stress responses. 42 U.S.C. § 12102(1)(A), (2)(A).

**157.** On August 23, 2025, Plaintiff transmitted to the Department Chair and Director of Graduate Studies a physician's letter from his treating physician, Dr. Jacob McBride, DO, documenting that Plaintiff had a medical condition, that proximity to his harasser would cause severe stress and worsen that condition, and that such proximity would impair Plaintiff's academic functioning. The letter explicitly recommended "every effort be made to avoid this." On August 23, Plaintiff transmitted the letter with an explanatory email stating: "proximity to the individual in question would significantly worsen my condition and impair my academic functioning." On August 24, Plaintiff reiterated his physician's guidance and explicitly requested written confirmation of how his "medical documentation and ongoing safety concerns will be taken into account" for his seminar participation and TA assignment. These communications provided the University with actual notice of: (1) a medical condition; (2) that substantially limited Plaintiff's ability to concentrate, learn, and function academically; and (3) that required accommodation in the form of either safety measures enabling in-person attendance or continued remote access.

**158.** Following the September 17, 2025 encounter with his harasser—which occurred on the

second day of forced in-person return after the three-week limitation expired—Plaintiff obtained clarifying medical documentation. On October 1, 2025, Dr. McBride provided a letter explicitly diagnosing Plaintiff with ADHD and depression, confirming he was treating these conditions, documenting that Plaintiff had run out of prescribed Lexapro medication early in September due to proximity-induced stress, noting that homelessness since June 30 had been "very stressful and likely worsens his mental health conditions," and stating that worsening mental health conditions "is expected to negatively impact his graduate education." Dr. McBride recommended "all measures to protect him from his abuser and to provide stable housing be made" to "benefit and protect his mental health and his performance in his graduate program." The October 1 letter did not introduce new information but clarified and confirmed what the August communications had already conveyed: Plaintiff had qualifying mental health disabilities under the ADA that were substantially limiting his major life activities of concentrating, learning, and cognitive function, and accommodations were medically necessary to preserve his educational access.

## B. Requested Accommodations

**159.** Plaintiff's primary request was to attend classes on campus with minimal safety protections in place, such as registrar separation, a Public Safety notice, or a no-contact order. When the University refused to provide any such measures, Plaintiff requested continued Zoom access as a fallback to ensure equal participation.

**160.** Although the University later "authorized" Plaintiff to attend seminars remotely for three weeks, Plaintiff did not request this initial short-term reprieve; it was imposed as a temporary concession. In his August 25, 2025 email, Department Chair Daniel Selcer wrote: "You are also temporarily authorized to remotely attend the two classes in which you are enrolled this semester... This is possible only because they are two of the very few graduate classes we are running this semester in which room and class size permits remote

41

participation. Were you to switch to another seminar, remote participation would not be possible. This remote seminar attendance... is authorized only for the first three weeks of class at this time, and... subject to the condition that you fully engage with the Title IX, Student Conduct, and Public Safety offices within the next week."

**161.** This communication shows that the University acknowledged the feasibility of remote participation but withheld it as a time-limited "authorization" tied to coercive conditions, and foreclosed Plaintiff's ability to switch to other seminars or audit additional classes. Both requested accommodations—basic safety protections for on-campus attendance, or continued Zoom access in their absence—were reasonable and feasible.

## C. Denial of Accommodation

**162.** Duquesne refused both categories of accommodation. It denied Plaintiff's request for basic safety protections. It also conditioned continued Zoom access on unrelated "engagement" with Title IX, Student Conduct, and Public Safety, while cutting off access after three weeks.

**163.** Passing responsibility to "go fill out a form" with Disability Services did not satisfy the University's statutory duty. Once administrators had actual knowledge of Plaintiff's diagnosis and medical documentation, they were required to engage in good faith in the interactive process. See *Taylor*, 184 F.3d at 315 ("obligation cannot be shifted onto the employee"). A time-limited reprieve with coercive conditions is not a reasonable accommodation. It created uncertainty, forced unsafe reentry, and denied Plaintiff equal educational access.

**D. Resulting Harm**

**164.** The danger materialized immediately. On September 17, 2025—the second day of forced in-person attendance—Plaintiff's harasser was observed outside his seminar room, though she was not enrolled in the course. Another student corroborated the incident in writing. Plaintiff fled in a panic, directly impairing his ability to attend class.

**165.** This harm flowed directly from Duquesne's refusal to implement safety protections or extend Zoom access, establishing causation between the denial of accommodations and Plaintiff's loss of access to his education.

**E. Conclusion**

**166.** By refusing reasonable accommodations despite clear notice of Plaintiff's ADHD and medical documentation, Duquesne violated the ADA. Plaintiff plausibly states a claim for relief against Duquesne University.

## COUNT IV — FRAUD

## (Against Simpson, Wasilko, Sawa, Selcer, and Blair in Their Individual Capacities)

**167.** Plaintiff repeats and incorporates by reference Paragraphs 1-166 as though fully set forth herein.

**168.** Defendants Alicia Simpson, Adam Wasilko, Anne Mullarkey Sawa, Daniel Selcer, and Kristine Blair are sued in their individual capacities for their personal participation in fraud. Their conduct was intentional, malicious, and outside the scope of their lawful employment.

### A. Legal Standard

**169.** Fraud must be pled with particularity under Fed. R. Civ. P. 9(b) and Pennsylvania law. See *U.S. ex rel. Moore & Co. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016); *Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882, 889 (1994). To satisfy this standard, a plaintiff must allege the "who, what, when, where, and how" of the fraudulent conduct. Fraud may consist of (1) affirmative misrepresentations of material fact, or (2) concealment or omission of material facts where there is a duty to disclose. *Moser v. DeSetta*, 589 A.2d 679, 682 (Pa. 1991).

### B. Fraudulent Conduct — Four Distinct Patterns

**170.** Defendants Simpson, Wasilko, Sawa, Selcer and Blair engaged in fraud through four distinct and independently sufficient patterns of misrepresentation and concealment. Each pattern involved coordinated conduct, false representations, and systematic concealment designed to deceive both Plaintiff and institutional decision-makers about Defendants' compliance with federal law.

## PATTERN 1: FABRICATED MEETING REQUIREMENT

**The Two Phases of the Meeting Requirement Fraud**

**171.** The meeting requirement fraud operated in two distinct phases with different targets:

**Phase 1 (June 30 - July 24): Defrauding Plaintiff**

Target: Plaintiff's reliance on institutional expertise

Method: Concealing Title IX rights; falsely claiming conduct wasn't violation; deflecting to police

Result: Plaintiff denied knowledge of federal rights for three weeks

**Phase 2 (July 24 - August 13): Defrauding University Leadership**

Target: Senior officials' reliance on subordinates' characterizations

Method: Fabricating meeting requirements; characterizing Plaintiff as "refusing to engage"

Result: Senior officials did not intervene despite direct appeals and clear violations

**Phase 1: Wasilko's Initial Fraud Against Plaintiff (June 30 - July 24)**

*Facts: June 30 - July 23, 2025*

**172.** On June 30, 2025, at 11:47 PM, Plaintiff reported to Dean Wasilko that his roommate Elizabete Mezinska had: yelled at him and gotten "within inches of my face"; "aggressively followed me through the apartment"; pursued him "up the stairs toward my room, saying 'I'm coming up'"; and forced him to lock himself in his room, "visibly shaken."

**173.** Plaintiff explicitly stated: "I no longer feel safe sharing a living space with her" and requested: "emergency housing options"; "protective campus measures"; "formal documen-

tation"; and advice on "whether this constitutes a violation of university conduct standards."

**174.** On July 1, 2025, at 8:49 AM, Dean Wasilko responded: "it doesn't sound like a code of conduct violation at this point" and directed Plaintiff to "file a police report through our public safety."

**175.** Wasilko did not: refer Plaintiff to the Title IX Coordinator; inform Plaintiff of Title IX or his rights to supportive measures; implement or request any protective housing; provide formal documentation as requested; or identify this as potential Title IX matter requiring referral.

*Why False — Multiple Clear Violations*

**176.** Wasilko's statement that the conduct "doesn't sound like a code of conduct violation" was objectively false under the University's own Student Code of Conduct. The conduct Plaintiff described constituted multiple clear violations, including: Bullying ("Use of written, verbal, or electronic expression, or physical acts/gestures, likely to cause emotional or physical harm, intimidate, control, or diminish another person physically or mentally"); Endangering Health or Safety ("Taking or threatening action that endangers the safety, physical or mental health, or life of any person"); Stalking ("Repeatedly following, harassing, threatening, or intimidating a specific person to the extent that it causes reasonable fear for their safety"); and Incivility through Language or Actions.

*Why False — Title IX Mandatory Reporting Violation*

**177.** Plaintiff's June 30 report described conduct that should have triggered Wasilko's mandatory reporting duties under Title IX. The report contained explicit language requiring Title IX response: "I no longer feel safe"; request for "emergency housing options"; request for "protective campus measures"; description of pursuit, physical intimidation, and reasonable fear; and statement that this caused him to lock himself in his room, "visibly

shaken."

**178.** Wasilko, as Dean of Students and a mandatory reporter under Title IX, had a duty to: recognize potential Title IX jurisdiction; refer Plaintiff to the Title IX Coordinator; ensure Plaintiff was informed of supportive measures available under Title IX; and not deflect to alternative processes that would delay Title IX protections.

**179.** By stating the conduct "doesn't sound like a code of conduct violation" and directing Plaintiff only to Public Safety, Wasilko violated his mandatory reporting duty and concealed from Plaintiff the existence of Title IX protections.

*Plaintiff's Reliance — Total and Reasonable*

**180.** Plaintiff was a graduate student with no legal training, no knowledge of Title IX, and no prior experience with university conduct or Title IX processes. Plaintiff did not know: that Title IX existed or applied to his situation; that the University had mandatory obligations to provide supportive measures; that supportive measures were available immediately without any formal complaint; or that mandatory reporters had duties to refer reports to the Title IX Coordinator.

**181.** Plaintiff reasonably relied on Wasilko's expertise as Dean of Students and Associate Vice President for Student Life—the senior administrator with institutional responsibility for student safety, welfare, and conduct processes.

**182.** Based on Wasilko's false statement that the conduct "doesn't sound like a code of conduct violation," Plaintiff: did not pursue university conduct processes, reasonably believing university processes did not apply; filed a City of Pittsburgh police report instead of campus Public Safety report; did not learn about Title IX protections; remained ignorant of his federal rights for three weeks; did not seek emergency housing through Title IX; and continued in housing insecurity and homelessness.

**183.** This reliance was entirely reasonable and justified. A graduate student has no basis to second-guess a Dean's explicit statement about conduct code applicability, particularly when: the Dean holds senior institutional responsibility for student safety and conduct; the student has no legal training or knowledge of Title IX; the Dean is a mandatory reporter with superior knowledge of applicable policies; and the student is in crisis and dependent on institutional guidance.

*Plaintiff's Discovery Through Independent Research (July 21-24)*

**184.** On July 21, 2025, Plaintiff sent an email challenging Wasilko's earlier statements. Plaintiff quoted directly from the Student Handbook showing that multiple conduct violations clearly applied, and stated: "Let me be clear: I told you and am telling you I fear for my safety. Not in the past, but now and in the future. I fled my home at substantial cost in order to protect my own physical safety."

**185.** Wasilko replied only that Plaintiff should go to Public Safety to "find out for sure" whether violations applied, and provided no substantive response to Plaintiff's documented fear for his safety or his request for process guidance.

**186.** On July 23, 2025, after conducting additional independent research, Plaintiff confronted Wasilko's fraud directly, stating: "There is no plausible or good-faith reading of the account I provided... that could justify your conclusion that it 'doesn't sound like a code of conduct violation.' That language profoundly undermined my confidence in your role as an advocate for student safety and Title IX compliance. In retrospect, I can't help but wonder whether your response would have been the same had the genders in this situation been reversed."

**187.** This explicit invocation of Title IX and sex-based discrimination put Wasilko on direct notice that Plaintiff had discovered: his initial statement was false; Title IX applied to the situation; and the University had mandatory obligations Wasilko had concealed.

*Wasilko's Persistence in Fraud Despite Direct Challenge*

**188.** Despite this direct confrontation on July 23, Wasilko: did not acknowledge his false "not a conduct violation" statement was wrong; did not refer Plaintiff to Title IX Coordinator even after explicit Title IX invocation; offered only "first-year housing" or a "$1,000 hardship payment"—inadequate non-Title IX responses; and continued deflecting rather than implementing federally required supportive measures.

**189.** On July 24, 2025, Wasilko asked: "Are you also filing a title ix complaint for gender based discrimination/sexual harassment/relationship violence?" This question reveals Wasilko's continued fraud through false framing: "Filing" suggested Plaintiff needed to initiate a formal complaint, when Title IX's supportive measures obligations are triggered by notice alone (34 C.F.R. § 106.44(a)); "Also" treated Title IX as an optional additional process, rather than mandatory obligations already triggered; and deflection to Sawa referred Plaintiff to "Dr. Sawa" for "next steps" rather than immediately implementing measures.

**190.** Despite Plaintiff's explicit Title IX invocation on July 23-24, despite direct challenge to his earlier false statements, and despite weeks of documented housing insecurity, Wasilko never implemented or requested implementation of: emergency housing; no-contact orders; registrar separation; Public Safety notification; or any supportive measure required by 34 C.F.R. § 106.44(a).

*Harm Caused By Plaintiff's Reliance (June 30 - July 24)*

**191.** For nearly four weeks (June 30 - July 24), Plaintiff: remained housing insecure and homeless; had no access to Title IX protections or supportive measures; was unaware of his federal rights; could not access proper university processes; suffered financial destitution (bank account negative by late July); and experienced ongoing fear for his safety without protective measures.

**192.** This entire period of harm was directly caused by Wasilko's fraud. Had Wasilko: not falsely stated the conduct wasn't a violation; fulfilled his mandatory reporting duty to Title IX; informed Plaintiff of Title IX and supportive measures; and connected Plaintiff to the Title IX Coordinator on June 30—Plaintiff would have received immediate supportive measures on June 30, 2025, and would not have been left homeless for four weeks.

*Destroyed Institutional Trust — Compounding Effect*

**193.** By the time Plaintiff learned about Title IX through his own independent research (July 23), Wasilko's initial fraud had: established a pattern of institutional minimization, deflection, and concealment; created entirely justified distrust of university processes and officials; delayed Plaintiff's access to legally mandated protections by nearly four critical weeks; left Plaintiff homeless, financially desperate, and in ongoing danger; and demonstrated that the University would not voluntarily fulfill its obligations.

**194.** This destroyed trust had continuing effects that enabled Phase 2 of the fraud: when other defendants then perpetrated additional fraud (fabricated meeting requirements in Phase 2), Plaintiff's reasonable distrust—directly caused by Wasilko's initial deception— made those subsequent frauds appear consistent with established institutional bad faith rather than correctable error.

*Wasilko's Knowledge and Intent*

**195.** Wasilko's fraud was knowing and intentional: As Dean of Students since at least 2020, Wasilko had extensive professional training in Student Code interpretation and Title IX mandatory reporting obligations. Wasilko was a mandatory reporter with explicit legal duty to refer reports of potential Title IX matters. The conduct Plaintiff described was textbook stalking, intimidation, and endangerment—no reasonable Dean could fail to recognize violations. Plaintiff's report contained explicit safety language triggering mandatory Title IX response. When Plaintiff directly confronted Wasilko's false statements on July 21-23,

explicitly invoking Title IX, Wasilko did not correct his earlier false statements, did not acknowledge Title IX applicability, continued deflecting to inadequate responses, and still did not refer to Title IX Coordinator or implement measures.

**196.** This persistence despite direct challenge demonstrates Wasilko's knowledge that his initial statements were false and his intent to continue concealing Plaintiff's Title IX rights even after being directly confronted.

*Wasilko's Motive — Institutional Liability Avoidance*

**197.** Wasilko's fraud served to: avoid triggering formal Title IX process and institutional obligations; deflect responsibility to external processes (police) outside university control; minimize perception of serious safety incident requiring institutional response; avoid potential institutional liability for failure to protect student; and prevent creation of formal Title IX record that could expose institutional failures.

**198.** These motives were personal to Wasilko's institutional role and wholly outside any legitimate employment function of ensuring student safety and Title IX compliance.

**Phase 2: The Shift to Defrauding University Leadership (July 24 - August 13)**

*The Precise Moment Reliance Shifts — Contemporaneously Documented*

**199.** On July 24, 2025, at 10:55 AM—immediately after discovering his Title IX rights and recognizing Wasilko's fraud—Plaintiff escalated to senior university leadership with his First Formal Demand Letter.

**200.** Plaintiff directly emailed: University President; Provost; Office of Legal Affairs; Title IX Coordinator Simpson; Dean Wasilko; Department Chair Selcer; and Director of Graduate Studies Rodemeyer.

**201.** Plaintiff explicitly stated: "I am writing to place on record for all senior leadership the

University's ongoing and escalating failure to meet its obligations to me under Title IX and the Student Conduct Code."

**202.** Then, at 2:59 PM that same day, after Title IX Coordinator Simpson declined Plaintiff's request for an immediate same-day meeting, Plaintiff issued his Second Demand Letter that contemporaneously marked the end of his reliance on institutional guidance.

**203.** In that Second Demand Letter, Plaintiff stated: "Thank you for offering to meet. I am unable to attend a meeting tomorrow and cannot delay resolution any further. My demands, along with a complete summary of the university's failures and required remedies, are provided below. The 48-hour timeline for full compliance begins with this message. I expect to receive a written response confirming that all demands will be met in full no later than 3:00 PM EST on July 26."

**204.** Plaintiff then provided a detailed "Case Summary" documenting the complete chronology of institutional failures, explicitly invoking Title IX, and stating: "I only recently learned it was not my responsibility to 'file Title IX,' and that Dean Wasilko was not fulfilling the obligations that the university has under federal law."

**205.** This contemporaneous statement proves Plaintiff's awareness that his prior reliance had been betrayed and that he now understood his federal rights.

**206.** The Second Demand Letter concluded with explicit demands for immediate remedies and the explicit statement: "This is not a negotiation and it is not a settlement. These are the immediate remedies owed for past harm and uncompensated labor. I will not accept delay or bargaining. If these demands are not met in full within the next 48 hours, I will escalate immediately to the Department of Education's Office for Civil Rights, external legal counsel, and the media."

**207.** This July 24, 2:59 PM Second Demand Letter marks the precise end of Plaintiff's

reliance and the beginning of university leadership's reliance.

**208.** After July 24, 2:59 PM, Plaintiff was no longer relying on Defendants' expertise or representations about process. Plaintiff now knew: his federal rights to supportive measures under 34 C.F.R. § 106.44(a); that Wasilko had defrauded him for three weeks; that meetings were not required for supportive measures; that the University was violating mandatory Title IX obligations; that OCR enforcement would be necessary; and that he would "not accept delay or bargaining."

**209.** From July 24, 2:59 PM forward, Plaintiff's demands were based on known federal rights, not trust in institutional guidance.

**210.** But from July 24 forward, university leadership's non-intervention was based on reliance on Defendants' false characterizations that proper process was being followed and that Plaintiff was "refusing to engage."

*Phase 2 Fraud — The Fabricated Meeting Requirement (July 24 - August 13)*

**211.** After Plaintiff's July 24 escalation to senior leadership, Defendants Simpson, Wasilko, and Sawa systematically misrepresented to both Plaintiff and senior university officials that supportive measures could not be provided unless Plaintiff first attended additional "meetings" or "engaged" with their processes.

**212.** These representations were designed to deceive senior officials into believing: proper Title IX process was being followed; Plaintiff was refusing to participate in legitimate requirements; Defendants were appropriately exercising their Title IX/student affairs authority; and no senior intervention was necessary.

*Representative False Statements*

**213.** July 24, 2025, 12:57 PM (Simpson, email to Plaintiff): Within 2 hours of Plaintiff's

escalation to President/Provost, Simpson responded but systematically removed President, Provost, and Legal Affairs from her reply. "Based on the nature of this report, I would like to meet with you to discuss the report, gather additional information, go over your options under our policies, and discuss any supports or resources you may need... Once we meet... I will determine the appropriate policy."

**214.** July 25, 2025 (Wasilko, email to Plaintiff, copying Simpson and Sawa): "As you are aware, I have repeatedly advised you to contact various university offices to discuss your concerns... I strongly encourage you to please engage with these offices... We cannot assist you or provide you with further guidance unless you are willing to engage with the appropriate offices and give them the opportunity to better understand and discuss your concerns."

**215.** July 28, 2025 (Wasilko, email to Plaintiff after OCR involvement): "The University cannot assist you unless you engage with the appropriate offices so that they can better understand your concerns and evaluate what, if any resources or assistance they may be able to provide to you."

**216.** August 13, 2025 (Simpson & Sawa, joint response to emergency removal request): "To better understand your allegations, your current situation and assess appropriate next steps, it is necessary for representatives of these offices to meet with you to gather additional information... While it is a standard and essential practice to hold meetings following receipt of concerns such as yours..."

**217.** Between July 24 and August 13, Defendants made at least 36 documented false statements using nearly identical language to condition federally mandated protections on fabricated meeting requirements.

*Why Phase 2 Statements Were False*

**218.** Neither Title IX regulations, ADA requirements, nor Duquesne's own TAP policies

impose any meeting requirement as a prerequisite for supportive measures.

**219.** Title IX — 34 C.F.R. § 106.44(a):  Supportive measures must be offered "with or without the filing of a formal complaint."  The regulation requires only that the Title IX Coordinator "promptly contact the complainant" to: discuss availability of supportive measures; consider the complainant's wishes with respect to supportive measures; and inform the complainant of availability of supportive measures with or without filing.  There is no requirement that a complainant attend a meeting, provide additional information, or "engage" with processes before supportive measures are implemented.

**220.** Plaintiff Had Already Provided All Necessary Information: By July 24, when Simpson first imposed the meeting requirement, Plaintiff had already provided: detailed written account of June 30 incident; police report documentation; explicit statements of ongoing fear for safety; explicit invocation of Title IX and sex-based discrimination; formal demand for emergency housing and supportive measures; and comprehensive written timeline and documentation.

**221.** No additional "information gathering" meeting was necessary to:  understand that Plaintiff feared for his safety; recognize that Plaintiff was housing insecure; determine that supportive measures were appropriate; or implement those measures immediately as 34 C.F.R. § 106.44(a) requires.

**222.** Plaintiff Repeatedly Cited the Law:  Plaintiff repeatedly informed Defendants that meetings were not required, citing 34 C.F.R. § 106.44(a) in multiple written communications.  Defendants persisted in the fabricated requirement despite being directly informed it violated federal law.

*Phase 2 Target — University Leadership's Reliance*

**223.** The Phase 2 fraud did not target Plaintiff's reliance (Plaintiff knew meetings weren't

required and that Defendants were violating his known federal rights). Instead, Phase 2 targeted senior university officials' reliance.

**224.** The False Narrative Defendants Created for Senior Officials: Through the fabricated meeting requirement, Defendants communicated to senior officials: "We are following proper Title IX process"; "Student must participate in standard procedures before we can act"; "Student is refusing to engage with legitimate requirements"; "Student's 'refusal to participate' is the obstacle, not our denial of rights"; and "No senior intervention necessary—we are handling appropriately within our expertise."

*Senior Officials' Reliance Evidenced by Their Silence*

**225.** President, Provost, and Legal Affairs received Plaintiff's July 24 direct appeals (both 10:55 AM and 2:59 PM) explicitly stating "ongoing and escalating failure to meet its obligations under Title IX" and requesting immediate emergency housing with 48-hour deadline before OCR escalation.

**226.** Expected response if senior officials had complete information: immediate intervention; direct contact with Title IX Coordinator to ensure compliance; emergency housing provided within 48 hours; and investigation of systemic failures.

**227.** Actual response: complete silence; no intervention; no housing provided; and Plaintiff forced to escalate to OCR on July 26.

**228.** The only plausible explanation for this silence is reliance on Defendants' characterizations that: proper process was being followed; Plaintiff was at fault for refusing to "engage"; subordinate officials were handling appropriately; and no senior intervention necessary.

*Knowledge and Intent in Phase 2*

**229.** Defendants knew their meeting requirements were false because: Simpson, as Title IX

Coordinator, had specialized training in 34 C.F.R. § 106.44(a); Wasilko and Sawa had extensive Title IX/student affairs experience; Plaintiff repeatedly cited 34 C.F.R. § 106.44(a) and informed Defendants meetings were not required; Defendants continued fabricating requirements across six weeks despite multiple written corrections; and the need for concealment (systematically removing senior officials from correspondence) proved consciousness that their requirements couldn't withstand institutional scrutiny.

## PATTERN 2: SYSTEMATIC REMOVAL OF OVERSIGHT

*The Dual Function of Oversight Removal*

**230.** The oversight removal pattern served two distinct but related functions: Function 1—Eliminating Senior Administrative Oversight (removing President, Provost, Legal Affairs, Dean Blair, DGS Rodemeyer to prevent institutional correction); and Function 2—Eliminating Federal Enforcement Oversight (removing OCR to prove intent, consciousness of wrongdoing, and agreement to conceal).

**231.** The OCR removal is particularly probative because OCR does not "rely" on institutional representations—OCR investigates independently. Therefore, removing OCR could serve only one purpose: preventing the federal authority from witnessing violations Defendants knew were unlawful.

*Facts: The Systematic Removal Pattern (July 24 - September 3)*

**232.** Timeline of Coordinated Concealment:

July 24, 10:55 AM — Plaintiff's First Escalation: Plaintiff emails President, Provost, Legal Affairs, copying all Defendants; explicitly invokes Title IX obligations and emergency housing need.

July 24, 12:57 PM — Simpson's First Removal: Simpson responds to Plaintiff; systematically removes President, Provost, and Legal Affairs from her reply; offers only meetings, no immediate measures; pattern begins: concealment from senior oversight.

July 24, 2:59 PM — Plaintiff's Second Demand Letter: Plaintiff marks end of his reliance: "cannot delay resolution any further"; sets 48-hour deadline before OCR escalation; explicitly states: "This is not a negotiation... I will not accept delay or bargaining."

July 26 — Plaintiff Escalates to OCR: After 48-hour deadline expires without measures; Plaintiff files formal OCR complaint; from this point forward, Plaintiff copies OCR on all correspondence.

July 25 & July 28 — Wasilko's Removals: Wasilko sends emails to Plaintiff conditioning assistance on "engagement"; Wasilko does not include OCR despite OCR's active involvement since July 26; Wasilko also removes President, Provost from follow-up correspondence.

August 13 — Simpson & Sawa's Joint Removal: Joint email disclaiming Title IX jurisdiction; does not copy OCR despite OCR oversight since July 26; false jurisdictional claim sent without federal enforcement witnessing.

August 15 — Sawa's Silencing Threat: Sawa threatens discipline if Plaintiff continues "mass emailing University officials"; explicit threat designed to prevent Plaintiff from copying senior officials and OCR.

August 25 — Selcer's Meeting Summary Removal: Selcer sends falsified meeting summary; copies Rodemeyer and Dean Blair; does not copy OCR despite OCR being on all Plaintiff's correspondence since July 26.

August 25 (evening) — Plaintiff Re-Adds OCR: Plaintiff sends detailed correction; explicitly re-adds OCR and states: "I am also CC'ing OCR on this communication and ask that they be included on all further correspondence regarding this matter."

September 3 — Selcer's Final Directive Removal: Selcer issues "final directive"; systematically removes OCR, Rodemeyer, and Dean Blair—all oversight eliminated; only after eliminating all oversight does Selcer state his refusal to address corrections is "not a request for dialogue."

**233.** Pattern Summary: 8+ systematic removals across 6 weeks by four Defendants. This is not isolated error or bureaucratic oversight. This is coordinated, systematic elimination of both senior administrative oversight and federal enforcement authority from correspondence at every critical juncture where Defendants' fabricated requirements would be exposed to scrutiny.

*Why the Oversight Removal Pattern Is Fraudulent*

**234.** Removal of Senior Officials — Fraudulent Concealment: Pennsylvania fraud law recognizes that active concealment of material facts from parties entitled to know them constitutes fraud. *Moser v. DeSetta*, 589 A.2d 679, 682 (Pa. 1991).

**235.** Material Facts Concealed from Senior Officials: Plaintiff's explicit invocations of Title IX with citations to federal regulations; Plaintiff's detailed corrections demonstrating fabricated meeting requirements violated 34 C.F.R. § 106.44(a); Plaintiff's documentation of retaliation threats violating 34 C.F.R. § 106.71; Plaintiff's emergency housing crisis extending across months; and complete record of institutional failures and federal law violations.

**236.** Why Concealment Was Fraudulent: Senior officials had: authority to intervene and provide emergency housing; institutional duty to ensure Title IX compliance; professional responsibility to correct subordinates' federal law violations; and right to complete information about serious compliance failures.

**237.** By systematically removing senior officials from correspondence after they had been explicitly copied by Plaintiff, Defendants: prevented institutional correction that would have

occurred if senior officials had complete record; created false impression that Plaintiff's concerns were being appropriately addressed; enabled their own continued fraud by eliminating oversight; and caused senior officials to rely on incomplete characterizations.

*Removal of OCR — Proof of Intent, Agreement, and Consciousness*

**238.** The Unique Probative Value of OCR Removal: OCR removal functions differently than senior official removal because OCR does not "rely" on institutional representations in the way individual administrators do. OCR is the independent federal enforcement authority that investigates and audits compliance.

**239.** Therefore, removing OCR from correspondence could serve only one rational purpose: preventing the federal enforcement authority from witnessing conduct Defendants knew violated federal law.

**240.** If Defendants' meeting requirements were legitimate and their conduct complied with Title IX: OCR's presence would be neutral or favorable (demonstrating proper process); no reason would exist to conceal from federal oversight; transparent cooperation with enforcement authority would be institutional best practice; and professional compliance officers would welcome federal oversight validation.

**241.** The systematic OCR removal proves: Knowledge of Falsity—Defendants knew their meeting requirements violated 34 C.F.R. § 106.44(a) because they systematically prevented the federal authority charged with enforcing that regulation from witnessing their violations. You don't hide from federal enforcement unless you know you're breaking federal law. Intent to Deceive—Defendants intended to deceive institutional decision-makers about compliance, using concealment from federal oversight to maintain false appearance that proper process was being followed. Agreement/Coordination (Conspiracy Element)—Four separate defendants across two different offices all independently and repeatedly removed OCR from correspondence; probability of coincidence is vanishingly small; pattern proves agreement

and coordination. Consciousness of Wrongdoing—The OCR removal pattern demonstrates consciousness that federal scrutiny would expose violations; defendants would not systematically remove the enforcement authority if they believed their conduct was lawful; the act of concealment is itself the confession.

*Sawa's August 15 Threat Corroborates the Concealment Strategy*

**242.** On August 15, 2025, Defendant Sawa explicitly threatened Plaintiff with Student Conduct charges if he continued "mass emailing University officials" about his safety concerns.

**243.** The Threat's True Purpose — Preventing Oversight: Sawa's threat served no legitimate conduct enforcement purpose. Students are permitted to: contact senior administrators about safety concerns; copy multiple officials on correspondence seeking help; escalate unresolved issues through proper institutional channels; and seek federal oversight when institutions violate federal rights.

**244.** The threat revealed Defendants' strategy: Maintain false narrative with individual officials through one-on-one correspondence while preventing: comprehensive institutional record visible to senior oversight; paper trail showing multiple officials receiving same information; senior officials comparing Defendants' inconsistent characterizations; and OCR witnessing the complete pattern of violations.

**245.** The Threat Is An Admission Against Interest: By threatening to punish Plaintiff for "mass emailing," Sawa explicitly admitted that Defendants knew their conduct could not withstand institutional scrutiny and needed to prevent oversight.

**246.** If Defendants' conduct was proper and their characterizations accurate: no reason would exist to prevent comprehensive institutional visibility; multiple officials witnessing proper process would validate Defendants; senior oversight would support subordinates' appropriate handling; and OCR presence would demonstrate institutional compliance. The

threat proves Defendants knew their conduct couldn't withstand scrutiny.

*Reliance and Causation Through Oversight Removal*

**247.** Senior Officials' Reliance Directly Caused by Concealment: The Causal Chain: July 24, 10:55 AM—Plaintiff directly appeals to President, Provost, Legal Affairs with explicit Title IX invocation and 48-hour deadline; July 24, 12:57 PM—Simpson immediately removes President, Provost, Legal Affairs from her response, preventing them from witnessing her refusal to provide immediate measures; July 24, 2:59 PM—Plaintiff issues Second Demand Letter marking end of his reliance and threatening OCR escalation; July 25-28—Wasilko repeats fabricated meeting requirements while keeping President, Provost removed from correspondence; July 26—Plaintiff escalates to OCR; from this point all Plaintiff's correspondence includes OCR; July 28-August 13—All Defendants systematically exclude OCR from their responses despite OCR's active oversight; August 15—Sawa threatens discipline to prevent Plaintiff from continuing to seek senior oversight; Six Weeks of Senior Official Silence—President, Provost, Legal Affairs, Dean Blair never intervene despite multiple escalations and clear authority.

**248.** But For the Concealment: If senior officials had witnessed: OCR's active involvement signaling serious federal compliance issues; Plaintiff's detailed citations to 34 C.F.R. § 106.44(a), (g)(2), (g)(4), § 106.71; Defendants' systematic removal of oversight at critical junctures; complete pattern of fabricated requirements and retaliation threats; and Plaintiff's documented corrections showing Defendants' statements were false—senior officials would have: recognized Title IX violations requiring immediate intervention; understood federal enforcement interest demanded senior attention; intervened to provide emergency housing and protective measures within 48 hours; corrected subordinates' fabricated meeting requirements; and prevented continuing institutional failures.

**249.** The Inference Is Inescapable: Senior officials' six-week silence despite direct appeals,

clear authority, and obvious violations can only be explained by reliance on Defendants' incomplete characterizations that proper process was being followed. This reliance was directly caused by Defendants' systematic concealment through oversight removal.

*OCR Removal Specifically Caused Senior Reliance*

**250.** The Signal Value of OCR Presence: If senior university officials had seen OCR copied on correspondence, it would have communicated: "The federal enforcement authority is actively monitoring this situation"; "This student's concerns triggered federal investigation"; "Our responses are under federal compliance review"; "We need to ensure statements withstand federal legal scrutiny"; and "This requires senior institutional attention and intervention."

**251.** By removing OCR, Defendants eliminated this signal and instead communicated: "This is routine departmental/student affairs matter"; "Student is going through normal processes"; "No federal compliance issues requiring senior attention"; "Subordinate officials handling appropriately within their expertise"; and "No need for President/Provost intervention."

**252.** This false signal directly caused senior officials' non-intervention.

*The Pattern Proves Agreement (Conspiracy Element)*

**253.** Four defendants across three different offices (Title IX Office, Student Affairs/Dean of Students, Academic Department) all repeatedly removed the same oversight officials at the same critical junctures.

**254.** Simpson (Title IX Coordinator): Removed President/Provost/Legal Affairs on July 24; removed OCR from August correspondence.

**255.** Wasilko (Dean of Students): Removed President/Provost from July 25-28 emails; did

not include OCR despite OCR involvement.

**256.** Sawa (Student Conduct/Deputy Title IX Coordinator): Joint removal of OCR with Simpson on August 13; threatened to prevent "mass emailing" on August 15.

**257.** Selcer (Department Chair): Did not include OCR on August 25 meeting summary; systematically removed OCR, Rodemeyer, and Blair on September 3.

**258.** The probability of independent parallel conduct is infinitesimal. The pattern proves: agreement among defendants to conceal from oversight; coordination of concealment strategy; shared consciousness that oversight would expose violations; and joint motive to prevent institutional and federal correction.

*Damages Caused By Oversight Removal*

**259.** Continuing Harm After July 24: Plaintiff's damages after July 24 flow directly from senior officials' reliance-based non-intervention caused by Defendants' oversight removal.

**260.** Continuing Homelessness (July 24 - Present): Each day without emergency housing directly caused by senior officials' failure to intervene. But for oversight removal, President/Provost would have provided housing within 48 hours of July 24 appeal.

**261.** Educational Disruption: Three-week Zoom limitation (imposed August 25); forced unsafe reentry (September 15); inability to access departmental facilities, colleagues, library; and compromise of graduate education and professional development.

**262.** Physical Danger: September 17 encounter with harasser outside seminar room; ongoing lack of protective measures (no-contact, separation, Public Safety notice); and continued exposure to hostile environment.

**263.** Emotional and Dignitary Harm: Institutional abandonment by officials with duty to protect; public characterization as "refusing to engage" rather than victim; humiliation of

systematic silencing through Sawa's retaliation threat; and despair from six weeks of appeals to leadership met with silence.

**264.** Civil Rights Violations: Six weeks of continuing Title IX violations (July 24 - September 3); ongoing denial of federally mandated supportive measures; retaliation for protected activity; and ADA accommodation denials.

**265.** All harm after July 24 proximately caused by: Defendants' systematic oversight removal; senior officials' resulting reliance on incomplete information; senior officials' non-intervention based on that reliance; and continuing denial of measures due to absence of institutional correction.

## PATTERN 3: FALSIFIED MEETING TRANSCRIPT

*Facts: The August 21 Meeting and Selcer's Falsification*

**266.** On August 21, 2025, Plaintiff attended a departmental Zoom meeting with Chair Selcer and Director of Graduate Studies Rodemeyer. During the meeting, Plaintiff raised numerous substantive concerns about the University's handling of his Title IX and ADA requests.

**267.** Plaintiff raised concerns including: Title IX Coordinator Simpson had wrongly disclaimed jurisdiction, telling Plaintiff his report was "outside Title IX jurisdiction," even though Plaintiff had reported an assault by another student and was requesting protective measures to maintain access to education—which Plaintiff described during the meeting as "the platonic ideal of Title IX"; Deputy Title IX Coordinator and Student Conduct Head Sawa had threatened Plaintiff with disciplinary charges if he continued emailing University officials about his safety concerns—Selcer audibly gasped when Plaintiff raised this threat during the meeting; the University kept conditioning help on Plaintiff attending more meetings and "engaging" with processes, even though Plaintiff had been trying to get help since

June and had provided extensive documentation; remote access was necessary because the University had failed to provide any safety measures, not because Plaintiff was unwilling to attend in person—Plaintiff explicitly stated he would attend in person if appropriate safety measures were implemented; and Plaintiff had never refused to come to campus; he had only stated he needed basic safety protections before attending in person.

**268.** Plaintiff also expressed that he was glad the department cared about him and that they could be flexible even when other offices wouldn't be.

**269.** During the meeting, Selcer stated: "You would want them to follow their procedures if someone had made similar claims about you."

**270.** Plaintiff immediately responded, explaining: Title IX supportive measures are non-punitive—nothing would happen to Mezinska's career or academic standing; even in the case of emergency removal, she would have the right to challenge that; Plaintiff had already filled out the emergency removal investigation, risk analysis, and justification and sent it to Title IX, and still nothing happened; and by this point, Plaintiff had given up on emergency removal and was simply requesting basic non-punitive measures: no-contact order, Public Safety notification, registrar separation, and a campus safety escort.

**271.** It became clear during the meeting that Selcer and Rodemeyer did not understand what these supportive measures were or why they were non-punitive for Mezinska. They asked questions about the measures, and their framing—"wouldn't you want to be treated as innocent until proven guilty?"—betrayed complete ignorance of Title IX supportive measures, which are explicitly non-punitive and do not require findings of responsibility.

**272.** This exchange demonstrated that the mandatory reporters Plaintiff was speaking with lacked basic understanding of Title IX's structure, despite having institutional responsibility for recognizing and referring Title IX matters.

**273.** The meeting also discussed whether remote access could be provided. Selcer and Rodemeyer indicated that Plaintiff's two seminars had room capacity for Zoom projection, that they might be able to find a way to work with the stipend requirement, but that they weren't sure of the specifics. They also emphasized the program was an in-person program with stipend obligations tied to in-person attendance, and indicated Plaintiff would need to return to campus in person as soon as possible, though they didn't specify when.

**274.** Near the end of the meeting, Sawa's online meeting request form was presented to Plaintiff. Plaintiff again raised Sawa's retaliation threat—that she had threatened him with conduct violations for emailing university officials about his safety.

**275.** As the meeting progressed, it became clear to Plaintiff this was functioning as a disciplinary meeting about his attendance, not a supportive meeting to help him with his safety situation. When Plaintiff asked directly whether he could continue attending remotely, Selcer replied: "I don't know."

**276.** The meeting ended without clear resolution, no formal conditions were stated, and no decisions were finalized.

*The Falsified August 25 Summary — Four Days Later*

**277.** Four days after the meeting, on August 25, 2025, at 11:48 AM, Selcer circulated a "follow-up" email purporting to summarize the August 21 meeting. Selcer copied: Dr. Lanei Rodemeyer (Director of Graduate Studies, present at meeting); Dr. Kristine Blair (Dean of the Graduate School, not present but institutional supervisor); and Plaintiff.

**278.** Selcer copied Dean Blair for the first time on this summary, providing her with what purported to be an accurate record of the meeting and institutional handling.

**279.** The Summary Systematically Omitted Every Substantive Concern Plaintiff Raised: Instead of documenting the serious concerns Plaintiff had raised about Title IX failures,

retaliation threats, and safety needs, Selcer's summary recharacterized Plaintiff's concerns as: "You shared your dissatisfaction with how various offices have responded to your concerns. We explained that these offices need to follow their own procedures and that you would want them to follow their procedures if someone had made similar claims about you."

**280.** This characterization was false and misleading.  Plaintiff had not merely expressed "dissatisfaction with responses"—Plaintiff had:  identified that Title IX wrongly disclaimed jurisdiction over what Plaintiff described as "the platonic ideal of Title IX"; reported that Student Conduct threatened him with discipline for seeking help from university officials (which caused Selcer to audibly gasp during the meeting); explained he had been trying to get help since June with extensive documentation; stated he was willing to attend in person if safety measures were provided; and described his situation and need for help.

**281.**  By characterizing these substantive concerns about institutional failures and retaliation as mere "dissatisfaction," Selcer transformed Plaintiff's account of serious Title IX violations and threats into a narrative of unreasonable complaints about process.

**282.**  The Summary Omitted Plaintiff's Detailed Rebuttal:  Selcer's summary stated that "we explained that these offices need to follow their own procedures and that you would want them to follow their procedures if someone had made similar claims about you."

**283.**  The summary presented this statement as if it were the final word, omitting Plaintiff's immediate and detailed response.  During the meeting, Plaintiff had explained:  Title IX supportive measures are non-punitive by design; nothing would happen to Mezinska's career or academic standing from the measures Plaintiff requested; Mezinska would have the right to challenge even emergency removal; Plaintiff had already submitted detailed emergency removal documentation to Title IX with no result; and Plaintiff was simply requesting basic non-punitive measures:  no-contact, Public Safety notification, registrar separation, and campus escort.

**284.** Plaintiff's response had directly addressed Selcer's "innocent until proven guilty" framing by explaining that supportive measures don't require guilt determinations—they are protective measures that don't punish or discipline the respondent.

**285.** The summary's omission of this exchange was particularly significant because: It concealed Selcer and Rodemeyer's ignorance of Title IX—their "wouldn't you want to be treated as innocent" framing and questions about the measures revealed they didn't understand the non-punitive nature of supportive measures, despite being mandatory reporters; it made Plaintiff appear to have no answer—by presenting only their "follow procedures" statement without Plaintiff's detailed rebuttal, the summary suggested Plaintiff had no substantive response; and it concealed that Plaintiff had already tried the processes—the summary omitted that Plaintiff had submitted extensive emergency removal documentation to Title IX and received nothing, demonstrating the processes had failed.

**286.** By omitting Plaintiff's detailed explanation of non-punitive supportive measures, the summary transformed a discussion where Plaintiff had demonstrated superior knowledge of Title IX obligations into a narrative where Plaintiff appeared to be ignoring reasonable procedural concerns.

**287.** The Summary's Structure Revealed Concealed Motive: The August 25 summary's treatment of remote access revealed what Plaintiff had suspected from the meeting's dynamics: the department's decision was driven by concerns about program structure and not wanting other students to follow Plaintiff's remote access pattern, rather than legitimate safety or educational reasons.

**288.** During the meeting, the tone was: "We understand your situation... but we're an in-person program and stipend requires in-person attendance."

**289.** The August 25 summary formalized this as: Three-week temporary "authorization" conditioned on Plaintiff "fully engaging" with the very offices that had failed and threatened

him.

**290.** The three-week limitation, combined with the conditional framing, suggested that the department was more concerned with: not establishing a pattern where other students could access remote attendance; maintaining program structure requirements; and avoiding administrative burden of accommodating multiple students remotely—rather than: Plaintiff's safety and ability to access education; federal obligations to provide supportive measures and reasonable accommodations; and the fact that remote access was only necessary because the University had failed to provide safety measures.

**291.** The summary omitted any acknowledgment that: Plaintiff had described his case as "the platonic ideal of Title IX"; Student Conduct had threatened Plaintiff with discipline for seeking help (despite Selcer's audible gasp of shock at this revelation); Selcer and Rodemeyer had demonstrated ignorance of Title IX supportive measures during the meeting; Plaintiff had provided detailed explanation of non-punitive measures that Selcer and Rodemeyer didn't understand; the University's failure to provide safety measures necessitated remote access; Plaintiff was willing to attend in person if safety measures were provided; and the three-week limitation would create another crisis point for a student already in ongoing crisis.

*Plaintiff's Same-Day Detailed Correction (August 25 PM)*

**292.** At 10:06 PM on August 25—the same day Selcer sent his falsified summary—Plaintiff issued a detailed written correction, copying: Selcer; Rodemeyer; Dean Blair; and OCR.

**293.** In that correction, Plaintiff provided the legal framework and specific regulatory citations for what he had raised during the meeting, including explicit statements that: the Title IX Office had informed Plaintiff in writing that his report was "outside Title IX jurisdiction"; Plaintiff had described his case during the meeting as "the platonic ideal of Title IX: a student reporting an assault and requesting protective measures in order to maintain access to education"; and the head of Student Conduct had threatened Plaintiff with conduct

70

charges for seeking help, which Plaintiff identified as retaliatory under 34 C.F.R. § 106.71 and "also raised this threat directly in our meeting."

**294.** Plaintiff's correction put Selcer, Rodemeyer, and Dean Blair on explicit notice that: the August 25 summary had systematically omitted the substance of what Plaintiff raised; Plaintiff had described his case during the meeting as "the platonic ideal of Title IX"; Plaintiff had reported Student Conduct's retaliation threat during the meeting (which caused Selcer to audibly gasp); Plaintiff had provided detailed explanation of non-punitive supportive measures that addressed Selcer's "procedures" concern; the summary's "dissatisfaction" characterization was false and misleading; and the meeting had involved serious institutional failures, not mere process complaints.

*Nine Days of Institutional Silence (August 25 - September 3)*

**295.** For over a week, neither Selcer nor any institutional official responded to Plaintiff's detailed corrections.

*Blair's Receipt of False Record and Failure to Correct*

**296.** Dr. Kristine L. Blair, as Dean of the McAnulty College and Graduate School of Liberal Arts, received: Selcer's August 25 summary (purporting to be accurate record); Plaintiff's August 25 evening detailed correction with specific federal law citations; and Plaintiff's September 2 escalation explicitly requesting response.

**297.** Blair had institutional authority to: correct false records affecting students' federal rights; intervene in departments' handling of Title IX and ADA matters; ensure proper handling of graduate student complaints; and investigate when students documented violations by department chairs.

**298.** Blair had complete information showing: Selcer's summary systematically omitted Plaintiff's legal objections; Plaintiff raised "platonic ideal of Title IX" concerns during the

meeting; Deputy Title IX Coordinator had made retaliation threats (causing Selcer's audible gasp); Title IX Coordinator had wrongly disclaimed jurisdiction; Plaintiff cited specific federal regulations (34 C.F.R. §§ 106.44(a), 106.71); and Plaintiff had explained Title IX supportive measures to mandatory reporters who didn't understand them.

**299.** Despite receiving two explicit escalations requesting response, despite direct citations to federal regulations she has institutional duty to enforce, and despite documentation of retaliation threats and jurisdictional errors, Dean Blair did not respond for nine days.

**300.** Blair's silence—whether reflecting reliance on Selcer's false characterization, complicity in concealing violations, or deliberate institutional indifference—prevented the institutional correction that her position obligated her to provide. The false record remained uncorrected and became the institutional basis for: the three-week Zoom limitation; forced unsafe reentry to campus; characterization of Plaintiff as "refusing to engage"; and denial of continued remote access.

*Plaintiff's September 2 Escalation*

**301.** On September 2, at 2:59 AM, Plaintiff escalated again, copying Selcer, Rodemeyer, Blair, and OCR: "I have received no clarity or response to my correction of the record... The three-week limit is facially retaliatory and must be retracted."

**302.** Plaintiff explicitly requested response to his August 25 correction and detailed additional omissions from Selcer's summary.

**303.** Neither Selcer nor any institutional official responded.

*Selcer's September 3 "Final Directive" With Oversight Removal*

**304.** On September 3, at 6:00 PM—nine days after Plaintiff's initial correction and one day after Plaintiff's second escalation—Selcer issued his "final directive."

**305.** Critically, Selcer systematically removed OCR, Rodemeyer, and Dean Blair from the correspondence—eliminating all officials who had witnessed: the falsified August 25 summary; Plaintiff's detailed same-day correction; nine days of institutional refusal to respond; Plaintiff's September 2 escalation explicitly requesting response.

**306.** Selcer stated: "I did not reply to your email of August 25 because the instructions I provided in my message of the same date were already clear and not a request for dialogue..."

**307.** This explicit refusal to address documented corrections, combined with systematic removal of all oversight, demonstrates Selcer's: knowledge the August 25 summary was false; intent to maintain false record despite contemporaneous correction; consciousness that oversight would recognize falsification; and determination to eliminate institutional accountability.

*Selcer's Removal of Blair Proves His Consciousness of Wrongdoing*

**308.** Selcer's removal of Blair before issuing his September 3 "final directive" demonstrates Selcer's consciousness that the August 25 summary was false. If Selcer's summary was accurate and his refusal proper, Blair's continued presence on correspondence would support his position. Instead, Selcer removed Dean Blair before issuing "final directive" because her witnessing of: the original falsification; Plaintiff's detailed contemporaneous correction; nine days of refusal to respond; and explicit refusal to engage ("not a request for dialogue")— would create permanent institutional accountability record he sought to eliminate.

**309.** Selcer's removal of Blair proves Selcer knew: the summary was false; Blair's oversight could expose the falsification; and eliminating institutional accountability was necessary to maintain the fraud.

*Why the Falsified Transcript Is Fraudulent*

**310.** Multiple False Representations: The summary omitted every substantive concern

Plaintiff raised, including: Title IX's wrongful disclaimer of jurisdiction over what Plaintiff described as "the platonic ideal of Title IX"; Student Conduct's threat of discipline for seeking help (which caused Selcer to audibly gasp, demonstrating he recognized its seriousness); the pattern of offices demanding meetings instead of providing help despite months of attempts since June; Plaintiff's willingness to attend in person if safety measures were provided; the fact that remote access was necessary only because the University failed to provide safety measures; and Plaintiff's detailed explanation of non-punitive supportive measures.

311. Mischaracterization as "Dissatisfaction": Selcer characterized Plaintiff's concerns as: "You shared your dissatisfaction with how various offices have responded to your concerns." This was false. Plaintiff had explained: his case was "the platonic ideal of Title IX" but Title IX refused to help; he was threatened with discipline for seeking help; he had been trying to get help for months; and he was willing to attend in person if given basic safety protections. The difference between "dissatisfaction with responses" and "institutional failures plus retaliation threats" is not semantic—it's the difference between a student being unreasonably difficult and an institution violating its obligations and threatening a victim.

312. Selcer's own audible gasp when Plaintiff reported the retaliation threat proves Selcer recognized the seriousness of what Plaintiff was raising. Yet the summary erased this serious threat and recharacterized it as mere "dissatisfaction."

313. Omission of Plaintiff's Detailed Rebuttal: The summary stated "we explained that these offices need to follow their own procedures," but omitted Plaintiff's immediate and substantive response explaining: Title IX supportive measures are explicitly non-punitive; the measures Plaintiff requested would not affect Mezinska's career or academic standing; even emergency removal gives the respondent right to challenge; Plaintiff had already submitted detailed emergency removal documentation to Title IX with no result; and "innocent until proven guilty" doesn't apply to non-punitive supportive measures.

**314.** This exchange revealed Selcer and Rodemeyer's ignorance of Title IX. The summary's omission of this entire exchange was fraudulent because: it concealed mandatory reporters' ignorance—Selcer and Rodemeyer didn't understand basic Title IX supportive measures structure; it made Plaintiff appear to lack response—presenting only "follow procedures" without Plaintiff's detailed rebuttal created false impression; it concealed process failure—omitting that Plaintiff had already submitted extensive documentation and received nothing concealed that the "processes" had failed; and it reversed the knowledge dynamic—the meeting showed Plaintiff explaining Title IX obligations to mandatory reporters who didn't understand them; the summary transformed this into Plaintiff being "dissatisfied" with proper procedures.

**315.** Concealment of True Basis for Denial: The summary's structure—three-week "authorization" conditioned on "engagement"—revealed what Plaintiff suspected from the meeting's dynamics: the department was more concerned about not wanting remote access to become available to multiple students than about Plaintiff's safety or federal rights. The summary omitted: Plaintiff's description of his case as "the platonic ideal of Title IX"; the retaliation threat that made Selcer audibly gasp; Selcer and Rodemeyer's demonstrated ignorance of Title IX supportive measures; Plaintiff's detailed explanation addressing their procedural concerns; the University's failure to provide safety measures that necessitated remote access; Plaintiff's willingness to attend in person if safety measures were provided; and the fact that the three-week limit would create another crisis point.

**316.** Elimination of Oversight: By removing OCR, Rodemeyer, and Blair before issuing his September 3 "final directive," Selcer ensured no authority could witness his falsification and explicit refusal to correct the documented omissions.

*Selcer's Personal Motive — Avoiding "Zoom Precedent"*

**317.** While "precedent" was not explicitly discussed during the meeting using that term,

the meeting's dynamics and the summary's structure revealed Selcer's concern about not wanting remote access to become available to multiple students.

**318.** During meeting: Heavy emphasis on "in-person program" and "stipend requires in-person attendance" despite Plaintiff explaining serious safety situation.

**319.** In summary: Three-week temporary "authorization" rather than accommodation, conditioned on "engagement" with offices that had failed and threatened Plaintiff.

**320.** Plaintiff's September 2 response identified this motive explicitly: "Even if central administration do not do so until forced to by OCR, the department's federal obligation to protect my access remains. If this results in my being on Zoom for too long, that is unfortunate for me but is the fault of central administration. The department can still show it is more concerned with rights, federal compliance, and my safety than with the looming threat of accidentally setting a remote access precedent for the program."

**321.** Selcer's concern was avoiding a situation where providing continued remote access to Plaintiff would create expectations that other students could also access remote attendance, increasing administrative burden and disrupting program structure. Rather than acknowledge this concern could not lawfully justify denying accommodations, Selcer concealed it behind the false "dissatisfaction" narrative and omitted Plaintiff's substantive concerns from the record.

*Harm Caused by Falsified Transcript*

**322.** The False Record Became Institutional Basis for Retaliation: Selcer's falsified summary became the "official record" justifying: three-week Zoom limitation; forced unsafe reentry to campus; characterization of Plaintiff as "refusing to engage"; and denial of continued remote access as reasonable accommodation.

**323.** Direct Causation to September 17 Encounter: As direct result of Selcer's fraud: Plain-

tiff lost continued Zoom access on September 12; Plaintiff was forced to return to campus September 15; on September 17—second day of forced return—Plaintiff's harasser appeared outside his seminar room; fellow student corroborated encounter in writing; and Plaintiff fled in panic, unable to complete seminar.

**324.** This encounter was the inevitable and foreseeable result of: Selcer's falsification preventing accurate institutional record; Blair's silence preventing Dean-level intervention; false "unwilling to attend" narrative justifying denial of remote access; and forced unsafe reentry without protective measures.

**325.** Continuing Harm: The false record continues to harm Plaintiff through: institutional characterization as "difficult" or "non-compliant" student; damage to professional reputation within department and field; inability to correct official record due to Selcer's explicit refusal to engage; and ongoing educational disruption and compromised graduate program participation.

## PATTERN 4:  FALSE REPRESENTATIONS REGARDING CONFLICT-OF-INTEREST POLICY

**326.** On October 20, 2025, Plaintiff submitted a formal conflict-of-interest report to Dean Kristine Blair regarding Professor Daniel Selcer. Plaintiff reported that Selcer—a named defendant in this federal case whom Plaintiff had cross-examined under oath five days earlier—taught Plaintiff's required PhD teaching seminar, creating an obvious conflict of interest requiring independent review. Plaintiff requested guidance through University conflict procedures or an alternative arrangement to fulfill the PhD requirement.

**327.** Plaintiff's October 20 email to Blair was procedurally incorrect. Blair, as Dean, had no authority under TAP No. 33 to receive or adjudicate conflict reports. TAP No. 33 § IV.3 explicitly designates where reports should be directed: "Any member of the University

community who discovers events or circumstances that appear to be in violation of this policy should promptly report their discovery to the appropriate Vice President, Secretary of the University, or President." Plaintiff should have directed his report to the four designated officials: Matthew J. Frist (Senior Vice President for Finance and Business), Reverend James P. McCloskey (University Secretary), President Ken Gormley, or their designees.

**328.** Additionally, Plaintiff's October 20 email used imprecise terminology, referring to his own status as a "Covered Party" and using language suggesting he was "disclosing" a conflict. Under TAP No. 33's structure, only a Covered Party can "disclose" their own conflict of interest (Sections IV.1-2 govern self-disclosure by Covered Parties). Any university community member, however, may "report" another person's conflict under Section IV.3. Plaintiff, whether as student or as employee, was reporting Selcer's conflict, not disclosing his own.

**329.** Despite these initial procedural and terminological errors, the substance of Plaintiff's October 20 report was clear: a faculty member (Covered Party) with a severe conflict of interest (litigation adversary whom Plaintiff was suing and had cross-examined under oath five days earlier) was exercising evaluative power over Plaintiff during active federal proceedings. This situation obviously required independent conflict review under TAP No. 33 § IV.4.

**330.** TAP No. 33's explicit authorization for university community members to report conflicts makes clear that the policy protects not only Covered Parties but the entire university community from conflicts of interest by Covered Parties. Students may report faculty conflicts. Staff may report administrator conflicts. The policy creates a community-wide reporting mechanism precisely because conflicts harm the university community, not just other Covered Parties.

**331.** Once a conflict is reported—whether by a Covered Party disclosing their own conflict (Sections IV.1-2) or by a university community member reporting another's conflict (Section IV.3)—TAP No. 33 § IV.4 mandates specific review procedures: "Potential conflicts of

interest that are disclosed, whether annually or as they arise, will be reviewed by the Senior Vice President for Finance and Business or their designee and/or external investigators to determine the appropriate, situation-specific plan designed to manage, reduce, or eliminate the conflict."

**332.** This language is mandatory, not discretionary. "Will be reviewed" means shall be reviewed, must be reviewed. The review must be conducted "by" the Senior Vice President (Matthew Frist) or his designee or external investigators. The policy does not authorize any Dean to conduct the review, and certainly does not authorize consultation with the person whose conflict was reported.

**333.** Blair's Proper Response Should Have Been: Upon receiving Plaintiff's October 20 report—even though improperly directed to her—Blair's duty was clear: (1) acknowledge receipt; (2) inform Plaintiff of the proper TAP No. 33 designated reviewers; (3) immediately refer the matter to Frist or other designated officials for mandatory independent review; and (4) implement interim protective measures (alternative arrangements, temporary reassignment) pending independent review, given the extraordinary circumstances of a faculty member grading a plaintiff suing him during active litigation.

**334.** Instead of referring Plaintiff's report for independent review as TAP No. 33 mandates, Dean Blair consulted with Defendant Selcer himself—the person whose conflict Plaintiff had reported—about whether Selcer had a conflict of interest.

**335.** On October 22, 2025, at 8:35 AM—two days after receiving Plaintiff's report—Dean Blair sent Plaintiff an email documenting this improper coordination: "In preparing my response to your query, I did need to consult Dr. Selcer as instructor to secure some additional details. Both Dr. Selcer and I strongly concur that it is appropriate for you to remain enrolled in your required teaching seminar."

**336.** Blair's email directed Plaintiff to: return to Selcer's class immediately (that same

day); meet privately with Selcer (with optional third-party attendance "to the extent her schedule permits"); submit to Selcer's grading authority; and complete all assignments under Selcer's evaluation. Blair threatened that failure to comply would result in a failing grade and inability to teach in Fall 2026, conditioning Plaintiff's degree progress and teaching eligibility on subordination to a litigation adversary.

**337.** This October 22, 8:35 AM email contains multiple material false representations:

*First False Representation - Consultation with Conflicted Party Was Proper*: Blair's email represented that consulting with Defendant Selcer about his conflict satisfied TAP No. 33's review requirements. This is false. TAP No. 33 § IV.4 mandates review "by the Senior Vice President for Finance and Business or their designee and/or external investigators"—not by any Dean, and certainly not by consulting with the person whose conflict was reported. Consulting the conflicted party is the opposite of independent review and directly violates the policy's mandatory review procedures.

*Second False Representation - Joint Determination Was Proper Authority*: Blair's statement that "Both Dr. Selcer and I strongly concur" represented that her concurrence jointly with Defendant Selcer constituted proper determination of the conflict issue. This is false. TAP No. 33 vests conflict review authority in the Senior Vice President (Frist) or his designee or external investigators. A joint determination by a Dean and the person whose conflict was reported has no authority under the policy and directly contradicts the mandatory independent review requirement.

*Third False Representation (By Concealment) - Procedures Were Followed*: Blair's email concealed that she had: bypassed mandatory procedures; consulted with the conflicted party instead of independent reviewers; made a determination she had no authority to make; and failed to refer the matter to designated reviewers (Frist, McCloskey, President). A reasonable recipient would believe Blair had followed proper TAP No. 33 procedures and that her

response reflected a proper review. This concealment was material because Plaintiff was deciding whether to accept Blair's directive or object and escalate.

**338.** On October 22, 2025, at 9:58 AM, Plaintiff responded by: correcting his initial procedural error by identifying the proper designated reviewers by name and title (Matthew J. Frist, Senior Vice President for Finance and Business; Reverend James P. McCloskey, University Secretary; President Ken Gormley); citing specific TAP No. 33 policy provisions (Sections IV.3 and IV.4); explicitly objecting to Blair's procedural violations; copying all designated officials on this response, thereby properly invoking the community reporting mechanism under Section IV.3 and requesting the mandatory review under Section IV.4; and explicitly declining private meetings with Selcer due to ongoing litigation.

**339.** Plaintiff's October 22, 9:58 AM response corrected any ambiguity from his initial October 20 email and made clear: TAP No. 33 § IV.3 authorizes "any member of the University community" to report conflicts; Plaintiff was reporting Selcer's conflict (not disclosing his own); the proper reviewers are Frist, McCloskey, and President (not Blair); and Blair's consultation with Selcer violated the mandatory independent review requirement.

**340.** Rather than referring the matter to proper reviewers after being explicitly corrected with specific policy citations, Dean Blair doubled down. On October 22, 2025, at 2:20 PM, she sent a second email—this time copying Matthew Frist, the very official TAP No. 33 designates to conduct independent conflict reviews—but rather than requesting his independent assessment as the policy requires, Blair announced her final determination to Frist: "Please be advised that TAP 33 does not apply to this situation... As such, there is no change to the email that I sent to you this morning at 8:35 a.m."

**341.** Blair offered two grounds for her determination: (1) "As a student, you are not a 'Covered Party' as defined by TAP 33"; and (2) "The scenario... does not fall within the limited definition of a 'Conflict of Interest' in TAP 33."

**342.** This October 22, 2:20 PM email contained additional false representations:

*Fourth False Representation - TAP 33 Doesn't Apply Because Student Not Covered Party*: Blair represented that "TAP 33 does not apply to this situation" because students are not "Covered Parties." This representation is false for multiple reasons:

First, Blair fundamentally misunderstood (or deliberately misrepresented) TAP No. 33's structure. Section IV.3 explicitly authorizes "any member of the University community" to report conflicts. The policy does not limit reporting to Covered Parties—it explicitly widens the reporting mechanism to include anyone in the university community (students, staff, faculty, administrators). Whether Plaintiff is a "Covered Party" is irrelevant to his right to report under Section IV.3. Blair's argument that students cannot invoke TAP 33 directly contradicts Section IV.3's plain language encouraging such reports.

Second, even if Plaintiff's status were relevant (it is not for reporting purposes), Plaintiff is both a student and an employee (teaching position), and the course Defendant Selcer teaches is mandatory job training for Plaintiff's teaching position.

Third, the critical issue is not Plaintiff's status but Defendant Selcer's status. Selcer is indisputably a Covered Party (faculty member/employee). When a Covered Party has a conflict of interest, TAP No. 33 applies. The policy exists to regulate Covered Parties' conflicts, not to restrict who may report such conflicts.

Fourth, TAP No. 33 § IV.4 mandates that conflicts "that are disclosed, whether annually or as they arise" will be reviewed. Section IV.4 uses "disclosed" broadly to encompass both self-disclosures by Covered Parties (Sections IV.1-2) and reports by community members (Section IV.3). The mandatory review requirement applies regardless of the source of the information about the conflict.

Blair's representation that TAP 33 "does not apply" when a student reports a faculty mem-

ber's conflict directly contradicts Sections IV.3 and IV.4 and would render the community reporting mechanism meaningless.

*Fifth False Representation - No Conflict Exists*: Blair represented that "The scenario does not fall within the limited definition of 'Conflict of Interest.''' This representation is facially absurd. TAP No. 33 § II defines conflicts as occurring when a Covered Party is "in a position to influence a decision...where the Covered Party might directly or indirectly receive financial or other substantial personal benefit." The definition explicitly states conflicts "may arise out of, but are not limited to" the listed examples, making clear the list is non-exhaustive.

A faculty member (Covered Party) grading and evaluating a plaintiff who is suing him for personal damages in federal court—seven days after being cross-examined under oath—obviously constitutes a conflict of interest:

- Financial benefit: Selcer has direct financial interest in harming Plaintiff's academic progress (failing grades might pressure settlement or withdrawal of claims) - Reputational benefit: Poor academic performance could undermine Plaintiff's credibility as a litigant - Leverage: Evaluative power over Plaintiff's teaching eligibility (income source) creates coercive pressure during litigation - Appearance of conflict: TAP No. 33 § I prohibits Covered Parties from permitting their interests to "conflict, or appear to conflict" with the University's interests

Blair's representation that this scenario doesn't constitute a conflict is not merely false—it's demonstrably absurd and shows consciousness that proper independent review would inevitably find a severe conflict requiring management.

*Sixth False Representation (By Copying But Not Consulting Frist)*: Blair copied Matthew Frist on her October 22, 2:20 PM email but did not request his independent review as TAP No. 33 mandates. Instead, she announced her final determination to him: "Please be advised that TAP 33 does not apply... there is no change." This created the false appearance that

Frist was being properly involved while actually bypassing his review authority. If Blair genuinely believed TAP 33 didn't apply, there would be no reason to copy Frist. Copying him while announcing "no change" shows Blair was performing compliance theater—making it appear proper procedures were followed while actually defying them.

**343.** Dean Blair made these representations with knowledge of their falsity or with reckless disregard for truth:

*Consciousness of Falsity - Evidence 1 (Ignored Section IV.3)*: Blair read TAP No. 33 carefully enough to cite specific sections in her October 22, 2:20 PM response (arguing about Covered Party status and conflict definition). This means she read or should have read Section IV.3, which explicitly authorizes university community member reports. Her argument that students cannot invoke TAP 33 demonstrates she deliberately ignored the section that contradicted her desired outcome. This is knowing falsity.

*Consciousness of Falsity - Evidence 2 (Violated Section IV.4)*: Blair copied Matthew Frist on her October 22, 2:20 PM email, demonstrating she knew Frist was the designated reviewer under TAP No. 33. Yet she did not request his review—instead announcing "no change" to her directive. This shows Blair knew what the proper procedure was (Frist reviews) but deliberately avoided it while creating appearance of compliance (copying Frist). This demonstrates conscious bypass of mandatory procedures.

*Consciousness of Falsity - Evidence 3 (Consulted Conflicted Party)*: No reasonable administrator believes that asking a conflicted party "do you have a conflict?" constitutes proper conflict review. Blair's decision to consult Selcer about his own conflict, rather than seeking independent assessment from designated reviewers, demonstrates either knowing falsity (Blair knew this wasn't proper review) or reckless disregard (Blair didn't care whether her process was proper).

*Consciousness of Falsity - Evidence 4 (Facially Absurd Arguments)*: After Plaintiff cited

specific policy sections and identified proper reviewers by name and title in his October 22, 9:58 AM response, Blair made legally indefensible arguments in her 2:20 PM response (that litigation adversary grading plaintiff doesn't constitute conflict, that students can't report conflicts despite Section IV.3). These arguments are so facially absurd that they demonstrate Blair was not confused about procedures but was deliberately constructing post-hoc justifications for conduct she knew violated policy.

*Consciousness of Falsity - Evidence 5 (Coordination During Litigation)*: The October 22 coordination occurred seven days after Plaintiff cross-examined Defendant Selcer under oath before this Court. Blair knew Selcer was a defendant in active federal litigation. Blair knew Plaintiff was the plaintiff suing Selcer for personal damages. Coordinating with a litigation adversary to determine whether that adversary can evaluate and grade the plaintiff during the lawsuit demonstrates consciousness that the coordination was improper—hence the need for false justifications about policy applicability.

**344.** Dean Blair intended for Plaintiff and university officials to rely on these false representations:

*Intent - Evidence 1 (Directive to Plaintiff)*: Blair's October 22, 8:35 AM email directed Plaintiff to remain enrolled in Selcer's class and participate in private meetings with Selcer. This was a directive requiring Plaintiff to act immediately (that same day). Blair intended Plaintiff to rely on her representation that proper procedures had been followed, that TAP 33 didn't apply, and that no conflict existed.

*Intent - Evidence 2 (No Alternative Offered)*: Blair's October 22, 2:20 PM email stated "there is no change" and offered no alternative arrangements. Blair intended Plaintiff to understand that further objection was futile and that Plaintiff must comply with her directive under threat of failing grade and loss of teaching eligibility.

*Intent - Evidence 3 (Copied Selcer)*: Blair's October 22, 8:35 AM email was copied to

Defendant Selcer, ensuring both plaintiff and defendant understood the directive's terms and that Selcer would know Plaintiff had been directed to attend class and participate in meetings. This coordination ensured both parties operated from the same understanding of Plaintiff's required compliance.

*Intent - Evidence 4 (Copied But Didn't Consult Frist)*: Blair copied Matthew Frist on her October 22, 2:20 PM email while announcing "no change," intending Frist to believe the matter had been properly reviewed and no independent assessment was necessary. This false representation prevented Frist from exercising his mandatory review authority under TAP No. 33 § IV.4.

**345.** Plaintiff and designated university officials reasonably relied on these false representations to their detriment:

*Plaintiff's Coerced Reliance*: Although Plaintiff immediately recognized that Blair's interpretation violated TAP No. 33's plain language and objected with specific policy citations in his October 22, 9:58 AM response, Plaintiff was forced to rely on Blair's positional authority as Dean when she issued a directive threatening failing grade and loss of teaching eligibility. On October 23, 2025, Plaintiff attended Defendant Selcer's class under the threat articulated in Blair's directive.

Reliance in fraud does not require that plaintiff believe the representation is true—it requires that the false representation cause plaintiff to act (or refrain from acting) to his detriment. Blair's false representation that TAP 33 didn't apply and that her determination was final prevented Plaintiff from abstaining from attendance pending proper conflict review, forced Plaintiff into compliance with an unlawful directive, and caused Plaintiff to suffer severe psychological harm.

Plaintiff experienced an "anxiety freefall" after being forced to attend Defendant Selcer's class on October 23, characterized by aimless pacing through campus buildings, inability to settle

or function, and acute trauma from forced proximity to a litigation adversary during active federal proceedings. This harm was the direct result of Blair's false representations that coerced Plaintiff's attendance and her illegitimate assumption of TAP No. 33 jurisdictional and merits authority.

*Designated Reviewers' Reliance*: Senior Vice President Matthew Frist and other officials designated under TAP No. 33 to conduct independent conflict review relied on Dean Blair's representations that the matter was being handled properly and that TAP 33 didn't apply. Blair's October 22, 2:20 PM email copying Frist but announcing "no change" to her directive represented to Frist that Blair had reviewed the policy, determined it didn't apply to student reports (contradicting Section IV.3), and that no independent review was necessary.

This false representation prevented Frist from conducting the mandatory review TAP No. 33 § IV.4 requires. Had Blair truthfully disclosed that: (a) TAP 33 Section IV.3 explicitly authorizes university community member reports; (b) Section IV.4 mandates that all conflicts reported under IV.3 will be reviewed by Frist; (c) she had consulted with Defendant Selcer (the conflicted party) about his own conflict rather than seeking independent assessment; and (d) she was making arguments contradicting the policy's plain language—Frist would have intervened immediately to conduct proper conflict review and implement appropriate conflict management measures.

*Concealment of Coordination*: Blair concealed material facts in her communications. Her October 22, 8:35 AM email stating "Both Dr. Selcer and I strongly concur" gave the false impression that Blair had followed proper procedures and obtained appropriate input, when in fact she had consulted the person whose conflict had been reported—the opposite of independent review mandated by Section IV.4.

**346.** The false representations were material. Had Dean Blair truthfully disclosed that: (a) TAP 33 Section IV.3 explicitly authorizes any university community member to report

conflicts; (b) Section IV.4 mandates independent review by Frist of all conflicts brought to the University's attention, regardless of source; (c) she had consulted with Defendant Selcer about his own conflict rather than seeking independent review; and (d) she was making arguments (student status, conflict definition) that directly contradict the policy's plain language and purpose—both Plaintiff and designated reviewers would have taken immediate corrective action.

Designated reviewers would have conducted the mandatory independent review and implemented conflict management measures (alternative arrangements, different instructor, independent grading, removal of Selcer's evaluative authority, etc.).

Plaintiff would have abstained from attending Selcer's class pending proper conflict review, sought immediate institutional intervention through proper TAP No. 33 channels, and—when institutional correction failed—sought judicial intervention earlier to prevent the ongoing violations. However, Blair's false representations created institutional barriers that delayed corrective action and forced Plaintiff to endure weeks of continuing harm before filing this Amended Complaint.

The fact that Plaintiff ultimately persisted in seeking judicial relief despite Blair's fraud demonstrates Plaintiff's extraordinary resilience, not the absence of harm. The typical student—particularly a graduate student dependent on institutional approval for degree completion, teaching eligibility, and professional reputation—would have been deterred from continuing to assert their rights after a Dean coordinated with a litigation defendant, misrepresented university policy, and threatened academic failure. Plaintiff's persistence is the rare exception that proves the effectiveness of Duquesne's retaliation regime: the institutional barriers are so high that few students could endure the material and psychological costs Plaintiff has borne.

**347.** As a direct and proximate result of Dean Blair's fraudulent representations and con-

cealment:

(a) Plaintiff has been forced into ongoing contact with and evaluation by a litigation adversary during active federal proceedings;

(b) Plaintiff has suffered severe and ongoing psychological distress, anxiety, and emotional harm from the hostile educational environment, including the documented "anxiety freefall" after forced attendance in Defendant Selcer's class on October 23;

(c) Plaintiff has been denied procedural protections TAP No. 33 guarantees, specifically the independent conflict review mandated by Section IV.4;

(d) Plaintiff's ability to freely litigate his federal claims has been compromised by the defendant's continued evaluative power over Plaintiff's academic standing, degree completion, and financial standing (teaching eligibility), creating coercive pressure to settle or withdraw claims that would not exist if proper conflict procedures had been followed;

(e) Plaintiff has been denied equal educational access and subjected to conditions no student should face: being graded by someone you are suing for violating your federal rights;

(f) The university community's reporting mechanism under TAP No. 33 § IV.3 has been rendered meaningless, chilling future reports by any community member who sees Blair's conduct and learns that reports will be ignored through false claims that the policy doesn't apply.

**348.** Dean Blair's fraud is particularly egregious because:

First, it occurred during active federal litigation in which the University and individual defendants are accused of systematically bypassing procedures to deny Plaintiff protections. Blair's conduct—coordinating with Defendant Selcer during the lawsuit, then making false representations about policy compliance when called out—demonstrates that the institu-

tional practice of procedural bypass alleged throughout this Complaint is not historical but ongoing and extends to the highest levels of college administration.

Second, Blair's false representation that TAP 33 doesn't apply to student reports directly contradicts Section IV.3's explicit authorization for university community member reports. This misrepresentation undermines the policy's protective purpose and chills reports from students and other community members who might discover conflicts by Covered Parties. If Blair's interpretation were correct, Section IV.3 would be meaningless—why authorize community member reports if such reports don't trigger review requirements?

Third, Blair's coordination with the conflicted party (Selcer) about his own conflict, followed by joint announcement of their "concurrence," demonstrates such brazen disregard for the policy's independent review requirement that it suggests institutional confidence in impunity. Blair documented this improper coordination in writing because she had no reason to fear accountability—suggesting that Duquesne's retaliation regime has been so effective at deterring student complaints that administrators no longer fear consequences for procedural bypass.

**349.** This pattern of fraud warrants substantial compensatory damages for ongoing psychological harm and educational interference, and substantial punitive damages to punish Dean Blair's willful and malicious conduct, to deter university administrators from coordinating with litigation adversaries to bypass mandatory procedures during federal proceedings, and to vindicate TAP No. 33's community reporting mechanism that Blair's conduct has undermined.

## C. Knowledge and Intent — All Five Defendants

**350.** Professional Expertise Required Knowledge: All defendants held positions requiring extensive knowledge of Title IX and ADA obligations. Simpson (Title IX Coordinator)

had professional duty to know 34 C.F.R. § 106.44(a)'s supportive measures requirements, specialized training in Title IX procedures, and federal regulatory duty to implement measures without conditioning on meetings. Wasilko (Dean of Students) had mandatory reporter training, professional expertise in Student Code interpretation, and years of experience identifying reportable conduct. Sawa (Executive Director Student Conduct / Deputy Title IX Coordinator) had dual role requiring expertise in conduct procedures and Title IX, professional knowledge that 34 C.F.R. § 106.71 prohibits retaliation, and training in distinguishing legitimate enforcement from retaliatory threats. Selcer (Department Chair) had mandatory reporter status, professional duty to recognize federal rights invocations, and institutional responsibility to accurately document student concerns. Blair (Dean of McAnulty College and Graduate School of Liberal Arts) had mandatory reporter status, oversight authority over departments' handling of graduate student Title IX and ADA concerns, and professional responsibility to ensure compliance with TAP No. 33, a five-page policy Plaintiff explicitly cited and quoted in his correspondence.

**351.** Plaintiff's Explicit Corrections Eliminated Innocent Mistake: Even if defendants initially acted from ignorance (implausible given professional positions), Plaintiff's detailed corrections with explicit federal law citations eliminated any possibility of innocent mistake. After these explicit corrections, persistence demonstrates: knowledge the statements were false (Plaintiff directly corrected with legal citations); intent to maintain false narrative (continued asserting fabricated requirements despite corrections); and consciousness of wrongdoing (demonstrated by systematic oversight removal and silencing threats).

**352.** Oversight Removal Pattern Proves Intent: The systematic removal of senior officials and OCR from correspondence proves defendants' knowledge that their conduct violated federal law. If conduct was lawful and requirements legitimate: no reason to conceal from senior officials; no reason to prevent OCR from witnessing; no reason to threaten Plaintiff for seeking oversight; and transparency would validate proper process. The concealment pattern

proves: knowledge senior officials would recognize violations and intervene; intent to prevent institutional correction; consciousness requirements couldn't withstand federal scrutiny; and agreement among defendants to maintain false narrative.

**353.** Blair's Pattern Across Multiple Frauds:  Blair's conduct demonstrates coordinated knowledge and intent across both Pattern 3 and Pattern 4.  In Pattern 3 (August 25 - September 3), Blair received Selcer's falsified meeting summary, Plaintiff's same-day detailed correction with specific Title IX citations, and Plaintiff's September 2 escalation requesting response—yet remained silent for nine days while the false record justified denying Plaintiff's accommodations.  In Pattern 4 (October 20-23), Blair consulted directly with defendant Selcer about his own conflict, misrepresented TAP No.  33's explicit community reporting provisions (Section IV.3), and threatened academic failure to coerce compliance during active litigation.  This pattern demonstrates:  knowledge of federal obligations she systematically violated; consciousness that proper oversight would expose violations (demonstrated by silence in Pattern 3 and compliance theater in Pattern 4); intent to coordinate with defendant Selcer rather than provide independent oversight; and willingness to document fraud in writing, demonstrating institutional confidence in impunity born of successful retaliation regime.

**354.** Motives — Institutional Liability and Administrative Burden: All defendants shared motives of avoiding institutional liability and administrative burden. Simpson's implementation of supportive measures would create formal Title IX record and establish precedent for immediate measures without meetings. Wasilko's proper Title IX response would document his failure to fulfill mandatory reporting duty and reveal weeks of deflection. Sawa's acknowledging Plaintiff's rights would undermine her threat to charge Plaintiff and admit retaliation violation. Selcer's providing remote access would set "Zoom precedent" increasing his administrative burden as chair. Blair's referring Plaintiff's TAP 33 report for proper independent review would:  (a) expose that a defendant was evaluating a plaintiff during litigation; (b) require institutional intervention in Selcer's authority over Plaintiff; (c) es-

tablish precedent for students reporting faculty conflicts; and (d) create permanent record of coordination with litigation defendant. These motives were personal to institutional roles and wholly outside legitimate employment functions.

## D. Reliance and Damages — Summary

**355.** Three Phases of Reliance:

*Phase 1 (June 30 - July 24)—Plaintiff's Reliance on Wasilko*: Plaintiff relied on Wasilko's false "not a violation" statement; three weeks of preventable homelessness and denial of Title IX protections; and complete ignorance of federal rights caused by Wasilko's concealment and deflection.

*Phase 2 (July 24 - September 3)—University Leadership's Reliance on Simpson, Wasilko, Sawa, and Selcer*: Senior officials (President, Provost, Legal Affairs, Blair) relied on defendants' false characterizations that proper process was being followed and Plaintiff was "refusing to engage"; silence and non-intervention across six weeks despite Plaintiff's direct appeals; reliance caused by systematic concealment through oversight removal; continuing harm through fabricated meeting requirements, retaliation threats, and forced unsafe reentry.

*Phase 3 (October 20-23)—Plaintiff's Coerced Compliance and Designated Reviewers' Bypass*: Plaintiff forced to attend Selcer's class under threat of failing grade after Blair's false representations that TAP 33 didn't apply; designated reviewers (Frist, McCloskey, Gormley) prevented from conducting mandatory independent conflict review by Blair's false claim that policy didn't apply to student reports; Blair's coordination with defendant Selcer created ongoing harm during active federal litigation.

**356.** Blair's Role Across Phases: Blair appears in both Phase 2 and Phase 3, demonstrating

evolution from potential reliance to active coordination. In Phase 2 (August 25 - September 3), Blair received Selcer's false meeting summary and Plaintiff's detailed corrections but failed to intervene, enabling Selcer's fraud whether through reliance, complicity, or indifference. In Phase 3 (October 20-23), Blair became an active participant in fraud, consulting directly with defendant Selcer and making her own false representations about TAP 33 applicability. This progression demonstrates: knowledge of ongoing violations (from receiving August corrections); consciousness that oversight role required intervention; deliberate choice to coordinate with defendants rather than correct violations; and escalating complicity in the institutional conspiracy.

**357.** Damages: Economic (housing insecurity and homelessness from June 30 through present; financial crisis documented by negative bank balance by August; loss of stable housing necessary for graduate studies); Educational (denial of in-person access to colleagues, faculty, library, facilities; compromised graduate education through forced limited remote participation; threat of attrition through three-week Zoom limitation; September 17 forced absence from seminar; ongoing evaluation by litigation adversary after Blair's TAP 33 fraud; chilling of academic performance and participation due to defendant's grading authority); Physical and Emotional (ongoing fear for safety without protective measures; medical necessity of remote access documented by physician; September 17 dangerous encounter with harasser; October 23 "anxiety freefall" after forced attendance in defendant Selcer's class; stress from housing instability and institutional betrayal; retaliation threats and disciplinary intimidation; ongoing psychological harm from forced contact with litigation opponent under defendant's evaluative control); Reputational (false characterization as "dissatisfied" rather than raising legal objections; institutional narrative of "refusing to engage"; damage to standing within department and program; portrayal as difficult/non-compliant rather than victim; professional harm from being evaluated by defendant during federal case); and Civil Rights (three weeks preventable Title IX denial caused by Wasilko's fraud; six weeks continuing denial despite known rights; retaliatory threats and conditions violating 34 C.F.R. § 106.71;

ADA accommodation denials; denial of TAP 33 procedural protections; ongoing deprivation of federally protected rights; forced subordination to litigation adversary's authority).

**358.** Causation Direct and Documented: But for defendants' fraud:

*Pattern 1 (Wasilko)*: Plaintiff would have received Title IX measures on June 30; three weeks homelessness prevented; immediate supportive measures would have provided housing and safety protections.

*Pattern 2 (Simpson, Wasilko, Sawa)*: Senior officials would have intervened within 48 hours of Plaintiff's July 24 appeal; six weeks continuing denial prevented; September 17 encounter prevented through proper protective measures.

*Pattern 3 (Selcer)*: Accurate meeting record would have enabled Dean Blair's institutional correction in her oversight capacity; forced unsafe reentry prevented; continued educational access secured; September 17 encounter prevented.

*Pattern 4 (Blair, Selcer)*: Proper TAP 33 independent review by designated officials would have:  removed Selcer's evaluative authority over Plaintiff during litigation; implemented alternative arrangements for teaching seminar; prevented October 23 forced attendance and resulting anxiety freefall; prevented October 23 confrontation by defendant Selcer; protected Plaintiff's academic standing and teaching eligibility from defendant's control; and vindicated TAP 33's community reporting mechanism.

## E. Individual Capacity and Scope of Employment

**359.** All defendants are sued in their individual capacities for conduct outside the scope of their lawful employment.

**360.** Fraud is Never Within Scope of Employment: Pennsylvania law is clear that intentional

torts, including fraud, fall outside the scope of employment as a matter of law. *Fitzgerald v. McCutcheon*, 410 Pa. Super. 587, 600 A.2d 1203, 1214 (1991); *Brumfield v. Sanders*, 232 F.3d 376, 380 (3d Cir. 2000).

**361.** Defendants' fraudulent conduct served their personal interests in: avoiding documentation of their own failures; minimizing administrative burdens; preventing institutional liability exposure; retaliating against protected activity; and silencing student attempts to seek oversight. These motives are wholly adverse to the University's legitimate interests in: Title IX compliance; student safety and welfare; accurate record-keeping; federal civil rights protections; and institutional accountability.

**362.** Specific Conduct Outside Scope of Employment:

*Wasilko* falsely stated conduct wasn't a violation when he knew it violated multiple Student Code provisions, failed to fulfill mandatory reporter duty, and conditioned assistance on fabricated requirements contrary to 34 C.F.R. § 106.44(a).

*Simpson* conditioned supportive measures on meetings contrary to federal regulations she is charged with implementing, fabricated jurisdictional requirements, and systematically removed oversight officials.

*Sawa* threatened retaliation for protected Title IX activity violating 34 C.F.R. § 106.71, attempted to silence student from seeking help, and used Student Conduct authority to suppress federal civil rights complaints.

*Selcer* deliberately falsified meeting records, refused to correct false record despite detailed corrections, removed institutional oversight before issuing "final directive," and conditioned educational access on fabricated requirements to avoid "Zoom precedent."

*Blair* consulted directly with defendant Selcer about his own conflict during active federal litigation, bypassed TAP No. 33's mandatory independent review procedures, misrepre-

sented a five-page policy's explicit community reporting provisions (Section IV.3) to exclude Plaintiff's complaint, threatened academic failure to coerce compliance with a litigation adversary's authority, and documented this coordination in writing to both Plaintiff and defendant Selcer. Blair's conduct demonstrates: willingness to coordinate with litigation defendants rather than provide independent oversight; conscious bypass of mandatory procedures she has institutional duty to enforce; retaliation through academic coercion during federal proceedings; and institutional confidence in impunity (documenting conspiracy in writing during active litigation alleging conspiracy).

**363.** Personal Participation Required for Individual Liability: Each defendant personally participated in the fraudulent conduct through their own statements, emails, and documented actions. The complaint identifies specific dates, times, recipients, and content of each defendant's false representations. This is not vicarious liability for others' conduct, but direct personal liability for each defendant's own fraudulent statements and concealments.

## F. Punitive Damages Against Individual Defendants

**364.** Defendants Simpson, Wasilko, Sawa, Selcer, and Blair's conduct was intentional, willful, and malicious. By fabricating requirements, concealing oversight, falsifying records, threatening retaliation, and cutting off protections for reasons unrelated to legitimate institutional functions, they acted in deliberate disregard of Plaintiff's rights and safety. Their personal participation in systematic fraud, committed outside the scope of their lawful employment, warrants punitive damages. *Hutchison v. Luddy*, 870 A.2d 766, 770-71 (Pa. 2005).

**365.** Blair's Conduct Warrants Substantial Punitive Damages: Blair's fraud is particularly egregious and demonstrates institutional confidence in impunity that punitive damages are designed to deter. Blair documented her coordination with defendant Selcer in writing

during active federal litigation—"I did need to consult Dr. Selcer... Both Dr. Selcer and I strongly concur"—because she had no reason to fear that written evidence of: consulting a litigation defendant about his own conflict; bypassing mandatory TAP 33 independent review procedures; misrepresenting policy provisions that explicitly authorized Plaintiff's report; threatening academic failure to coerce compliance with defendant's authority; and coordinating with defendant during federal litigation alleging conspiracy—would result in institutional consequences or personal liability.

**366.** This institutional confidence in impunity is itself evidence of the effectiveness of Duquesne's retaliation regime: administrators operate with such brazen disregard for procedures that they document conspiracy in writing because the system has successfully deterred prior complaints through retaliation so effective that administrators no longer fear accountability. Blair's willingness to document fraud during active federal litigation alleging fraud demonstrates that punitive damages are necessary to: punish willful and malicious conduct that continues unabated during federal proceedings; deter university administrators from coordinating with litigation adversaries to bypass mandatory procedures; vindicate TAP No. 33's community reporting mechanism that Blair's conduct has undermined; and correct institutional confidence in impunity that enables administrators to commit fraud openly without fear of consequences.

**367.** All five defendants' coordinated fraud—spanning from June through October 2025 and continuing through present—demonstrates systematic, willful, and malicious disregard for Plaintiff's federal rights, safety, and educational access. Substantial punitive damages are warranted to punish this conduct, deter future violations, and vindicate the federal and institutional protections these defendants systematically undermined.

## COUNT V — CIVIL CONSPIRACY

## (Against Simpson, Wasilko, Sawa, Selcer, and Blair in Their Individual Capacities)

**368.** Plaintiff repeats and incorporates Paragraphs 1-367 of the Complaint as though fully set forth herein.

**369.** Defendants Alicia Simpson, Adam Wasilko, Anne Mullarkey Sawa, Daniel Selcer, and Kristine Blair are sued in their individual capacities for civil conspiracy. Their conduct was intentional, malicious, and outside the scope of their lawful employment.

### A. Legal Standard

**370.** Pennsylvania law defines civil conspiracy as a combination of two or more persons to do an unlawful act or to do a lawful act by unlawful means, together with an overt act in furtherance of the combination and resulting harm. *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 472-73 (1979).

**371.** Elements Required: Agreement (two or more persons acting in concert); Unlawful act or unlawful means (the object or method violates law); Overt acts (conduct in furtherance of the conspiracy); Malice (intent to injure or consciousness of wrongdoing); and Resulting harm (damages proximately caused by the conspiracy).

**372.** Circumstantial Evidence Suffices: Federal courts have long recognized that civil conspiracy is rarely established by direct evidence; circumstantial evidence of coordinated conduct and parallel statements is sufficient at the pleading stage. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (circumstantial evidence can be "more certain, satisfying, and persuasive than direct evidence").

The Supreme Court's recognition reflects a fundamental truth about evidentiary patterns: direct evidence provides only a snapshot—sufficient for discrete physical events, but inadequate for complex processes requiring proof of deception, intent, or agreement among multiple actors. For such processes, circumstantial evidence creates the flipbook. Like individual frames in animation, seemingly isolated incidents may appear innocuous when viewed alone, but when viewed in sequence with proper frequency and speed, they reveal a clear, cohesive narrative of coordinated wrongdoing.

This principle is especially critical in discrimination cases, but applies equally when proving intent of any kind. Even explicit statements of animus require circumstantial confirmation to establish malicious action, as the critical link between intent and action cannot be established directly. Two snapshots—animus plus adverse action—remain insufficient without the flipbook evidence proving that the intent caused the action. The adverse action may have been contextually justified, policy-driven, or coincidental to the expressed animus. Only systematic patterns of conduct can establish the causal link between discriminatory intent and wrongful action that proves culpability.

Here, Plaintiff's systematic evidence of agreement and malice—36 near-identical false statements and approximately eight OCR removals offered in the face of Plaintiff's requests to keep OCR on CC—would be more probative of coordinated wrongdoing than if each administrator had independently stated "I hate the plaintiff." Such individual expressions of animus could be dismissed as isolated personal bias, but coordinated patterns of deception cannot be recontextualized or explained away.

**373.** Apodictic Circumstantial Evidence: Plaintiff contends the record presents apodictic circumstantial evidence—circumstantial evidence so internally consistent, so uncontradicted, and so probative that it leaves no plausible alternative inference. In the conspiracy context, apodictic evidence means the patterns, events, and omissions are of such uniformity that coincidence or innocent explanation is not a plausible inference. The record cannot be

explained without both agreement and malice.

## B. Four Distinct Conspiracies — Each Tethered to Underlying Fraud

**374.** Defendants Simpson, Wasilko, Sawa, Selcer, and Blair engaged in four distinct and independently sufficient conspiracies. Each conspiracy is tethered to the underlying fraud schemes alleged in Count IV. Each involved agreement, overt acts, and malice. Each independently satisfies Pennsylvania's civil conspiracy elements.

## CONSPIRACY 1: FABRICATED MEETING REQUIREMENT

**375.** The Two-Phase Conspiracy: The meeting requirement conspiracy operated in two distinct phases mirroring the fraud pattern. Phase 1 (June 30 - July 24)—Wasilko's Solo Fraud: Single actor (Wasilko); target was Plaintiff's reliance; no conspiracy during this phase (requires two or more actors); establishes foundation for Phase 2 conspiracy. Phase 2 (July 24 - August 13)—Coordinated Four-Defendant Conspiracy: Multiple actors (Simpson, Wasilko, Sawa, Selcer); target was university leadership's reliance; agreement evidenced by 36 nearly identical false statements; conspiracy begins precisely when Plaintiff escalates to senior leadership.

**376.** Phase 1: Foundation — No Conspiracy (June 30 - July 24): Wasilko's June 30 - July 24 fraud was unilateral. During Phase 1, only Wasilko participated in deceiving Plaintiff about Title IX applicability and fabricating the "not a violation" statement. Other defendants were not yet involved in coordinated misconduct. However, Phase 1 establishes critical foundation for Phase 2 conspiracy by creating three weeks of institutional delay and denial, establishing pattern of concealing Title IX from Plaintiff, destroying Plaintiff's trust in institutional good faith, and setting stage for Phase 2's coordinated effort to deceive leadership. Phase 1 is alleged as fraud (Count IV, Pattern 1, Phase 1) but not conspiracy due to single actor.

**377.** Phase 2: The Four-Defendant Conspiracy (July 24 - August 13): The Precise Moment Agreement Forms: On July 24, 2025, at 2:59 PM, Plaintiff issued his Second Demand Letter marking the end of his reliance and escalating to senior university leadership. Plaintiff explicitly stated: "This is not a negotiation... I will not accept delay or bargaining. If these demands are not met in full within the next 48 hours, I will escalate immediately to the Department of Education's Office for Civil Rights." Plaintiff had already sent his First Demand Letter copying President, Provost, Legal Affairs, Title IX Coordinator Simpson, Dean Wasilko, Department Chair Selcer, and Director of Graduate Studies Rodemeyer. Within 2 hours of the First Demand, Simpson responded with the first fabricated meeting requirement while systematically removing senior officials from her reply. From July 24 forward, four defendants—Simpson, Wasilko, Sawa, and Selcer—made 36 nearly identical false statements over six weeks claiming supportive measures required meetings or "engagement." This pattern of uniform false statements across multiple actors at different organizational levels demonstrates agreement.

**378.** Agreement — Proven by Uniform Conduct: The 36 Statements Prove Agreement: Between July 24 and August 13, four defendants made at least 36 documented statements using nearly identical language to fabricate meeting requirements. Representative statements include: Simpson (July 24, 12:57 PM): "Once we meet... I will determine the appropriate policy"; Simpson (August 13): "It is necessary for representatives of these offices to meet with you to gather additional information"; Wasilko (July 25): "We cannot assist you or provide you with further guidance unless you are willing to engage with the appropriate offices"; Wasilko (July 28): "The University cannot assist you unless you engage with the appropriate offices"; Sawa (August 13, joint with Simpson): "While it is a standard and essential practice to hold meetings following receipt of concerns such as yours..."; Sawa (August 15): "You are expected to communicate directly with the resources offered to you... Failure to do so may result in charges"; Selcer (August 25): "You would need to follow the procedures of the potentially relevant university offices... we were glad to learn that you

are considering further engaging with these university processes"; and Selcer (September 3): "You are expected to follow up with and participate in the relevant processes with Title IX, Student Conduct, and Public Safety."

**379.** The Uniformity Proves Coordination: These statements share critical common elements proving agreement: identical false requirement (all condition assistance on meetings/"engagement"); identical false legal basis (all claim this is "necessary" or "standard practice" despite no such requirement in 34 C.F.R. § 106.44(a)); identical victim-blaming frame (all characterize Plaintiff's "refusal to engage" as obstacle rather than defendants' denial of rights); identical timing (all occur after July 24 escalation to senior leadership); and identical purpose (all designed to justify denial of measures to senior officials who received Plaintiff's appeals).

**380.** Probability of Coincidental Uniformity: Four defendants across three different institutional offices (Title IX Office, Student Affairs/Dean of Students, Academic Department) all independently chose: identical false legal requirement; identical false characterization; identical timing; identical language patterns; and identical concealment strategy. The probability of independent parallel conduct across four actors, 36 statements, and six weeks is vanishingly small. The only plausible explanation is agreement.

**381.** Unlawful Object and Means: The Conspiracy's Object Was Unlawful: The conspiracy's object was to deny Plaintiff federally mandated Title IX supportive measures by fabricating requirements not found in law and concealing this denial from senior officials who would correct it. This violated Title IX (34 C.F.R. § 106.44(a) requires supportive measures without meetings); constituted fraud (making false statements to deceive institutional decision-makers); and constituted retaliation (conditioning assistance on cessation of protected activity). The Conspiracy's Means Were Unlawful: Even if defendants could argue some lawful institutional interest in "process," their means violated law through fabrication (creating requirements that don't exist); concealment (systematically removing oversight of-

ficials); retaliation (threatening discipline for contacting senior officials); and falsification (creating false records).

**382.** Overt Acts — Representative Examples: The 36 false statements constitute overt acts in furtherance of the conspiracy. Representative examples include: Overt Act 1 (July 24, 12:57 PM - Simpson): responded to Plaintiff's escalation to senior leadership; fabricated meeting requirement; simultaneously removed President, Provost, Legal Affairs from correspondence; prevented senior officials from witnessing refusal to provide immediate measures. Overt Act 2 (July 25 - Wasilko): coordinated with Simpson's meeting requirement; used identical false framing; maintained removal of senior officials from correspondence; reinforced false narrative. Overt Act 3 (August 13 - Simpson & Sawa Joint Statement): coordinated joint response disclaiming Title IX jurisdiction; both imposed identical meeting requirement; both used identical "necessary to meet" language; joint authorship proves direct coordination and agreement. Overt Act 4 (August 15 - Sawa's Threat): threatened discipline if Plaintiff continued "mass emailing officials"; explicit effort to prevent oversight from learning complete record; coordinated with other defendants' concealment strategy; reinforced conspiracy's goal of preventing institutional correction. Overt Act 5 (August 25 - Selcer): falsified meeting record to omit Plaintiff's legal objections; imposed fabricated three-week limitation tied to "full engagement"; coordinated with Simpson/Wasilko/Sawa's meeting requirements; used identical "must engage" language across departmental boundaries. Overt Act 6 (September 3 - Selcer): removed all oversight officials before "final directive"; explicitly refused to address Plaintiff's corrections; maintained fabricated "must engage" requirement; coordinated concealment with other defendants' strategy. Each overt act was in furtherance of the conspiracy's unlawful object, coordinated with co-conspirators' parallel conduct, designed to deceive senior officials and prevent correction, and harmful to Plaintiff by prolonging denial of measures.

**383.** Malice — Legal and Actual: Pennsylvania Malice Standard: Malice means either legal

malice (conduct intentionally done in disregard of known duties or rights) or actual malice (intent to harm or injure). Both forms present here. Legal Malice — Intentional Disregard of Federal Rights: All four conspirators acted with knowledge that federal law required supportive measures without meetings, their conduct violated federal law (Plaintiff repeatedly cited 34 C.F.R. § 106.44(a)), and senior officials would intervene if informed (systematic removal of oversight proves consciousness). Acting with this knowledge constitutes legal malice—intentional conduct in disregard of Plaintiff's known federal rights. Actual Malice — Intent to Harm: The conspiracy was designed to and did harm Plaintiff by prolonging homelessness and housing crisis, depriving educational access, causing emotional and dignitary harm, and denying civil rights. Conspirators knew harm would result (medical documentation, explicit warnings, obvious urgency, foreseeable danger). Acting with knowledge that harm would result from denial of measures constitutes actual malice.

**384.** Resulting Harm: Plaintiff suffered substantial documented harm directly caused by Conspiracy 1. Temporal Harm — July 24 through Present: continuing homelessness; educational disruption; physical danger; emotional and dignitary harm; and civil rights violations. But-For Causation: But for Conspiracy 1's fabricated meeting requirements and coordinated false narrative: senior officials would have intervened within 48 hours of July 24 appeal; emergency housing would have been provided by July 26; supportive measures would have been implemented; remote access would have been secured; and September 17 encounter would not have occurred. All harm after July 24 was proximately caused by the conspiracy.

## CONSPIRACY 2: SYSTEMATIC REMOVAL OF OVERSIGHT

**385.** Actors and Agreement: Four Defendants Participated: Conspiracy 2 involved four defendants—Simpson, Wasilko, Sawa, and Selcer—systematically removing both senior administrative oversight and federal enforcement oversight (OCR) from correspondence at critical junctures across six weeks.

**386.** The Dual-Target Conspiracy: The oversight removal conspiracy targeted two distinct categories of oversight: Target 1 (Senior Administrative Oversight)—President, Provost, Legal Affairs, Dean Blair, Director of Graduate Studies Rodemeyer; purpose was to prevent institutional correction and intervention. Target 2 (Federal Enforcement Oversight)—OCR; purpose was proof of intent, consciousness, and agreement; enabled senior reliance.

**387.** Agreement — Proven by Systematic Parallel Conduct: Eight Documented Removals Across Six Weeks: Removal 1 (July 24, 12:57 PM - Simpson): removed President, Provost, Legal Affairs within 2 hours of Plaintiff's escalation; prevented senior officials from witnessing Simpson's refusal to provide immediate measures and fabricated meeting requirement. Removal 2 (July 25 - Wasilko): removed President, Provost, senior officials day after Simpson's removal; coordinated with Simpson's meeting requirement; prevented senior officials from witnessing coordinated "cannot assist unless you engage" narrative. Removal 3 (July 28 - Wasilko): removed President, Provost; did not include OCR despite OCR involvement since July 26; after Plaintiff escalated to OCR; prevented senior officials and federal oversight from witnessing persistence in fabricated requirements despite OCR escalation. Removal 4 (August 13 - Simpson & Sawa Joint): removed OCR from joint response; joint statement disclaiming Title IX jurisdiction; both imposing identical meeting requirements; prevented federal enforcement authority from witnessing false jurisdictional claim and fabricated meeting requirements. Removal 5 (August 15 - Sawa's Threat): threat designed to prevent future copying of senior officials and OCR; after Plaintiff continued seeking oversight despite defendants' removals; explicit threat of discipline for "mass emailing University officials"; prevented future oversight through intimidation and threatened retaliation. Removal 6 (August 25 - Selcer): removed OCR from meeting summary; four days after August 21 meeting; falsified summary omitting all legal objections; prevented federal oversight from witnessing false characterization of meeting. Removal 7 (August 25 evening - Plaintiff Re-Adds OCR): Plaintiff sent detailed correction explicitly re-adding OCR and stating: "I am also CC'ing OCR on this communication and ask that they be included on all further correspondence

regarding this matter"; Plaintiff put all defendants on explicit notice that OCR removal was deliberate and must cease. Removal 8 (September 3 - Selcer): removed OCR, Rodemeyer, Dean Blair—all oversight eliminated; before issuing "final directive" refusing to address corrections; after Plaintiff explicitly requested OCR remain copied; prevented all institutional and federal oversight from witnessing Selcer's explicit refusal to correct false record.

**388.** The Pattern Proves Agreement: Four defendants across three offices all: removed same categories of oversight (senior admin + OCR); removed at same critical junctures (immediately after Plaintiff copied them); removed for same purpose (preventing oversight from witnessing violations); coordinated removals across six weeks; and continued removals even after Plaintiff explicitly requested oversight remain copied. Probability of coincidental parallel conduct across four actors, eight removals, and six weeks is vanishingly small. The only plausible explanation is agreement and coordination.

**389.** The OCR Removal Pattern — Apodictic Proof: OCR Removal Functions Differently Than Senior Official Removal: While senior official removal directly enables their reliance through concealment, OCR removal functions as apodictic proof of the conspiracy's intent, consciousness, and agreement. Why OCR Removal Is Apodictic Evidence: OCR Does Not "Rely"—OCR is an independent federal enforcement authority that investigates independently of institutional narratives. Therefore, OCR Removal Serves Only One Rational Purpose—preventing the federal enforcement authority from witnessing conduct conspirators knew violated federal law. The Logic Is Inescapable: You don't hide from federal enforcement unless you know you're breaking federal law. If defendants' meeting requirements were legitimate and conduct complied with Title IX: OCR's presence would validate proper process; no reason to conceal from federal oversight; transparent cooperation would be best practice; and professional compliance officers would welcome federal validation. But if defendants knew their requirements violated 34 C.F.R. § 106.44(a): OCR presence would expose violations; federal enforcement would immediately correct violations; institutional

liability would result; and concealment from OCR becomes necessary to conspiracy's success. Systematic OCR Removal Proves: knowledge (defendants knew meeting requirements violated federal law); intent (defendants intended to deceive senior officials by preventing external validation signal); agreement (four defendants coordinated to remove same federal oversight at critical junctures); consciousness (defendants were conscious federal scrutiny would expose conspiracy); and causation (removal directly caused senior officials' reliance by eliminating signal that would trigger intervention).

**390.** The Removal Pattern Is Self-Proving: The beauty of OCR removal as evidence: it proves conspiracy even without anyone "believing" the lie; OCR didn't need to "rely" on anything; senior officials' reliance is proven separately through their six-week silence; the act of concealment itself is the evidence; and the systematic elimination of oversight is the confession.

**391.** Sawa's August 15 Threat Corroborates Agreement: Sawa's explicit threat to discipline Plaintiff for "mass emailing University officials" directly corroborates the oversight removal conspiracy. The Threat Proves: coordination (Sawa knew other conspirators were removing oversight and needed to prevent Plaintiff from re-adding them); shared purpose (all conspirators shared goal of preventing complete institutional record from reaching senior officials); consciousness (the threat admits conspirators knew their conduct couldn't withstand oversight scrutiny); and agreement (the threat was designed to support co-conspirators' removal strategy by preventing Plaintiff from circumventing their removals). The threat is an admission against interest: it proves conspirators needed to prevent oversight to maintain their false narrative.

**392.** Unlawful Object and Means: The Conspiracy's Object Was Unlawful: The conspiracy's object was to conceal from senior institutional decision-makers and federal enforcement authority the conspirators' violations of Title IX mandatory obligations. This constituted fraud (concealment of material facts from parties entitled to know them); obstruction (prevent-

ing federal enforcement authority from witnessing violations); and retaliation (threatening discipline to prevent oversight violates 34 C.F.R. § 106.71). The Conspiracy's Means Were Unlawful: systematic concealment (active removal of oversight officials from correspondence after Plaintiff explicitly included them); threats and intimidation (Sawa's threat to charge Plaintiff for seeking oversight); coordination across offices (multiple defendants across different offices coordinating to remove same oversight at same times); and persistence despite corrections (continued removals even after Plaintiff explicitly requested OCR remain copied).

**393.** Overt Acts — Systematic Pattern: Each of the eight documented removals constitutes an overt act in furtherance of the conspiracy. The pattern demonstrates: Immediate Response to Plaintiff's Oversight Attempts (July 24, 10:55 AM—Plaintiff copies President/Provost/Legal Affairs; July 24, 12:57 PM—Simpson removes them 2 hours later; July 26—Plaintiff escalates to OCR; July 28—Wasilko excludes OCR from response; August 25—Plaintiff explicitly requests OCR remain copied; September 3—Selcer removes OCR, Rodemeyer, Blair before "final directive"); Coordination Across Organizational Boundaries (Title IX Office, Student Affairs, Academic Department all removed same categories of officials at critical junctures demonstrating agreement across institutional silos); and Escalating Sophistication (early removals targeted senior administrative oversight only; mid-conspiracy OCR exclusion begins; late conspiracy explicit threat to prevent future oversight attempts; final stage total elimination of all oversight before explicit refusal to correct—this escalation proves coordinated strategic thinking).

**394.** Malice — Legal and Actual: Legal Malice — Consciousness of Wrongdoing: The oversight removal pattern itself proves legal malice. No Innocent Explanation Exists (email systems make "reply all" easier than selective removal; deliberate effort required proves consciousness of wrongdoing). Pattern Contradicts Institutional Best Practices (professional compliance officers are trained to cooperate transparently with federal oversight, escalate serious compliance issues to senior leadership, document institutional responses for account-

ability, and welcome external validation—systematic removal contradicts all institutional best practices, proving consciousness that conduct wouldn't withstand scrutiny). Persistence Despite Explicit Corrections (after Plaintiff's August 25 explicit request that "OCR... be included on all further correspondence," Selcer's September 3 removal demonstrates knowledge the removal was deliberate and noticed, intent to continue concealment despite being called out, and consciousness that OCR presence threatened conspiracy). Sawa's Threat Proves Collective Consciousness (Sawa's August 15 threat proves all conspirators were conscious that oversight threatened their false narrative, senior officials would intervene if fully informed, federal enforcement would expose violations, and concealment was necessary to conspiracy's success).

**395.** Actual Malice — Intent to Harm: The oversight removal conspiracy was designed to harm Plaintiff by: preventing institutional correction (by concealing violations from President/Provost/Legal Affairs/Dean Blair, conspirators prevented institutional intervention that would have provided emergency housing, implemented protective measures, corrected Title IX violations, and prevented September 17 encounter); enabling continuing denial (concealment allowed conspirators to persist in denying measures for six weeks despite Plaintiff's repeated escalations, explicit citations to federal law, medical documentation, and obvious urgency and danger); causing reputational harm (by preventing oversight from witnessing complete record, conspirators enabled false narrative that Plaintiff was "refusing to engage" rather than victim of institutional violations); and prolonging housing crisis and educational disruption (each day of concealment prolonged Plaintiff's homelessness, financial crisis, and denial of educational access). Conspirators knew this harm would result from preventing oversight and intervention.

**396.** Resulting Harm: Conspiracy 2 caused distinct and compounding harm. Harm Directly Caused by Oversight Removal: Senior Officials' Non-Intervention (six weeks of silence from President, Provost, Legal Affairs, Dean Blair despite multiple direct appeals, clear authority

to intervene, obvious Title IX violations, and emergency housing crisis—but for oversight removal, senior officials would have witnessed OCR's active involvement, seen Plaintiff's explicit citations to 34 C.F.R. § 106.44(a), recognized pattern of fabricated requirements, and intervened to provide housing and measures within 48 hours); Prolonged Homelessness (each day of senior officials' non-intervention prolonged Plaintiff's housing crisis; from July 24 through present, Plaintiff has remained homeless and housing insecure due to concealment preventing institutional correction); Educational Harm (oversight removal enabled three-week Zoom limitation imposed August 25, forced unsafe reentry September 15, September 17 encounter with harasser, and ongoing denial of in-person access to facilities, colleagues, faculty); Emotional Harm — Institutional Abandonment (the oversight removal created particularly severe emotional harm—Plaintiff appealed directly to President, Provost, and Dean for help, and received only silence; this silence—caused by conspirators' concealment—communicated institutional abandonment and created despair; Plaintiff reasonably perceived that even the highest officials didn't care about his safety or rights; this perception was false—senior officials were relying on incomplete information—but the emotional harm was real and directly caused by the conspiracy's concealment); and Civil Rights Violations (oversight removal enabled six weeks of continuing Title IX violations, retaliation for protected activity, ADA accommodation denials, and obstruction of federal enforcement).

## CONSPIRACY 3: FALSIFIED MEETING TRANSCRIPT

**397.** Actors and Agreement: Two Actors — One Sued Individually: Conspiracy 3 involved two actors: Daniel Selcer (Department Chair)—Defendant, sued individually; and Lanei Rodemeyer (Director of Graduate Studies)—Co-conspirator, named but not sued. Only Defendant Selcer is sued individually for Conspiracy 3. Rodemeyer is identified solely to establish the conspiracy's existence under Pennsylvania law's two-actor requirement. Plaintiff does not seek damages from Rodemeyer in this Amended Complaint and does not name her

as a defendant.

**398.** Agreement Between Selcer and Rodemeyer: The conspiracy required agreement between at least two actors: Selcer and Rodemeyer. Evidence of Agreement: Joint Participation in August 21 Meeting (both participated in Zoom meeting where Plaintiff raised substantive concerns; both witnessed Plaintiff's question and Selcer's "I don't know" response; both heard substantive legal objections); Selcer's August 25 Summary Copied Rodemeyer (four days after meeting, Selcer sent falsified summary to Plaintiff, Rodemeyer, and Dean Blair; by copying Rodemeyer, Selcer provided opportunity to correct if summary was inaccurate, sought Rodemeyer's implicit endorsement through silence, and created appearance of institutional consensus); Rodemeyer's Nine-Day Silence (Rodemeyer received Selcer's falsified summary which she knew was false having attended meeting, Plaintiff's detailed correction explicitly copied to her, and Plaintiff's September 2 escalation requesting response—for nine days, Rodemeyer did not correct Selcer's false summary, respond to Plaintiff's corrections, intervene to provide accurate account, or alert Dean Blair that summary was inaccurate—Rodemeyer's silence after witnessing both the actual meeting and Selcer's false characterization and Plaintiff's detailed correction constitutes ratification and evidence of agreement); and Coordinated Silence as Agreement (nine days of coordinated silence from both Selcer and Rodemeyer despite both attending meeting, both knowing summary was false, both receiving Plaintiff's detailed corrections, and both receiving Plaintiff's September 2 escalation proves agreement to maintain false record).

**399.** Dean Blair's Role in Conspiracy 3 — Reliance Victim, Not Co-Conspirator: Blair is identified in Conspiracy 3 not as a participant but as a reliance victim whose non-intervention demonstrates the conspiracy's success. Blair's Position (Dean of Graduate School; institutional supervisor over department chair; first copied on August 25 summary; no direct knowledge of meeting's content). Blair's Reliance (Blair received Selcer's false summary, Plaintiff's detailed correction, and Plaintiff's September 2 escalation; Blair relied on Sel-

cer and Rodemeyer's coordinated silence to conclude summary was accurate because both attended meeting, neither corrected summary, coordinated silence suggested institutional consensus, and Blair had no independent basis to know summary was false—Blair's nine-day silence demonstrates successful deception, not conspiracy participation). Why Blair Is Not Sued for Conspiracy 3 (no direct knowledge—Blair did not attend August 21 meeting; victim of conspiracy—Blair's reliance on false summary demonstrates she was deceived, not that she participated in deception; removed before exposure—Selcer removed Blair from September 3 "final directive" before explicitly refusing to correct, suggesting Selcer sought to prevent Blair from witnessing his consciousness of falsification).

Blair is identified in Conspiracy 3 solely to establish: the conspiracy's existence (requires two or more actors: Selcer + Rodemeyer); the conspiracy's success (Blair's reliance proves conspiracy deceived institutional decision-maker); and the conspiracy's harm (Blair's non-intervention caused by reliance on false record).

Blair is sued as a defendant in this Amended Complaint, but for her own fraudulent conduct in Pattern 4 and her coordination with Selcer in Conspiracy 4, not for participation in Conspiracy 3. Blair's role in Conspiracy 3 was as a reliance victim, and her subsequent conduct in October 2025 (Pattern 4 and Conspiracy 4) demonstrates her evolution from potential reliance victim to active conspirator.

**400.** Unlawful Object and Means: The Conspiracy's Object Was Unlawful: The conspiracy's object was to create and maintain a false institutional record that omitted Plaintiff's substantive concerns about Title IX failures, transformed discussion of federal law violations into narrative of "dissatisfaction," concealed Selcer's impermissible "Zoom precedent" motive, justified three-week limitation and forced unsafe reentry, and prevented Dean-level institutional correction. This constituted fraud (creating false record to deceive Dean Blair); obstruction (preventing institutional oversight and accountability); and retaliation (using false record to justify limitations that punished protected activity). The Conspiracy's Means

Were Unlawful: falsification (systematic omission of documented concerns from meeting record); concealment (Selcer's removal of OCR, Rodemeyer, Blair from September 3 "final directive"); coordinated silence (both Selcer and Rodemeyer refusing to respond to corrections despite explicit requests); and explicit refusal (Selcer's statement corrections were "not a request for dialogue").

**401.** Overt Acts — The Falsification Sequence: Overt Act 1 (August 21 - The Meeting): Selcer and Rodemeyer attended meeting with Plaintiff; both heard Plaintiff's substantive concerns; both heard Plaintiff describe case as "platonic ideal of Title IX"; both heard Plaintiff report retaliation threat (Selcer audibly gasped); both heard Plaintiff explain non-punitive nature of supportive measures; both heard Selcer respond "I don't know" to question about remote attendance; meeting ended without resolution, conclusion, or conditions stated. Overt Act 2 (August 25, 11:48 AM - False Summary): four days later, Selcer sent summary systematically omitting all substantive concerns; copied Rodemeyer (seeking implicit endorsement through silence); copied Dean Blair (providing false record to institutional supervisor); recharacterized Title IX violations and retaliation threats as "dissatisfaction"; omitted Plaintiff's detailed explanation of non-punitive measures; concealed department's "Zoom precedent" concerns. Overt Act 3 (August 25, 10:06 PM - Plaintiff's Correction): Plaintiff sent detailed correction to Selcer, Rodemeyer, Blair, OCR; explicitly identified omissions and mischaracterizations; cited specific federal regulations that were omitted; explained what was actually said during meeting; put all parties on notice summary was false. Overt Act 4 (August 25 - September 3 - Coordinated Silence): both Selcer and Rodemeyer received correction; neither responded despite explicit request for response; coordinated nine-day silence allowed false record to stand; silence communicated to Blair that summary was accurate. Overt Act 5 (September 2 - Second Escalation): Plaintiff escalated again to Selcer, Rodemeyer, Blair, OCR; explicitly requested response to August 25 correction; identified three-week limit as "facially retaliatory"; neither Selcer nor Rodemeyer responded. Overt Act 6 (September 3, 6:00 PM - Final Directive with Oversight Removal): Selcer systemati-

cally removed OCR, Rodemeyer, Blair; issued "final directive" explicitly refusing to address corrections; stated instructions were "not a request for dialogue"; eliminated all oversight before explicit refusal to correct.

**402.** The Pattern Proves Agreement: The overt acts demonstrate coordination between Selcer and Rodemeyer: parallel silence (both maintained silence across nine days and two escalations); temporal coordination (silence began simultaneously August 25 and ended simultaneously September 3); strategic removal (Selcer removed Rodemeyer before explicit refusal, suggesting Rodemeyer's continued presence would create accountability); and shared outcome (both achieved same goal of maintaining false record despite corrections).

**403.** Selcer's Personal Motive — Avoiding "Zoom Precedent": Selcer was motivated to avoid creating a "Zoom precedent" that would require providing remote access to other students, increase his administrative burden as department chair, and establish pattern of remote access as available accommodation. In Plaintiff's September 2 escalation, Plaintiff explicitly identified this motive. Rather than acknowledge this motive violated federal law (ADA prohibits denying accommodations based on administrative burden), Selcer: maintained nine-day silence; removed all oversight; explicitly refused to engage with corrections; and concealed "precedent" concern behind false "dissatisfaction" narrative.

**404.** Rodemeyer's Motive — Conspiracy and Zoom Precedent Avoidance: As Director of Graduate Studies, Rodemeyer's participation in falsification served to: (1) support the conspiracy by providing witness validation for Selcer's false meeting summary; and (2) help terminate Plaintiff's Zoom access to avoid creating precedent that would burden departmental administration—evidenced by her selective flexibility statement "we can be flexible in *that* way" regarding course load while refusing Zoom flexibility. These motives were personal to institutional roles, served conspiracy objectives, and were wholly outside legitimate employment functions.

**405.** Malice — Legal and Actual: Legal Malice — Intentional Disregard of Rights: Selcer's Legal Malice (Selcer acted with knowledge that the summary was false—Selcer attended meeting and knew Plaintiff raised substantive concerns about Title IX failures, not mere "dissatisfaction"; Plaintiff corrected the record—Plaintiff's August 25 detailed correction put Selcer on explicit notice with specific citations to federal law; conditions violated federal law—Plaintiff cited 34 C.F.R. § 106.44(g)(2) and (g)(4); Dean would intervene if informed—Selcer's removal of Blair before explicit refusal proves consciousness that oversight would correct falsification—acting with this knowledge constitutes legal malice). Rodemeyer's Legal Malice (Rodemeyer acted with knowledge that she had actual knowledge summary was false—Rodemeyer attended meeting and heard Plaintiff's substantive concerns; her silence would enable false record—by not correcting Selcer's summary, Rodemeyer knew false record would stand; false record would harm Plaintiff—Rodemeyer knew false record would be used to justify denials and forced unsafe reentry—acting with this knowledge constitutes legal malice).

**406.** Actual Malice — Intent to Harm: The conspiracy was designed to harm Plaintiff by: creating false institutional record (the false "dissatisfaction" narrative portrayed Plaintiff as unreasonably difficult, concealed substantive Title IX concerns from institutional decision-makers, prevented Dean-level correction, and became basis for justifying denials); enabling three-week limitation (the false record justified time-limited remote access, forcing unsafe reentry, and characterizing accommodation as "temporary authorization" rather than federal right); causing September 17 encounter (but for false record preventing Dean Blair's intervention, continued remote access would have been secured, forced unsafe reentry would not have occurred, and September 17 encounter with harasser would have been prevented); and ongoing reputational harm (the false record continues to damage Plaintiff's professional reputation, characterize Plaintiff as "refusing to engage" rather than victim, prevent correction of institutional record, and justify ongoing denials and limitations). Conspirators knew these harms would result from maintaining false record.

**407.** Resulting Harm: Conspiracy 3 caused distinct and severe harm. Immediate Harm — Forced Unsafe Reentry: three-week limitation (Selcer's false record justified imposing time limit on remote access with September 12 cutoff); forced return (Plaintiff required to attend in person beginning September 15); September 17 encounter (second day of forced return, harasser appeared outside Plaintiff's seminar room—but for false record, Dean Blair would have recognized substantive Title IX concerns, Dean would have intervened to secure continued remote access, forced reentry would not have occurred, and September 17 encounter prevented). Continuing Harm — False Institutional Record: reputational damage (permanent departmental record characterizing Plaintiff as "dissatisfied" and "refusing to engage"; damage to professional standing within field; false narrative communicated to faculty, administrators, colleagues); inability to correct (Selcer's explicit refusal—"not a request for dialogue"—prevents correction; false record stands as official institutional account; ongoing harm to reputation and standing); and educational disruption (ongoing uncertainty about access to education; compromised relationship with department; hostile environment created by false characterization). Emotional Harm — Uniquely Severe: the falsified record created particularly severe emotional harm (Plaintiff attended meeting in good faith, raised substantive Title IX concerns, described his case as "platonic ideal of Title IX," reported retaliation threats that made Selcer audibly gasp, and explained Title IX supportive measures to mandatory reporters who didn't understand them—four days later, institutional officials systematically erased those concerns from the record and transformed Plaintiff's Title IX violations and retaliation threats into a story about being unreasonably "dissatisfied"—when Plaintiff issued detailed corrections pointing out specific omissions and providing legal framework, institutional officials refused to respond for nine days, then explicitly stated corrections were "not a request for dialogue"—this communicates to Plaintiff that his Title IX concerns don't matter, his federal rights are irrelevant, he is not entitled to accurate institutional records, he deserves to be mischaracterized and silenced, and even detailed corrections with legal citations will be ignored—this is institutional gaslighting—the deliberate falsification

of records combined with explicit refusal to correct despite documented evidence—the emotional harm is profound: despair, humiliation, worthlessness, institutional abandonment).

## CONSPIRACY 4: BLAIR-SELCER COORDINATION TO BYPASS CONFLICT-OF-INTEREST PROCEDURES DURING LITIGATION

**408.** *Defendants*: Kristine Blair and Daniel Selcer

**409.** *Agreement*: On or about October 20-23, 2025, Defendants Kristine Blair and Daniel Selcer agreed to coordinate and act jointly to bypass TAP No. 33's mandatory conflict-of-interest procedures, thereby denying Plaintiff the independent review the policy guarantees when conflicts are reported. This agreement is evidenced by:

*Direct Documentary Evidence*: Dean Blair's October 22, 2025, 8:35 AM email stating "I did need to consult Dr. Selcer as instructor to secure some additional details. Both Dr. Selcer and I strongly concur that it is appropriate for you to remain enrolled in your required teaching seminar." This written statement documents consultation between Blair and Selcer and their joint conclusion—direct evidence of agreement to act in concert.

*Coordination of Timing*: Blair issued her directive on October 22, seven days after Plaintiff cross-examined Selcer under oath before this Court. The timing demonstrates both defendants understood the stakes: Plaintiff was actively litigating against Selcer and had just exercised protected court participation rights. Their coordination immediately following that protected activity demonstrates agreement to retaliate.

*Shared Purpose*: Both defendants benefited from bypassing independent conflict review. Selcer maintained evaluative power over a litigation adversary (creating leverage during ongoing proceedings). Blair avoided scrutiny of her department's handling of a plaintiff suing one of her faculty members. Their shared interest in avoiding independent oversight

demonstrates common purpose.

*Enforcement Coordination*:  On October 23, 2025, one day after Plaintiff objected to the Blair-Selcer directive with specific policy citations, Defendant Selcer personally approached Plaintiff on campus and stated "We need to set something up"—attempting to arrange the private meetings Plaintiff had explicitly declined.  This enforcement action demonstrates Selcer was acting pursuant to the coordinated plan, not independently, and that Blair's directive and Selcer's enforcement were part of a unified scheme.

**410.**  *Unlawful Act or Unlawful Means*:  The conspiracy's object was to bypass TAP No. 33's mandatory conflict-of-interest procedures to deny Plaintiff procedural protections during active federal litigation.  The conspirators employed multiple unlawful means:

*Fraud*:  As detailed in Count IV, Pattern 4 (¶¶ 326-349), Dean Blair made false representations about TAP No. 33 applicability, concealed her coordination with Defendant Selcer, falsely represented that consulting the conflicted party constituted proper review, and made facially absurd arguments that a litigation adversary grading a plaintiff does not constitute a conflict of interest.  This fraud is incorporated by reference as an underlying tort supporting this conspiracy claim.

*Title IX Retaliation*:  The coordination occurred seven days after Plaintiff cross-examined Defendant Selcer under oath before this Court on October 15, 2025—protected activity under 34 C.F.R. § 106.71 (participation in Title IX proceedings and related court actions).  Blair's directive forcing Plaintiff to attend Selcer's class and participate in private meetings with a litigation adversary constitutes adverse action taken in response to that protected activity.  The seven-day proximity and the documented coordination between the defendant whose testimony triggered the action (Selcer) and the administrator taking adverse action (Blair) establish retaliatory motive.

*Due Process Violations*:  Forcing Plaintiff to be evaluated by a biased decision-maker—a

litigation adversary with direct financial and reputational interests in the outcome of this case—during active federal proceedings violates fundamental fairness and due process principles. Selcer has personal financial exposure (compensatory and punitive damages) and professional reputation interests that create actual bias, not merely appearance of bias. Requiring Plaintiff to submit to evaluation by this biased decision-maker without independent conflict review violates basic procedural due process.

*First Amendment Retaliation*: Defendant Selcer's evaluative power over Plaintiff's academic standing (grades affecting degree progress) and teaching eligibility (Plaintiff's source of income) creates leverage that chills Plaintiff's exercise of federal court access rights. Plaintiff must calculate each litigation decision—discovery requests, deposition questions, trial strategy—knowing that a defendant holds power to retaliate through academic means. This interference with court access rights constitutes unlawful retaliation for exercising First Amendment petition rights.

**411.** *Overt Acts in Furtherance of the Conspiracy*:

**412.** October 20, 2025: Plaintiff submitted formal conflict-of-interest report to Dean Blair regarding Professor Selcer. Plaintiff reported that Selcer—a defendant in active federal litigation whom Plaintiff had cross-examined under oath five days earlier—taught Plaintiff's required seminar, creating an obvious conflict requiring independent review. Plaintiff requested guidance through University conflict procedures or an alternative arrangement.

**413.** October 20-22, 2025: Dean Blair consulted with Defendant Selcer—the person whose conflict Plaintiff had reported—about whether Selcer had a conflict, rather than referring the matter for independent review as TAP No. 33 mandates.

**414.** October 22, 2025 (8:35 AM): Dean Blair sent email documenting coordination with Selcer and announcing their joint conclusion: "I did need to consult Dr. Selcer... Both Dr. Selcer and I strongly concur that it is appropriate for you to remain enrolled in your required

teaching seminar."

**415.** October 22, 2025 (8:35 AM): Blair's email directed Plaintiff to remain enrolled in Selcer's class and participate in private meetings with Selcer—requiring ongoing contact with and evaluation by a litigation adversary during active federal proceedings.

**416.** October 22, 2025 (8:35 AM): Blair's email threatened consequences for non-compliance with the directive, including failing grade and loss of teaching eligibility (Plaintiff's income source).

**417.** October 22, 2025 (9:58 AM): Plaintiff responded by correcting his initial procedural error: he cited specific TAP No. 33 provisions (Sections IV.3 and IV.4), identified proper designated reviewers by name and title (Matthew J. Frist, Reverend James P. McCloskey, President Ken Gormley), copied all designated officials on his response, and explicitly objected to Blair's procedural violations.

**418.** October 22, 2025 (2:20 PM): Rather than referring to proper reviewers after being explicitly corrected with specific policy citations, Dean Blair doubled down, making facially absurd arguments that TAP 33 doesn't apply to student reports (contradicting Section IV.3's explicit authorization) and that litigation adversary grading plaintiff doesn't constitute conflict.

**419.** October 22, 2025 (2:20 PM): Blair copied Matthew Frist (the designated conflict reviewer) on her email but did not request his independent review—instead announcing "no change" to her directive. This demonstrates Blair knew proper procedures required Frist's involvement but deliberately avoided seeking his actual assessment.

**420.** October 22, 2025 (2:20 PM): Blair's email was sent to Plaintiff and copied to Defendant Selcer, ensuring both plaintiff and defendant understood the directive's terms and that Selcer would expect Plaintiff's compliance.

**421.** October 23, 2025: Although Plaintiff had immediately recognized that Blair's interpretation violated TAP No. 33's plain language and had objected with specific policy citations, Plaintiff was forced to attend Defendant Selcer's class under the threat articulated in Blair's directive, experiencing severe psychological distress ("anxiety freefall") from forced proximity to litigation adversary.

**422.** October 23, 2025 (approximately 6:00 PM): Defendant Selcer approached Plaintiff on campus while Plaintiff was in vulnerable psychological state following forced class attendance. Selcer stated "We need to set something up"—attempting to arrange the private meetings Plaintiff had explicitly declined, thereby enforcing the Blair-Selcer coordinated directive through direct personal pressure.

**423.** October 23-present: Plaintiff continues to be required to attend Selcer's class, be evaluated by a litigation adversary, and navigate campus while avoiding further improper contact—all pursuant to the Blair-Selcer coordinated directive that bypassed mandatory conflict-of-interest procedures.

**424.** October 23-present: The University has not conducted the independent conflict-of-interest review TAP No. 33 mandates, despite Plaintiff's report and explicit identification of proper reviewers, demonstrating the conspiracy's success in bypassing procedural protections.

**425.** *Resulting Harm*: As a direct and proximate result of this conspiracy, Plaintiff has suffered and continues to suffer:

*Severe Psychological Distress*: Plaintiff experienced an "anxiety freefall" after being forced to attend Defendant Selcer's class on October 23, 2025, characterized by aimless pacing through campus buildings for approximately fifteen minutes, inability to settle or function, and acute trauma from forced proximity to a litigation adversary during active federal proceedings. This psychological harm continues each time Plaintiff is required to attend Selcer's class or

navigate campus while avoiding improper contact. The psychological toll includes constant anxiety, hypervigilance to avoid encounters with defendants, inability to focus on academic work due to ongoing threat, and trauma from being required to submit assignments to and receive grades from someone Plaintiff is suing for violating his federal rights.

*Hostile Educational Environment*: Plaintiff cannot complete PhD requirements without subjecting himself to evaluation by a litigation adversary with direct financial and reputational interests in harming Plaintiff's academic progress. Plaintiff cannot navigate campus safely without risk of improper contact from defendants attempting to enforce coordinated directives. Plaintiff cannot participate in his academic department's normal activities (seminars, colloquia, meetings with faculty) without encountering the defendant who holds evaluative power over him. This creates an environment where educational access is conditioned on accepting ongoing contact with and subordination to a litigation adversary.

*Intimidation and Fear*: Defendant Selcer's October 23 approach occurred while Plaintiff was in a vulnerable psychological state caused by the forced attendance defendants had orchestrated. This exploitation of manufactured vulnerability demonstrates that defendants use threats to force Plaintiff to campus, creating psychological distress, then approach when Plaintiff is vulnerable to pressure compliance with improper demands. Plaintiff now experiences fear each time he must go to campus, knowing that defendants may approach him when he is in distress to apply additional pressure.

*Impossibility of Safe Compliance*: Plaintiff cannot comply with both the Blair-Selcer directive (requiring attendance and private meetings with litigation adversary) and his duty to protect his litigation interests and personal safety. Defendants have created a no-win situation: non-compliance results in academic penalties (failing grade) and loss of teaching income (teaching eligibility jeopardized); compliance results in ongoing evaluation by biased decision-maker, continued improper contact during federal proceedings, and submission to leverage by litigation adversary. Plaintiff is forced to choose between his education and his safety,

between his degree progress and his litigation rights.

*Denial of Procedural Protections*: Plaintiff has been denied the independent conflict-of-interest review TAP No. 33 mandates. The policy exists precisely to prevent situations where individuals with conflicts of interest exercise power over vulnerable parties. Blair and Selcer coordinated to bypass those protections, leaving Plaintiff without recourse through university channels and forcing him to seek judicial intervention for protections the policy should have provided administratively.

*Interference with Protected Litigation Activity*: Defendant Selcer's evaluative power over Plaintiff's grades (affecting degree progress and academic standing) and teaching eligibility (Plaintiff's income source) creates leverage during discovery, depositions, and trial. Plaintiff must calculate each litigation decision knowing that a defendant holds power to retaliate through academic means. This includes: tempering discovery requests to avoid antagonizing the defendant who grades him; moderating deposition questions to avoid academic retaliation; and considering settlement not based on case merits but to escape the defendant's evaluative power. This interference with litigation strategy and court access violates Plaintiff's rights and undermines the integrity of these federal proceedings.

*Chilled Exercise of Federal Rights*: The conspiracy demonstrates that reporting Title IX violations, reporting conflicts of interest under university policies, and exercising court access rights will result in coordinated retaliation by administrators who bypass procedures to punish complainants. This chills not only Plaintiff's rights but the rights of every Duquesne student who might otherwise report violations. When a dean coordinates with a defendant during litigation to deny procedural protections, it sends a message: "Exercise your rights and we will make you suffer for it through every administrative mechanism available."

*Material Harm*: Loss of emergency housing support ($2,500 value), loss of safe housing (forced into unsafe arrangements), costs of unsafe housing arrangements, threatened loss

of teaching income (teaching eligibility jeopardized by Blair's directive threatening failing grade), costs incurred in attempting to obtain proper conflict review (time spent documenting violations, drafting objections, identifying proper reviewers), and ongoing financial insecurity caused by defendant's evaluative power over Plaintiff's academic and professional standing.

*Ongoing and Escalating Harm*: Unlike the three prior conspiracies which involved historical conduct that has been completed, Conspiracy 4 is active and escalating. Each week Plaintiff must attend Selcer's class compounds the psychological harm. Each assignment graded by Selcer during litigation creates potential retaliation and leverage. Each day on campus creates risk of further improper contact from defendants enforcing their coordinated directive. The harm will continue throughout discovery, depositions, motion practice, trial preparation, and trial itself—and will continue until Plaintiff completes degree requirements or defendants are enjoined from maintaining evaluative power over Plaintiff during litigation.

**426.** *The Effectiveness of Duquesne's Retaliation Regime*:

Retaliation has not and will not prevent Plaintiff from exercising his civic right to due process and participation in this Court. However, it has made Plaintiff suffer for it greatly—both psychologically and materially. In the vast majority of cases, this retaliation regime would have simply prevented students from pursuing any recourse whatsoever.

The effectiveness of Duquesne's retaliation regime at chilling student petition across multiple enforcement mechanisms—both federal (Title IX) and institutional (TAP policies)—is the only explanation for why Dean Blair, a dean of the graduate school with extensive administrative and regulatory training, felt obliged to act with such impunity and to document and enforce her own conspiracy in writing against Plaintiff during active federal litigation.

Dean Blair's conduct demonstrates institutional confidence born of successful intimidation: administrators at Duquesne have learned that students can be retaliated against without consequence, that procedures can be bypassed without accountability, and that coordina-

tion with litigation adversaries will be tolerated by the institution. Blair documented her coordination with Defendant Selcer in writing—"I did need to consult Dr. Selcer... Both Dr. Selcer and I strongly concur"—because she had no reason to fear that written evidence of procedural bypass during federal litigation would result in institutional consequences or personal liability.

This institutional confidence in impunity is itself evidence of the effectiveness of Duquesne's retaliation regime. When administrators operate with such brazen disregard for procedures that they document conspiracy in writing during active federal litigation about conspiracy, it demonstrates that the system has successfully deterred prior complaints through retaliation so effective that administrators no longer fear accountability even when committing the same violations that are the subject of pending litigation.

Plaintiff's persistence in exercising his federal rights despite this retaliation should not obscure the fact that the retaliation regime works as designed: it chills student petition, denies procedural protections, and creates conditions where administrators coordinate openly to deny students recourse. That Plaintiff has not been deterred does not mean the regime is not effective—it means Plaintiff has borne extraordinary psychological, material, and educational costs to vindicate rights that should have been protected by the procedures defendants conspired to bypass. Plaintiff's continued pursuit of his claims is the rare exception that proves the effectiveness of Duquesne's retaliation regime: the institutional barriers are so high that few students could endure the material and psychological costs Plaintiff has borne.

The conspiracy's success in bypassing TAP No. 33 procedures demonstrates the broader institutional failure: when conflict-of-interest policies can be ignored by consulting with the conflicted party instead of independent reviewers, when explicit objections citing specific policy provisions can be dismissed with facially absurd arguments, and when administrators face no consequences for documented coordination with litigation adversaries, the entire procedural protection system becomes meaningless. This institutional breakdown—where

126

policies exist on paper but are bypassed with impunity—creates the conditions for ongoing civil rights violations and requires substantial damages both to compensate Plaintiff's harm and to deter future administrator conduct that treats mandatory procedures as optional suggestions.

## C. Inapplicability of Intra-Corporate Conspiracy Doctrine

**427.** Defendants Simpson, Wasilko, Sawa, Selcer, and Blair may argue that the "intra-corporate conspiracy doctrine" ("ICCD") bars these conspiracy claims because all alleged conspirators were University employees. That argument fails at the pleading stage for four independent reasons.

**428.** First, the Third Circuit has held ICCD does not apply where agents act with malice or outside the scope of their duties. *Heffernan v. Hunter*, 189 F.3d 405, 412 (3d Cir. 1999). Here, all four conspiracies satisfy this exception. Defendants fabricated requirements contrary to 34 C.F.R. § 106.44(a), persisted despite explicit corrections citing federal law, systematically removed federal enforcement authority (OCR) from correspondence, threatened retaliation against protected activity, and explicitly refused to correct documented falsifications. This conduct subverted Duquesne's lawful purposes and exposed the University to federal liability. Defendants' conduct served their personal interests in avoiding accountability, not Duquesne's institutional interests in compliance. The exception does not require proof of personal vendetta or private gain; it is enough that Defendants acted contrary to Duquesne's lawful purposes and compliance obligations, which they plainly did.

**429.** Second, ICCD developed in the for-profit corporate context and is structurally misfit in the civil rights compliance context. Universities are subject to federal civil rights obligations (Title IX, ADA) and are required to maintain independent compliance officers. Title IX specifically requires designation of a Coordinator "to coordinate compliance" with federal

127

law.  34 C.F.R. § 106.8(a).  Congress deliberately created independent compliance officers whose role is to ensure institutional compliance, not to shield institutions from liability. Applying ICCD here would collapse the statutory independence Congress created, transform compliance officers into institutional shields rather than federal safeguards, and render the Title IX Coordinator role a nullity.  Moreover, Duquesne's own Charter commits the University to maintaining "respect for the dignity of all persons" and requires institutional actors to uphold federal civil rights obligations.  The coordinated violations alleged here contradicted both federal mandates and Duquesne's charter obligations, placing Defendants' conduct outside any legitimate employment purpose.

**430.**  Third, the Court's procedural posture forecloses categorical ICCD dismissal at this stage.  The Court dismissed other tort claims with prejudice but expressly allowed Plaintiff leave to amend civil conspiracy.  Having invited amendment, the Court cannot now hold that ICCD categorically bars such claims in the university civil rights context.  At the pleading stage, Plaintiff's well-pled allegations of malice and ultra vires conduct must be credited. Whether ICCD ultimately applies should be determined after discovery develops the full record.

**431.**  Fourth, even if ICCD generally applies in the university context, it cannot shield defendants who conspired to violate federal civil rights laws that impose personal liability. Title IX and ADA create individual rights that individuals may enforce through private actions.  Where institutional actors conspire to deny those federal rights, permitting ICCD to shield them would create an end-run around Congress's remedial scheme.  Federal civil rights protections would become illusory if institutional actors could systematically violate them through coordinated conduct while claiming immunity under state common law doctrines.  ICCD must yield to federal civil rights enforcement, particularly where—as here— defendants' coordination was designed specifically to obstruct federal oversight (OCR) and prevent institutional correction of federal violations.

## D. Damages — Conspiracy Imposes Unique Harm

**432.** Joint and Several Liability: Under Pennsylvania conspiracy law, all conspirators are jointly and severally liable for all harm proximately caused by the conspiracy. Each Defendant's participation makes each liable for the full extent of damages.

**433.** Compounding Nature of Conspiracy Harm: Conspiracy inflicts unique harm beyond the underlying tortious acts. Isolation and Powerlessness: by conspiring to brand Plaintiff as "non-compliant" across offices, conceal complete record from oversight, remove senior leadership from correspondence, and coordinate to maintain false narratives, Defendants ensured Plaintiff's appeals to higher administrators and even the President were ignored or minimized—this created profound sense of institutional abandonment, powerlessness against coordinated opposition, despair that even highest officials wouldn't help, and humiliation of systematic silencing. Erasure of Credibility: the conspiracy systematically destroyed Plaintiff's institutional credibility by creating false narrative he was "refusing to engage," concealing his substantive Title IX concerns from decision-makers, preventing oversight from witnessing complete record, and coordinating uniform false characterizations across offices. Institutional Gaslighting: the conspiracy constituted institutional gaslighting (Plaintiff raised specific Title IX violations; Defendants systematically erased those violations from record; Plaintiff issued detailed corrections with legal citations; Defendants coordinated to ignore corrections and refuse engagement; false record became official institutional account—this communicated to Plaintiff: "Your documented reality doesn't matter; institutional power determines truth"). Despair from Coordinated Opposition: facing conspiracy is qualitatively different from facing individual wrongdoers (against one wrongdoer, Plaintiff can appeal to other officials for correction; against conspiracy, Plaintiff's appeals met with coordinated silence, uniform false narratives, and systematic concealment ensuring no oversight could correct—this creates reasonable belief that institution has determined Plaintiff unworthy of protection, no amount of documentation or legal citations will matter, system itself is rigged

against Plaintiff, and appeals are futile because coordination ensures consistent denial).

**434.** Emotional Distress — Conspiracy-Specific: The emotional distress inflicted by conspiracy is distinct from distress caused by individual torts. Individual tort: "This person wronged me, but others may help." Conspiracy: "Multiple officials across offices coordinated to wrong me, ensured no one would help, and systematically silenced my attempts to seek help." The despair is different in kind, not just degree.

**435.** Damages Summary — All Four Conspiracies: Conspiracy 1 (Meeting Requirement)— six weeks continuing homelessness (July 24 - September 3); financial crisis; educational disruption; civil rights violations; emotional distress from fabricated requirements. Conspiracy 2 (Oversight Removal)—senior officials' non-intervention caused by concealment; prolonged all harm from Conspiracy 1; September 17 encounter with harasser; emotional distress from institutional abandonment; despair from coordinated silence despite direct appeals. Conspiracy 3 (Falsified Transcript)—forced unsafe reentry; September 17 encounter; false institutional record; reputational harm; inability to correct record; emotional distress from institutional gaslighting. Conspiracy 4 (Blair-Selcer TAP 33 Bypass)—October 23 anxiety freefall after forced attendance in defendant's class; ongoing evaluation by litigation adversary creating leverage and coercion; denial of TAP 33 procedural protections; October 23 exploitation of manufactured vulnerability through Selcer's approach; interference with protected litigation activity; ongoing and escalating psychological harm throughout discovery, depositions, and trial; chilling of federal court access rights. All damages are compounding: each conspiracy enabled the others, Conspiracy 4 is active and escalating while others are historical, and the harm from coordination exceeded the sum of individual harms.

**436.** Conspiracy inflicts a unique and compounding form of emotional harm. By conspiring to brand him as "non-compliant," to conceal oversight, and to strip senior leadership from the record, Defendants Simpson, Wasilko, Sawa, Selcer, and Blair ensured that Plaintiff's direct appeals to higher administrators and even the President were ignored or minimized. The

consistent abandonment by those expressly charged with his safety and educational access inflicted deep humiliation, anxiety, and despair. This was not mere inaction; it was the foreseeable and intended result of a coordinated scheme by these individual Defendants that deprived Plaintiff of credibility, isolated him institutionally, and left him feeling unprotected and silenced by the very officials duty-bound to safeguard his rights. Plaintiff was left with the inescapable perception that no one in authority cared whether he could safely continue his education—or even whether he survived. The emotional distress inflicted by Defendants Simpson, Wasilko, Sawa, Selcer, and Blair's conspiracy is qualitatively distinct: it creates the reasonable belief that one is undeserving of rights, protection, and education, and instead deserving of humiliation, erasure, and disregard.

### E. Punitive Damages — Conspiracy Context

**437.** Pennsylvania Law Permits Punitive Damages for Conspiracy: Where conspiracy involves intentional, willful, and malicious conduct, punitive damages are available. *Thompson Coal*, 412 A.2d at 472-73.

**438.** All Four Conspiracies Satisfy Standard: Intentional (36 uniform false statements in Conspiracy 1; 8 systematic removals in Conspiracy 2; explicit refusal to correct despite documented evidence in Conspiracy 3; Blair's documented coordination with Selcer in writing and consultation with conflicted party about his own conflict in Conspiracy 4). Willful (persistence despite explicit corrections citing federal law; continuation despite OCR involvement; coordination across six weeks and multiple offices in Conspiracies 1-3; Blair's doubled-down misrepresentations after Plaintiff's October 22 corrections with specific TAP 33 citations in Conspiracy 4). Malicious (knowledge conduct violated federal law; consciousness oversight would expose violations; intent to harm through denial of rights and protections; actual harm resulting from forced unsafe reentry in Conspiracies 1-3; coordination with litigation defendant during active federal proceedings; threatening academic failure to coerce compli-

ance; exploiting manufactured vulnerability through October 23 approach; and documenting conspiracy in writing during litigation alleging conspiracy in Conspiracy 4).

**439.** Coordination Aggravates Culpability: The coordinated nature of the conduct makes it more culpable, not less. Individual wrongdoing may reflect mistake, negligence, or isolated bad judgment. Coordinated conspiracy requires: agreement among multiple sophisticated actors; shared consciousness of wrongdoing; collective decision to persist despite corrections; and systematic effort to conceal from oversight. This coordination demonstrates higher degree of culpability warranting punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and grant the following relief:

**Against Duquesne University (Counts I-III):**

**Declaratory Relief**

**A.** A declaration that Duquesne University violated Plaintiff's rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., and 34 C.F.R. § 106.30(a), § 106.44(a), § 106.71 (2020), by:

1. Possessing actual knowledge of sex-based harassment through Title IX Coordinator Alicia Simpson's explicit acknowledgment that Plaintiff's report warranted Title IX response and supportive measures;

2. Responding with deliberate indifference by withdrawing Title IX jurisdiction without new facts, legal justification, or explanation—a response clearly unreasonable in light of known circumstances under *Davis v. Monroe County Board of Education*, 526 U.S. 633, 648 (1999);

3. Conditioning Title IX protections on complainant participation in discretionary meetings, thereby converting mandatory federal protections into discretionary institutional favors;

4. Abdicating mandatory Title IX obligations through the Coordinator's jurisdictional disclaimer that left Plaintiff without any institutional recourse for federal protections;

5. Retaliating against Plaintiff for protected Title IX activity through jurisdictional withdrawal, explicit disciplinary threats, conditional educational access, and forced unsafe return to campus in violation of 34 C.F.R. § 106.71 (2020);

6. Creating a chilling effect that deterred and prevented Plaintiff from seeking institutional remedies by communicating that continued advocacy would result in loss of protections and threat of discipline;

7. Enabling coordinated retaliation across multiple offices (Title IX, Student Conduct, Academic Department) that systematically punished Plaintiff's refusal to participate in retaliatory processes;

8. Causing Plaintiff's ongoing homelessness, educational exclusion, and documented medical harm through deliberate institutional indifference to known sex-based harassment.

**B.** A declaration that Duquesne University violated Plaintiff's rights under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., by:

1. Failing to provide reasonable accommodations despite actual notice of disability;

2. Conditioning accommodations on unrelated "engagement" requirements;

3. Imposing time-limited "authorization" rather than reasonable accommodation;

4. Denying Plaintiff equal access to educational programs and services;

**Injunctive Relief**

**C.** A permanent injunction requiring Duquesne University to:

1. Implement comprehensive training for all mandatory reporters, Title IX personnel, and administrators on: the deliberate indifference standard under *Davis v. Monroe*;

134

the requirement that Title IX Coordinators respond reasonably to actual knowledge of sexual harassment; the prohibition on conditioning institutional response on complainant participation in discretionary meetings; the prohibition on retaliation under 34 C.F.R. § 106.71 (2020); and proper identification and referral of Title IX matters;

2. Revise Title IX and ADA policies to: eliminate any requirement that complainants attend meetings before institutional response; clarify that Title IX Coordinators must respond reasonably upon actual knowledge; prohibit jurisdictional disclaimers that abdicate institutional obligations; establish clear timelines for implementing emergency housing and protective measures; and ensure transparency with federal oversight authorities;

3. Establish oversight mechanisms to: ensure Title IX Coordinator independence from institutional liability management; prevent systematic removal of federal oversight from institutional correspondence; provide regular reporting to Board of Directors on Title IX/ADA compliance; and create accountability for administrators who demonstrate deliberate indifference to federal civil rights;

**Compensatory Damages**

**D.** Compensatory damages in an amount to be determined at trial for:

Economic Losses (housing costs and expenses from homelessness from June 30, 2025 through present; financial losses including bank overdrafts and emergency expenses; loss of stable housing necessary for graduate study; ongoing housing insecurity and associated costs);

Educational Harm (denial of in-person access to colleagues, faculty, library, and departmental facilities; compromised graduate education through forced limited remote participation; loss of professional development opportunities; damage to academic progress and career

prospects; ongoing educational disruption);

Physical and Emotional Harm (ongoing fear for physical safety without protective measures; severe emotional distress from institutional betrayal and abandonment; anxiety and trauma from September 17, 2025 encounter with harasser; medical necessity of remote access due to proximity to harasser; stress from prolonged housing crisis and financial instability; humiliation from institutional retaliation and threats);

Reputational Harm (damage to professional reputation within department and field; false institutional characterization as "non-compliant" or "refusing to engage"; ongoing harm from false institutional records);

**Attorneys' Fees and Costs**

**E.** An award of reasonable attorneys' fees, costs, and expenses pursuant to:  20 U.S.C. § 1688 (Title IX); 42 U.S.C. § 12205 (ADA); and any other applicable authority;

**Against Individual Defendants Simpson, Wasilko, Sawa, Selcer, and Blair (Counts IV-V):**

**Declaratory Relief**

**F.** A declaration that Defendants Alicia Simpson, Adam Wasilko, Anne Mullarkey Sawa, Daniel Selcer, and Kristine Blair, acting in their individual capacities, committed:

1. **Fraud** through four distinct patterns of misrepresentation and concealment: Pattern 1 (fabricating meeting requirements contrary to federal law); Pattern 2 (systematically removing institutional and federal oversight from correspondence); Pattern 3 (falsifying meeting records and refusing to correct documented misrepresentations); Pattern 4

136

(misrepresenting TAP No. 33 conflict-of-interest procedures and coordinating with conflicted party during active litigation);

2. **Civil Conspiracy** through four distinct coordinated schemes: Conspiracy 1 (coordinated fabrication of meeting requirements to deny federally mandated supportive measures); Conspiracy 2 (coordinated systematic removal of senior administrative and federal enforcement oversight); Conspiracy 3 (coordinated falsification and maintenance of false institutional records—Selcer and Rodemeyer, with only Selcer sued); Conspiracy 4 (Blair-Selcer coordination to bypass mandatory conflict-of-interest procedures during active federal litigation);

**Compensatory Damages**

**G.** Compensatory damages against Defendants Simpson, Wasilko, Sawa, Selcer, and Blair, jointly and severally, in an amount to be determined at trial for:

Economic Losses (three weeks of preventable homelessness caused by Wasilko's fraud from June 30 - July 24, 2025; six additional weeks of continuing homelessness caused by coordinated conspiracy from July 24 - September 3, 2025; ongoing housing costs and financial crisis; bank overdrafts and emergency expenses; threatened loss of teaching income from Blair's directive jeopardizing teaching eligibility);

Educational Harm (denial of educational access through fabricated requirements; three-week limitation on remote access justified by falsified records; forced unsafe reentry to campus on September 15, 2025; September 17, 2025 encounter with harasser preventing seminar attendance; ongoing evaluation by litigation adversary with direct financial and reputational interests in harming Plaintiff's academic progress; forced attendance in defendant's class under threat of failing grade; denial of TAP No. 33 procedural protections; ongoing educational disruption and compromised graduate education; hostile educational environment where ac-

cess is conditioned on subordination to litigation adversary; loss of professional development opportunities);

Physical and Psychological Harm (September 17, 2025 dangerous encounter with harasser directly caused by forced unsafe reentry; October 23, 2025 "anxiety freefall" after forced attendance in defendant Selcer's class; ongoing physical danger from lack of protective measures; continued exposure to hostile environment; ongoing psychological distress from forced proximity to litigation adversary; constant anxiety and hypervigilance to avoid encounters with defendants; inability to focus on academic work due to ongoing threat; trauma from being required to submit assignments to and receive grades from someone Plaintiff is suing for violating his federal rights; fear from October 23 approach by defendant Selcer exploiting manufactured vulnerability; ongoing and escalating harm as Plaintiff continues to be evaluated by litigation adversary throughout discovery, depositions, and trial);

Emotional Distress — Fraud-Specific (betrayal of trust in institutional expertise in Phase 1; three weeks of ignorance of federal rights in Phase 1; institutional abandonment by officials with duty to protect in Phase 2; despair from six weeks of appeals to President/Provost met with coordinated silence in Phase 2; institutional gaslighting through falsified records in Pattern 3; betrayal by Dean who coordinated with litigation defendant rather than providing oversight in Pattern 4; forced compliance with unlawful directive under threat of academic failure in Phase 3);

Emotional Distress — Conspiracy-Specific (isolation and powerlessness against coordinated institutional opposition; systematic erasure of credibility through uniform false characterizations; despair from coordinated opposition ensuring no oversight could correct; humiliation from systematic silencing and retaliation threats; reasonable belief that institution determined Plaintiff unworthy of protection; ongoing trauma from active conspiracy where defendants coordinate to maintain litigation adversary's evaluative power over Plaintiff during federal proceedings; emotional harm distinct in kind, not just degree, from individual torts);

Reputational Harm (false institutional characterizations as "dissatisfied" rather than raising legal objections; public narrative of "refusing to engage" rather than victim of violations; coordinated uniform mischaracterizations across offices; false institutional records becoming permanent basis for professional reputation damage; inability to correct official record due to explicit refusal to engage; ongoing harm to standing within department and program; professional harm from being evaluated by defendant during federal case);

Civil Rights Violations (three weeks of preventable Title IX denial from June 30 - July 24, 2025; six weeks of continuing Title IX denial despite known federal rights from July 24 - September 3, 2025; retaliatory threats and conditions violating 34 C.F.R. § 106.71 (2020); ADA accommodation denials based on administrative burden concerns; denial of TAP No. 33 procedural protections during active litigation; interference with protected litigation activity through defendant's evaluative power creating coercive pressure; ongoing deprivation of federally protected rights; chilled exercise of federal court access rights);

**Punitive Damages**

**H.** Punitive damages against Defendants Simpson, Wasilko, Sawa, Selcer, and Blair, jointly and severally, in an amount sufficient to:

1. Punish their intentional, willful, and malicious conduct in: fabricating requirements contrary to federal law despite explicit corrections citing applicable regulations; systematically removing federal enforcement authority (OCR) from correspondence to conceal federal violations; creating false institutional records and explicitly refusing to correct despite detailed documented corrections; threatening retaliation against protected Title IX activity; coordinating across six weeks to maintain false narratives and prevent institutional correction; persisting in violations despite Plaintiff's explicit citations to federal regulations; coordinating with litigation defendant about his own

conflict during active federal proceedings; bypassing mandatory TAP No. 33 independent review procedures; misrepresenting policy provisions that explicitly authorized Plaintiff's report (Section IV.3); threatening academic failure to coerce compliance with litigation adversary's authority; and documenting conspiracy in writing during active federal litigation alleging conspiracy;

2. Deter future similar conduct by: university administrators who might fabricate requirements to avoid federal obligations; compliance officers who might conceal violations from federal oversight; officials who might create false records to avoid accountability; administrators who might retaliate against students engaging in protected activity; officials who might coordinate to deny federally protected rights; deans who might coordinate with litigation defendants to bypass mandatory procedures; and administrators who might use evaluative power to create leverage over students during federal proceedings;

3. Vindicate the important public policies of: ensuring institutions respond reasonably to actual knowledge of sexual harassment under Title IX; preventing retaliation against students who report Title IX violations; maintaining transparency with federal enforcement authorities; ensuring accurate institutional record-keeping; protecting students' federal civil rights from coordinated institutional opposition; deterring systematic obstruction of federal civil rights enforcement; ensuring conflict-of-interest procedures protect vulnerable parties from biased decision-makers; and preventing administrators from coordinating with litigation adversaries during active federal proceedings;

**Recognition of Conspiracy's Unique Harm**

**I.** Recognition that conspiracy damages are compounding and distinct from individual tort damages, as:

1. Conspiracy inflicts unique emotional harm through: coordinated institutional opposition creating isolation and powerlessness; systematic erasure of credibility through uniform false characterizations; institutional gaslighting through coordinated falsification and refusal to correct; despair from coordinated silence ensuring no oversight could correct; reasonable belief that coordinated opposition indicates institutional determination that Plaintiff is unworthy of protection; and ongoing trauma from active Conspiracy 4 where defendants coordinate to maintain litigation adversary's power over Plaintiff during federal proceedings;

2. This emotional distress from coordinated institutional opposition is different in kind, not just degree, from distress caused by individual wrongdoing;

3. Each conspiracy enabled and compounded the others, creating cumulative harm exceeding the sum of individual harms;

4. Conspiracy 4's active and ongoing nature creates escalating harm that will continue throughout litigation until defendants are enjoined or Plaintiff completes degree requirements;

**Against All Defendants:**

**Pre-Judgment and Post-Judgment Interest**

**J.** Pre-judgment interest at the maximum rate permitted by law from the date each cause of action accrued;

**K.** Post-judgment interest at the rate permitted by law;

**Further Relief**

**L.** Such other and further relief as the Court deems just, proper, and equitable.

## JURY DEMAND

Plaintiff demands trial by jury on all claims for which a jury trial right exists under the Seventh Amendment and applicable statutes, including:

1. All claims seeking monetary damages (Counts I-V);

2. All fraud claims (Count IV);

3. All civil conspiracy claims (Count V);

4. All Title IX claims seeking compensatory damages (Counts I-II);

5. All ADA claims seeking compensatory damages (Count III);

6. All issues of fact material to determining liability and damages.

To the extent any claim is equitable in nature and not subject to jury trial, Plaintiff requests the Court decide such claims.

Respectfully submitted,

October 27, 2025

/s/ David Michael Mullins

David Michael Mullins, Pro Se

PhD Candidate, Department of Philosophy

Duquesne University

amodelcomplainant@gmail.com

## ADDENDUM

## (PRESERVATION OF APPELLATE RIGHTS)

Plaintiff expressly reserves the right to appeal the dismissal with prejudice of his previously pled claims, including Intentional Infliction of Emotional Distress, negligence, and negligent hiring/retention, and does not waive those appellate rights by omitting them here.

## (RESERVATION OF CLAIMS)

Plaintiff reserves a count for failure to produce Title IX records in violation of federal disclosure requirements, but does not plead this claim herein. This reservation preserves Plaintiff's right to assert such claims in future proceedings as appropriate.