IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

David Michael Mullins,

   Plaintiff,

v.

DUQUESNE UNIVERSITY;

ALICIA SIMPSON, individually;

ADAM WASILKO, individually;

ANNE MULLARKEY SAWA, individually;

DANIEL SELCER, individually,

   Defendants.

Civil Action No. 2:25-cv-01366-MJH

Judge Marilyn J. Horan

---

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR RECONSIDERATION OF THE COURT'S MAY 8, 2026 OPINION AND ORDER (ECF 45) UNDER FEDERAL RULE OF CIVIL PROCEDURE 54(b)**

---

## I. INTRODUCTION

As the Third Circuit has "previously emphasized," "reconsideration is the appropriate means of bringing to the court's attention manifest errors of fact or law." *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (quoting *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)).

    Plaintiff David Michael Mullins respectfully moves under Federal Rule of Civil Procedure 54(b) for reconsideration of the Court's May 8, 2026 Opinion and Order (ECF 45) denying leave

1

to file a Second Amended Complaint. Rule 54(b) leaves the entry of judgment open and permits reconsideration of any order that adjudicates fewer than all the claims as to fewer than all the parties; reconsideration is warranted to correct a clear error of law, to consider new evidence, or to prevent manifest injustice. *Max's Seafood Cafe*, 176 F.3d at 677.

ECF 45 lays an unappealable pall across the entire operative pleading: a generalized adverse-credibility ruling that attaches to the operative Amended Complaint already screened-in at ECF 14 and to any future amendment — a ruling no party briefed and no party can answer. At page 14, the Order announces six categories of allegations that "Need Not Be Credited" and represents that "[t]he specific allegations that are not worthy of credit, are identified within the following discussion." The discussion that follows places no paragraph of the proposed Second Amended Complaint into any of the six categories. Not once across thirteen pages. The categories themselves are not all categories the Court can apply at the pleading stage under *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) — only one of the six even approaches *Iqbal* step-2 territory — and even that one requires paragraph-level enumeration that the Order does not perform on any allegation, in any paragraph, at any point. What the Order performs in place of enumeration is approximately thirty-eight adjectival and conclusory closures: "patently unreasonable," "demonstrably untrue averments," falsity-disposing closures ("is not a false representation," "no false statement," "did not make any false representations," "is not, in fact, a false representation") across the per-representation discussions, "no nonfrivolous allegations." Each closure stands in declarative form. None is paired to a numbered paragraph. None states which of the page-14 categories the closure invokes. None traces to a doctrinal source that would make the closure a finding rather than a declaration. The combined effect reaches further than the proposed amendment: it produces a generalized adverse-credibility ruling against Plaintiff's pleading practices as such, attaching to the operative Amended Complaint already screened-in at ECF 14 under 28 U.S.C. § 1915(e)(2) and to any future amendment the Court might entertain.

The grammar of the page-14 enumeration is habitual, not document-specific: "Plaintiff includes," "he makes," "he provides," "he renders." Across the thirteen pages of discussion that follow, the Order cites individual SAC paragraphs (¶¶ 58, 62, 73, 76, 337, 342, 344, 345) and

incorporates by reference the fraud and conspiracy ranges introduced at page 13 (¶¶ 326–358 and ¶¶ 408–426); it sorts none of them into any of the six categories. The categories therefore operate at the level the Order announced them at — Plaintiff's pleading practices — and not at the level of any allegation the Court purported to evaluate. That is why the ruling attaches to the pleader and travels with the pleader to the operative Amended Complaint and to any future amendment.

No paragraph appears in any of the six categories not because the categorization work was incomplete, but because the categorization work was never the work the Order performed. What the Order performed in place of *Iqbal* step-2 categorization is merits adjudication — deciding what Dean Blair's October 22 communications meant, whether they were false, whether reliance on them was justifiable. Those are merits closures wearing step-2 framing. The page-14 framework would matter if the Order were discounting allegations under *Iqbal* step 2 before reaching the merits; the Order does not do step-2 work, and that is why the six categories stay empty across thirteen pages of discussion. The mismatch between announced analysis and analysis performed is the antecedent procedural defect on which reconsideration is sought.

**Manifest injustice is independently engaged.** Reconsideration under Rule 54(b) is warranted on three grounds; the Arguments below engage clear error (the first ground), and Argument 5 § 3 engages new evidence (the second). The third ground — manifest injustice under *Max's Seafood Café*, 176 F.3d at 677 — is engaged independently of whether any individual Argument succeeds, because the Order's defects are not localizable to the leave-to-amend posture. Three registers of injury extend beyond the denial of amendment, each independently sufficient: (i) *fraud-pleading foreclosure by criteria* — the Order's per-representation discrediting of Plaintiff's pled meanings as *"personal interpretations"* and *"unsupported inferences"* (ECF 45 at 14), and as *"misconstruing the plain text"* (id. at 27), together with the parallel characterizations of those readings as *"conclusory"* and *"unwarranted inference"* at pp. 23–24, would, if applied at face value, foreclose the misrepresentation element of fraud in any case; the Order conflates Rule 9(b) particularity with proof, contrary to *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008), and reaches every fraud claim, not just this amendment (Argument 4); (ii) *downstream*

*operative-pleading impairment* — the dispositive move (reading AC ¶¶ 173–174 / PSAC ¶ 208's first-party disclaimer as fatal) applies with identical force to the operative AC's three parallel third-party-reliance Patterns, all of which rest on the same architectural disclaimer; leaving the Order in place creates a record on which the operative AC — screened in seven months ago and contested by no one — cannot be defended without first dislodging the Order (Argument 3); and (iii) *generalized adverse-credibility on the record* — the page-14 framework attaches to the pleader rather than to any particular allegation and travels with him to settlement posture, to any subsequent amendment under *Foman v. Davis*, 371 U.S. 178 (1962), to any Rule 12 opposition on the operative AC, and to appellate review (Argument 1). Vacatur limited to the SAC denial leaves the case-level injury in place; reconsideration on manifest-injustice grounds is therefore independently warranted whether or not any individual clear-error ground succeeds.

Five arguments follow. **Argument 1** demonstrates that the page-14 framework was not applied to any allegation; in its place the Order performed four distinct analyses — credibility, intent, frivolousness, and sua sponte doctrinal substitution — each procedurally invalid on its own terms. **Argument 2** shows that even if the page-14 framework had been properly applied, the Order's TAP No. 33 § II analysis omits the controlling § III ¶ 2. **Argument 3** shows that the operative Amended Complaint pleads reliance in three structurally distinct architectures — orthodox first-party reliance (Phase 1 only, pre-July 24, 2:59 PM); third-party reliance (Patterns 1 Phase 2, 2, 3, and proposed Pattern 4, with senior University officials and designated TAP No. 33 reviewers as reliers); and coerced reliance (Plaintiff as continuing subject of reliance under institutional compulsion) — and was screened in on all three under § 1915(e)(2)(B). Defendants' opposition (ECF 34) contests only the first architecture, and only by misreading Plaintiff's own non-reliance disclaimer as fatal to the entire fraud claim. The Order attacks the third architecture sua sponte (ECF 45 at 20: *"Plaintiff does not provide any legal support for this proposition"*) on a sub-architecture neither party briefed. The second architecture — third-party reliance — is uncontested by everyone. **Argument 4** demonstrates that each of the Order's six per-representation merits closures performs a meaning-determination at Rule 12(b)(6) — choosing between two competing

readings of Dean Blair's October 22 communications and disposing of the SAC's reading — that *Iqbal* step 2 does not authorize.  **Argument 5** shows that the proposed civil conspiracy claim, dismissed by the Order as derivatively futile, survives independently of any individual fraud rep on Pennsylvania law and, on this very docket, cannot be dismissed with prejudice given this Court's prior without-prejudice disposition of the same claim at the AC stage.

The five arguments share a single diagnosis: the Order could be written in the form it was only by setting aside Plaintiff's procedural rights and the governing pleading standard.  Whether Dean Blair's October 22 communications ultimately give rise to fraud liability is the kind of fact-intensive, scienter-laden, discovery-dependent question Rules 12(b)(6) and 15(a)(2) reserve for adversarial briefing, summary judgment, or trial — not the kind a leave-to-amend ruling answers on declarative closures unaccompanied by paragraph-level enumeration, on sua sponte doctrinal frameworks, on credibility findings against the non-movant, and on meaning-determinations *Iqbal* does not authorize.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 54(b) provides that "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). Reconsideration under Rule 54(b) is warranted on three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct a clear error of law or prevent manifest injustice. *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). The third ground is the principal basis for this motion. The second is independently engaged by a record fact developed during the pendency of the Motion for Leave but outside the briefing record — Dr. Selcer's cross-examination testimony at ECF 44 at 149, docketed February 10, 2026, after the close of briefing on the Motion for Leave

(November 2025) and approximately three months before the Order issued. Plaintiff develops the new-evidence and clear-error application of that record fact at Argument 5 § 3 below.

The Order denies leave to amend on the sole ground of futility. Futility is measured by the Rule 12(b)(6) standard: leave to amend may be denied as futile only if *"the complaint, as amended, would fail to state a claim upon which relief could be granted." In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997). Rule 12(b)(6) in turn requires that the complaint *"state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). On a motion to dismiss — and accordingly on a futility analysis — the court must *"accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). *Iqbal* permits a court at step two of the plausibility inquiry to disregard *"threadbare recitals of the elements of a cause of action, supported by mere conclusory statements,"* 556 U.S. at 678; it does not permit a court to disbelieve factual allegations at any step. *Id.* at 678–79. Where intent or scienter is at issue, surrounding-fact pleading is the operative practice. *Id.* at 686; *Burlington Coat*, 114 F.3d at 1422.

A related doctrinal limit governs the documents a court may consider at the futility stage and the work it may do with them. Under the integral-documents doctrine, a court may *consider* documents incorporated by reference into, or relied upon by, the pleading. *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). The doctrine functions as a notice-and-context expansion of the pleading record; it ensures that a plaintiff cannot defeat a Rule 12(b)(6) motion by selective quotation of documents central to the claim.

The doctrine permits *consideration*, not *resolution*. Where a document admitted under the doctrine is ambiguous on its face, or where two reasonable readings of the document are available, the Rule 12 inference rule applies to the document itself: the contested reading goes to the non-movant. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). A document admitted

under the integral-documents doctrine does not become a vehicle for the court to act as factfinder on its meaning; the court reads what the document says, draws reasonable inferences in the non-movant's favor, and reserves contested meanings for development beyond the pleadings. This limit is implicated in the Order at pages 12–13 (invocation of the integral-documents doctrine) and at pages 14–25 (resolution of contested meanings in TAP 33 and Dr. Blair's October 22 emails as a matter of law) — the doctrinal mismatch developed in Arguments 2 and 4 below.

The same plausibility floor governs the Court's *sua sponte* screening obligation under 28 U.S.C. § 1915(e)(2)(B): the statute requires dismissal *"at any time"* upon a determination that an *in forma pauperis* action is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from an immune defendant.  § 1915(e)(2)(B). Section 1915(e)(2)(B) screening, Rule 12(b)(6) dismissal, and Rule 15(a)(2) futility apply the same plausibility standard. Frivolousness characterizations, by contrast, require their own procedural register — Rule 11 sanctions practice (notice, opportunity to respond, separate motion or show-cause order), Fed. R. Civ. P. 11(c)(1)–(3); § 1927 vexatious-multiplication findings (notice and opportunity to be heard), *see In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*, 278 F.3d 175, 188 (3d Cir. 2002); and § 1915(e)(2) frivolousness determinations operate in a separate procedural register, *cf. Neitzke v. Williams*, 490 U.S. 319, 327 (1989) (§ 1915 frivolousness distinct from Rule 12(b)(6); requires arguable-basis test and procedural protections).

## III. ARGUMENT

### A. Argument 1 — The Order announced one analysis and performed four others; each is procedurally invalid on its own terms

*Thesis and logical move*

The Order announced one analysis and performed four others. The announced analysis was *Iqbal* step-2 categorization of conclusory allegations. The analyses actually performed were credibility findings, intent findings, frivolousness characterizations, and sua sponte adoption of an unbriefed

Pennsylvania reliance framework that does not match the third-party architecture of the operative pleading or the parallel architecture this Court already screened in under 28 U.S.C. § 1915(e)(2). Three of those four require procedural protections that were not afforded; the fourth (credibility findings on the pleadings) is not authorized at the Rule 12(b)(6) / Rule 15(a)(2) futility stage at all. Each prong follows the same single-step structure — the Order performed an act of process X; X requires procedural protections Y; Y were not afforded; X must be vacated — the standard remedy when a court resolves a matter on a basis the parties had no notice of and no opportunity to brief. Each prong independently warrants reconsideration; together they warrant vacatur of the Order's adverse-credibility framework in full.

*The procedural posture (load-bearing predicate)*

Two facts establish the procedural inversion the Order's reliance ruling effects. *First, doctrinal: Foman v. Davis*, 371 U.S. 178, 182 (1962) (quoting then-Fed. R. Civ. P. 15(a)(2)), directs that leave to amend *"shall be freely given when justice so requires,"* and *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997), measures futility by the Rule 12(b)(6) standard. The Rule 15(a)(2) futility inquiry, Rule 12(b)(6) dismissal, and § 1915(e)(2)(B) screening apply the same plausibility floor. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). *Second, procedural:* the operative AC has been on the docket continuously since October 6, 2025 (ECF 4) and pleads in Count IV a fraud architecture in which senior University officials and designated TAP No. 33 reviewers are the third-party reliers and Plaintiff is the non-relying damaged party.[1]

---

[1]

The architecture is enumerated under verbatim AC section headings *"Phase 2 Target — University Leadership's Reliance"* (Pattern 1 Phase 2); *"Reliance and Causation Through Oversight Removal"* (Pattern 2); *"Senior Officials' Reliance Directly Caused by Concealment"* (Pattern 2 sub-subheading). This Court's October 6, 2025 service direction (ECF 14) is a § 1915(e)(2)(B) plausibility determination by operation of the statute (developed at Argument 3 § 2), necessarily covering all three operative third-party reliance patterns. Defendants have not filed a Rule 12(b)(6) motion against any count of the operative AC (ECF 38, the only intervening motion, was decided

The AC's architecture has therefore been measured against, and survived, the very plausibility floor under which the Order now denies leave to extend it by one defendant.

The Order's dispositive moves — reading Plaintiff's first-party non-reliance disclaimer as fatal, and attacking the coerced-reliance proposition at ECF 45 at 20 as unsupported (developed in Prong 4a below) — apply with equal force to the three operative AC patterns and to proposed Pattern 4: each shares the same disclaimer (AC ¶¶ 173–174; PSAC ¶ 208) and the same architectural reliance pleading. The moves either defeat all four Patterns or defeat none. The futility ruling therefore functions as a sua sponte Rule 12(b)(6) ruling on the operative AC, delivered through the Rule 15(a)(2) side-door without a defense motion, adversarial briefing, burden allocation, or Rule 12's procedural protections. The procedurally correct move under *Foman* was to grant leave and let Defendants test the third-party architecture by Rule 12(b)(6) motion under those protections; that is the procedural posture in which each of the four prongs below operates, and it is, on its own terms, an independent ground for reconsideration.

*Prong 1 — Credibility findings, including the refusal to credit the verbatim text of the pleading*

The Order makes credibility findings in two registers. In the first register the Order finds that allegations of the proposed Second Amended Complaint are *"not worthy of credit"* (ECF 45 at 14) and *"will not be credited"* (id. at 17, 24; *see also id.* at 18 ("will not credit")) — refusals to believe pleaded allegations. In the second register the Order finds that the proposed SAC *"does not allege"* matter the proposed SAC verbatim alleges (ECF 45 at 14) — refusals to acknowledge that the allegation was made. Both are credibility findings on factual matter; neither is authorized at the Rule 12(b)(6) / Rule 15(a)(2) futility stage. At the pleading stage, the court must accept well-pleaded factual allegations as true and draw all reasonable inferences in the non-movant's favor. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008); *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000).

---

on procedural grounds unrelated to substantive sufficiency). The Court has not vacated, narrowed, or revisited the architecture.

**Lead application — the Selcer-divergence** *"does not allege"* **finding (ECF 45 at 14).** The Order's Section III.B futility ruling on TAP No. 33 rests on the express factual finding that *"Plaintiff does not allege that Dr. Selcer's personal interests conflict, or appear to conflict, with the interests of the University."* ECF 45 at 14. That finding is contradicted by the verbatim text of the proposed Second Amended Complaint across three independent pleading registers, each addressed to the only kind of divergence TAP 33 § I can regulate — Covered Party-versus-University divergence in the exercise of delegated authority. First, as express characterization in § I's own statutory terms, Proposed SAC ¶ 73 alleges: *"TAP No. 33 § I prohibits Covered Parties from permitting their interests to 'conflict, or appear to conflict' with the University's interests. This scenario constitutes both an actual conflict and an unmistakable appearance of conflict under any reasonable interpretation."* Second, as specific factual conduct evidencing personal motivation during active federal litigation, Proposed SAC ¶¶ 78–79 plead that Dr. Selcer personally approached Plaintiff on a coerced-attendance day to pressure compliance with private-meeting requirements Plaintiff had refused — conduct from which the Rule 12 inference of personal motivation diverging from the University's institutional interest in fair academic evaluation untainted by litigation pressure is fairly drawn. Third, as enumerated categories of personal interest distinct from any institutional interest the University could hold, Proposed SAC ¶ 342 enumerates four categories of Dr. Selcer's personal interest in his own litigation defense (financial benefit, reputational benefit, leverage, and appearance of conflict) — three pleaded in concrete factual terms and the fourth invoking § I's appearance prong directly.

The *"does not allege"* finding is not a finding that the SAC's divergence allegations are threadbare legal conclusions under *Iqbal* step 2; it is a finding that the divergence allegations *do not exist* in the pleading. That finding cannot be reconciled with the verbatim text of ¶ 73, ¶¶ 78–79, or ¶ 342. The Order's Section III.B analysis at pages 14–15 also leaves § I's appearance prong unaddressed even though the Order block-quotes the full *"conflict, or appear to conflict"* prohibition at pages 9 and 14 and the appearance prong is independently and expressly pleaded at ¶ 73 (*"an unmistakable appearance of conflict"*) and at the fourth bullet of ¶ 342. A *"does*

*not allege"* finding that omits the appearance prong leaves half the policy text — and a separately pleaded basis for the conflict allegation — unaddressed.

The same paragraphs ¶¶ 78–79 are recited elsewhere in the Order (at p. 8, in the Background's account of the October 23 Selcer-on-campus interaction) but never engaged in the TAP 33 analysis at pages 14–15 — a manifest error in the Rule 15(a)(2) analysis given that a single factual allegation can do double doctrinal duty.

**The general application — the page-14 framework and the** *"not worthy of credit"* **findings.** The Order announces six categories of allegations it will not credit (ECF 45 at 14):

> *"Thus, Plaintiff includes multiple explanations of facts already alleged; he makes unsupported inferences from his factual allegations; he provides his personal interpretations of the parties' statements; he provides legal arguments and reaches legal conclusions regarding relationships, documents, policy, and applicable law; he renders conclusory statements as to what a party's words or actions mean; and he provides argument in favor of his preferred outcomes."*

Items 3 and 5 identify as a pleading defect precisely what *Iqbal* and Rule 9(b) require. *Iqbal* step 2 discards allegations stating a legal element with no supporting content — bare assertion untethered to any word, act, or circumstance. 556 U.S. at 678. An allegation that quotes a defendant's communication, reads it, and anchors the claimed meaning in the words and their context supplies the content *Iqbal* requires. A court's disagreement with the plaintiff's reading is not a basis to discard the allegation; it is a basis to draw the inference in the non-movant's favor. *Phillips*, 515 F.3d at 233.

The page-14 framework would matter if the Order were doing step-2 work. It is not. The thirteen pages following page 14 cite individual SAC paragraphs by number (and incorporate the fraud and conspiracy ranges introduced at page 13) and sort none into the six announced categories; in place of categorization the Order performs merits closures — deciding what Blair's October 22 emails meant, whether they were false, whether reliance was justifiable. A *"not worthy of credit"* determination on a factual allegation is a credibility finding, not an *Iqbal* step-2 categorization. 556 U.S. at 678–79. Clear error and manifest injustice in compounding forms: no party briefed the

11

findings; Plaintiff cannot answer them; no appellate court can review paragraph-by-paragraph what no paragraph-level enumeration produced.

**Authority.** *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008); *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997); TAP No. 33 § I (full *"conflict, or appear to conflict"* prohibition); Prop. SAC ¶ 73, ¶¶ 78–79, ¶ 342.

**Remedy.** Vacate every credibility finding in both registers: (a) the *"does not allege"* findings that refuse to credit the verbatim text of the pleading, including the Selcer-divergence finding at ECF 45 at 14; and (b) the *"not worthy of credit"* findings that refuse to credit pleaded factual allegations. On reconsideration, identify any specific paragraph-level allegation the Court declines to credit and the doctrinal source supporting the decline — *Iqbal* step 2 if the allegation is a threadbare legal conclusion; nothing else at the pleading stage — so that Plaintiff may respond and Defendants may brief.

*Prong 2 — Intent findings*

Intent is a quintessentially factual question. Scienter is rarely amenable to direct proof; a plaintiff pleads it at Rule 12(b)(6) by alleging surrounding facts — context, prior knowledge, institutional position, sequence of conduct, statements at material moments — from which intent is fairly inferable. *Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997).

The SAC pleads Blair's intent in precisely this inferential form: she read TAP 33 closely enough to cite specific sections back to Plaintiff (Prop. SAC ¶ 343); copied Frist — the § III ¶ 2 reviewer — but announced *"no change [to Selcer's role]"* rather than requesting his review (¶¶ 340, 419); consulted the conflicted party (¶ 334) rather than independent reviewers; and did all of this seven days after Plaintiff cross-examined Selcer at a TRO hearing in this case (¶¶ 409–410). Two further registers compound the inferential weight. Blair holds the role of Dean of the Graduate School; TAP 33 is her own institution's conflict-of-interest policy applicable to her role

— constructive awareness of §§ I, II, III ¶ 2, IV.3, IV.4 is at minimum a permissible inference and on these facts an overwhelming one. And the TRO-record fact developed in § II above (Selcer's ECF 44 at 149 admission that Blair instructed him to remove her name from the September 3 cc line while preserving informational access by forwarded copy) supplies circumstantial scienter independent of the October 22 emails: an actor who orchestrates concealment at one decision point is plausibly the same actor who knowingly bypasses § IV.4 while cc'ing its named reviewer.

The Order labels these allegations *"conclusory"* (ECF 45 at 23; *see also id.* at 24 ("unwarranted inference")), mislabeling what *Iqbal* and *Twombly* mean by that term: a conclusory allegation is a threadbare recital of a legal element, not an inferential allegation supported by contextual facts — which is precisely what those decisions require. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 556. Treating inferential scienter as conclusory collapses the doctrine into a no-scienter-ever rule. The Order commits the symmetric error in reverse: it makes affirmative findings about *Plaintiff's* intent — that he *"changed course"* (ECF 45 at 26–27), that *"what [Plaintiff] really meant"* (id. at 27) was something other than what his email said, and that his *"belief"* about his own email *"will not be credited"* (id. at 17). Subjective-intent findings against the non-movant on the pleadings are not authorized at Rule 12(b)(6) / Rule 15(a)(2) at all; Rule 12 directs inferences in the non-movant's favor. *Phillips*, 515 F.3d at 233. The intent work is therefore doubly defective: scienter against Blair is misclassified as conclusory while scienter against Plaintiff is made affirmatively. Both are clear error under *Max's Seafood Café*; either is independently sufficient to vacate the reliance and falsity rulings on the first three representations.

**Remedy.** Vacate all intent findings in both directions: (a) the *"conclusory"* characterizations of the proposed SAC's inferential scienter allegations against Dean Blair, and (b) the affirmative findings of Plaintiff's intent at ECF 45 pages 17–20 and 26–27. On reconsideration, apply the correct pleading-stage standard: accept the proposed SAC's inferential scienter allegations as true (or, if any specific paragraph-level allegation is found wanting, identify which allegation is threadbare and why), and refrain from making contrary intent findings against the non-movant.

13

*Prong 3 — Frivolousness characterizations*

**Thesis.** The Order's characterizations — *"demonstrably untrue averments"* and *"no nonfrivolous allegations"* (ECF 45 at 27); *"patently unreasonable"* (id. at 17) — live in the sanctions register: Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927 (vexatious multiplication), and 28 U.S.C. § 1915(e)(2) (in forma pauperis frivolousness review). Each of those vehicles has its own procedural protections — notice, an opportunity to be heard, and a separate motion or show-cause order. The Order makes sanctions-register findings on the record without invoking any of those statutory or rule-based vehicles and without affording the procedural protections each requires.

    **Logic.**

- Rule 11 sanctions require notice, an opportunity to respond, and a separate motion or show-cause order. Fed. R. Civ. P. 11(c)(1)–(3).

- § 1927 vexatious-multiplication findings require notice and an opportunity to be heard. *In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*, 278 F.3d 175, 188 (3d Cir. 2002).

- § 1915(e)(2) frivolousness operates in a different register from Rule 12(b)(6) failure-to-state and requires procedural protections; the substantive standard is whether *"the legal theory or the factual contentions lack an arguable basis in law or in fact." Neitzke v. Williams*, 490 U.S. 319, 327 (1989). Here the Order makes no paragraph-level frivolousness identification; frivolousness is characterized at the level of *"the pleading,"* not at the level of any numbered allegation.

- The Order's characterizations therefore function as sanctions-register findings on the record without sanctions-register process. The defect appears under each of the three available vehicles independently.

    **Authority.** Fed. R. Civ. P. 11(c)(1)–(3); *In re Prudential*, 278 F.3d at 188; *Neitzke v. Williams*, 490 U.S. 319, 327 (1989).

    **Remedy.** Vacate the frivolousness characterizations. If the Court intends to make frivolousness findings on reconsideration, route them through the proper procedural vehicle —

Rule 11, § 1927, or § 1915(e)(2) — with notice, identification of the specific allegations alleged to be frivolous, and an opportunity to be heard.

*Prong 4 — Sua sponte adoption of an unbriefed doctrinal framework, applied to a pleading the Court itself already screened in*

Prong 4 has two heads. Each is independently sufficient. Both are operative on the face of the Order.

**4a. Process — adopted from neither party's brief.** The Order's resolution of the justifiable-reliance prong on the first three alleged false representations rests on a Pennsylvania reliance framework assembled at ECF 45 pages 19–21: ten case authorities[2] — *Drelles v. Manufacturers Life Ins. Co.*, 881 A.2d 822, 840 (Pa. Super. 2005) (cited twice); *Porreco v. Porreco*, 811 A.2d 566, 571 (Pa. 2002); *Fort Wash. Res., Inc. v. Tannen*, 858 F. Supp. 455, 460 (E.D. Pa. 1994); *Scaife Co. v. Rockwell-Standard Corp.*, 446 A.2d 280, 286–88 (Pa. 1971); *Huu Nam Tran v. Metro. Life Ins. Co.*, 408 F.3d 130, 135 (3d Cir. 2005); *Kline v. EDS Relocation & Assignment Servs.*, 2008 WL 4822026, at *6 (M.D. Pa. 2008); *Toy v. Metro. Life Ins. Co.*, 863 A.2d 1, 12 (Pa. Super. 2004), and *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 207 (Pa. 2007); *Kirwin v. Sussman Auto.*, 149 A.3d 333, 337 (Pa. Super. 2016); and *Patel v. Kandola Real Est., LP*, 271 A.3d 421, 427 (Pa. Super. 2021) — together with *Restatement (Second) of Torts* § 541. None of those ten authorities, and not the *Restatement (Second) of Torts*, appears in Defendants' opposition to leave (ECF 34). ECF 34's reliance argument cites only *Youndt v. First Nat. Bank of Port Allegany*, 868 A.2d 539, 545 (Pa. Super. 2005), for the six elements of Pennsylvania fraud, and rests its substantive reliance argument on two sentences pointing at PSAC ¶¶ 208 and 421 —

---

[2] Counted by distinct judicial decision. The Pennsylvania Superior Court (2004) and Pennsylvania Supreme Court (2007) *Toy* opinions are treated as separate authorities. *Drelles* and *Fort Wash. Res.* each appear twice within the page-19–21 framework. Inclusion of *Restatement (Second) of Torts* § 541 brings the total to eleven authorities across thirteen citation occurrences.

Plaintiff's own non-reliance disclaimers (ECF 34 at 8–9). None of those ten authorities, and not the *Restatement (Second) of Torts*, appears in Plaintiff's reply (ECF 43).

**Figure 1 — Reliance discussion: Defendants' opposition vs. Court's opinion**

| | *Defendants' Opposition* (ECF 34) | *Court's Opinion* (ECF 45) |
|---|---|---|
| **Words in reliance discussion** | 113 | 981 |
| **Paragraphs in reliance discussion** | 1 | $\approx 6$ |
| **Pennsylvania fraud-reliance authorities cited** | **1** — *Youndt v. First Nat. Bank of Port Allegany*, 868 A.2d 539, 545 (Pa. Super. 2005) (six-element fraud framework only; no reliance doctrine introduced) | **11** distinct authorities (13 occurrences): *Drelles* ×2, *Porreco*, *Fort Wash. Res.* ×2, *Scaife*, *Huu Nam Tran*, *Kline*, *Toy* ×2 (Pa. Super. + Pa.), *Kirwin*, *Patel*; plus *Restatement (Second) of Torts* § 541 |

The reply responded to the arguments Defendants actually made on Rule 15 futility-standard grounds — *Foman v. Davis*, 371 U.S. 178, 182 (1962); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) — and did not introduce Pennsylvania reliance authority because Defendants did not raise any.

The ten-authority framework on which the Order's dispositive reliance ruling rests was therefore adopted sua sponte, after the close of briefing, from neither party's submission. The procedural defect is independent of whether the framework is doctrinally apt. The Third Circuit's long-standing rule is that a litigant is entitled to know what an adverse party contends and to be heard in response. Where a court resolves a dispositive question on doctrinal grounds neither party has raised, neither the procedural protections of adversary briefing nor the substantive accuracy that adversary briefing tends to produce can be relied on. Reconsideration is the procedural vehicle available before final judgment to dispel that defect. *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).

*Conceded, not contested.* ECF 34 at 8–9 made one substantive reliance argument: reading PSAC ¶¶ 208 and 421 as defeating the entire fraud claim. Defense did not raise third-party reliance,

coerced reliance, or the § 1915(e)(2)(B) screening posture under which all three architectures had been running unchallenged for seven months. The reply responded to what Defendants raised. Every doctrinal question the Order resolves at pages 19–21 — § 541 first-party voluntary reliance, coerced reliance at PSAC ¶ 345, and third-party reliance through Frist on proposed Pattern 4 — was conceded, not contested. Reconsideration is the first procedurally available filing in which Plaintiff has notice of the frameworks the Court intends to apply; the opportunity to be heard is requested as relief, not performed here.

*The non-reliance disclaimers are the architecture, not a gotcha.* Two documents treat Plaintiff's disclaimers as fatal to element; each reaches a different sub-architecture. ECF 34 at 8–9 block-quotes PSAC ¶ 208 (incorporating AC ¶ 174's *"no longer relying on Defendants' expertise or representations about process"*) and PSAC ¶ 421, then concludes: *"Plaintiff's own allegations establish that he did not rely on Dean Blair's October 2025 representations or any representations made by Defendants after July 24, 2025. Accordingly, Plaintiff fails to state any plausible legal claims arising out of Dean Blair's communications regarding TAP No. 33."* ECF 34 at 8–9. That is orthodox first-party voluntary reliance and reaches neither sub-architecture. The Order, after quoting PSAC ¶ 345's reliance proposition, states sua sponte: *"Plaintiff does not provide any legal support for this proposition."* That attack reaches coerced reliance — compelled engagement under threat of sanction, denial of supportive measures, and grading exposure to the conflicted party — a sub-architecture distinct from the first-party reliance defense disputes and from the third-party reliance running through Frist.

The disclaimer's architectural work is on the face of the AC. AC ¶ 173 alleges: *"This July 24, 2:59 PM Second Demand Letter marks the precise end of Plaintiff's reliance and the beginning of university leadership's reliance."* AC ¶ 174 continues: *"After July 24, 2:59 PM, Plaintiff was no longer relying on Defendants' expertise or representations about process."* PSAC ¶ 208 carries the disclaimer forward. The disclaimer is the *predicate* of the third-party pleading: Plaintiff stopped crediting Defendants' process representations; institutional reliers (from whom the misrepresentations were concealed) continued to credit them; that asymmetry is what makes

17

the third-party architecture cognizable as fraud at all. It is not the predicate of coerced reliance — compelled non-voluntary engagement is the register voluntariness disclaimers do not reach. Defense's gotcha reaches architecture (1); the Order's reaches architecture (3); neither reaches architecture (2); the screening at ECF 14 admits all three. A pleading cannot be defeated for being what the Court has already admitted it as.

*The coerced-reliance attack reproduces the Prong 4a defect at sub-architecture level.* Defendants did not raise coerced-reliance doctrine; the reply did not respond because no challenge required a response; the Court raised it sua sponte after briefing closed. The remedy is procedural: vacate the *"no legal support"* finding at ECF 45 at 20 and afford notice and an opportunity to be heard on PSAC ¶ 345 before any dispositive ruling adverse to it is entered. Third-party reliance — running through Frist on proposed Pattern 4 and through senior officials in operative AC Patterns 1 Phase 2, 2, and 3 — is contested by no one on this record, not addressed in the Order, and survived § 1915(e)(2)(B) screening at ECF 14; Argument 3 develops the screening-baseline asymmetry.

**4b. Substance — screening-baseline asymmetry on an architecture this Court already admitted.** The substantive dimension of the same defect — the Order denies leave on futility while the § 1915(e)(2)(B) screening of three reliance architectures (orthodox first-party, third-party, coerced) all pleaded in the operative AC remains in place at ECF 14, and while four already-proceeding Pattern claims (Pattern 1 Phase 2, Pattern 2, Pattern 3, all sounding in third-party reliance) remain in place without any feature of proposed Pattern 4 identified as distinguishing them — is developed in full at Argument 3 below. Prongs 4a (process) and 4b (substance) are independent: each is sufficient on its own under *Max's Seafood Café*'s clear-error standard; both converge on the same remedy. The independence matters because the Court may accept either without reaching the other; either acceptance vacates the dispositive reliance ruling on the first three false representations.

**Remedy.** Vacate the Order's reliance findings on the first three alleged false representations and the predicate-denial disposition of the sixth. On reconsideration, measure the futility question against the § 1915(e)(2) screening baseline already established for the parallel architecture in Count

18

IV's surviving Patterns 1 Phase 2, 2, and 3 of the operative Amended Complaint, and afford notice and an opportunity to be heard on any reliance sub-architecture the Court intends to address — including the coerced-reliance proposition at PSAC ¶ 345 attacked sua sponte at ECF 45 at 20.

*Aggregation — the Order's closing sentence and the four-prong convergence*

The four prongs converge in the Order's closing sentence at pages 26–27: *"Plaintiff's rationale in support of adding the new claims rests almost entirely upon demonstrably untrue averments, legal argument, misconstruing the plain text of the emails, and an unwarranted reliance on Duquesne University's TAP No. 33 Policy."* Each characterization maps onto one prong above. *"Demonstrably untrue averments"* is sanctions vocabulary (Rule 11(b)(3); § 1915(e)(2)(B)(i)) — a Prong 3 finding without the sanctions-register process Rule 11(c) and *In re Prudential*, 278 F.3d at 188, require. *"Legal argument"* repeats item #4 of the page-14 enumeration — the *Iqbal* step-2 categorization Prong 1 shows was never applied to any numbered SAC paragraph. *"Misconstruing the plain text of the emails"* (ECF 45 at 27) is Argument 4's per-representation meaning-determination at Rule 12(b)(6), inverting the inference rule of *Phillips*, 515 F.3d at 233. *"Unwarranted reliance"* on TAP 33 (like *"patently unreasonable"* at p. 17 and *"unwarranted inference"* at p. 24) is Argument 2's sua sponte textual reading on a four-bullet exhaustiveness the policy's anti-limit text and § III ¶ 2 catch-all foreclose. The umbrella *"rests almost entirely upon"* performs aggregate work no per-paragraph finding supports; the closing sentence is the documentary specimen of the four-prong defect and a clean Rule 54(b) target on its own terms.

Each prong independently warrants reconsideration. Three (Prongs 2, 3, and 4a) require procedural protections the Order did not afford — notice, identification of specific allegations, an opportunity to be heard, separate motion or show-cause process. Prong 1 (credibility findings on the pleadings) is not authorized at the Rule 12(b)(6) / Rule 15(a)(2) futility stage at all. Prong 4b adds independent clear error on the substantive standard, developed in Argument 3. Reconsideration is sought not on rulings the Order made about credibility, intent, frivolousness, or Pennsylvania

reliance doctrine, but on the antecedent question whether the announced *Iqbal* step-2 analysis was the analysis actually performed. *Max's Seafood Café*, 176 F.3d at 677.

**B. Argument 2 — The Order's TAP No. 33 analysis stops at § II without addressing the controlling § III ¶ 2**

**Thesis.** If TAP 33's definition of conflict of interest is *"limited"* — as Dean Blair characterized it in her October 22 email and as the Order accepts — the limit must come from somewhere in the policy. The Order does not identify the limit, and the policy's text forecloses it. Section II contains three non-exhaustive textual cues; Section III ¶ 2 separately commits the policy to covering circumstances the enumerated list does not capture. The clause that does the catch-all work — Section III ¶ 2 — is not addressed anywhere in the Order.

**Section III ¶ 2 in full.** *"[T]o the extent a circumstance leading to a potential conflict of interest arises and such circumstance is not addressed in this policy or any of the other policies below (Section V), Covered Parties are expected to use good judgment, professional commitment, and ethics to respond to such potential conflicts of interest and are expected to disclose the potential conflict to the Senior Vice President for Finance and Business or their designee, the Secretary of the University, or the President."*

**TAP 33 limits applicability by one thing: the function of the decisions being made.** Decisions by Covered Parties that could be — or could appear to be — directed by divergence between the Covered Party's personal and institutional interests fall within the policy. § II's text is non-exhaustive on its face: *"may arise out of, but are not limited to"* precedes the four-bullet enumeration, and *"such as"* introduces examples within bullets; § III ¶ 2 supplies the catch-all expressly. The policy imposes none of the limits on which the Order's analysis rests: no topic limits (the policy is not bounded to financial relationships); no person-concerned limits beyond the uncontested Covered-Party status of the decision-maker (here, Dr. Selcer); no keyword limits (whether the words *"student"* or *"seminar"* appear is not the test). Each is a limit the Order reads into TAP 33, not a limit TAP 33 imposes.

20

**Authority to determine applicability is vested in § IV.4's designated reviewers, not in a Dean.** A designated reviewer can legitimately conclude that a situation does not trigger the policy; non-applicability is a possible outcome of § IV.4 review. The issue is that the person who reached the non-applicability conclusion had no authority to reach it. Dr. Blair is not § IV.4's designated reviewer; she made a non-applicability determination by consulting the conflicted party rather than referring the matter to Mr. Frist, and communicated her conclusion to Frist as fait accompli rather than as a question. The Order's footnote 7 (p. 23 n.7) treats Plaintiff's terminological imprecision about his own status as ratifying that bypass; it does not. Plaintiff's status is immaterial to whether *Selcer's* decisions trigger § IV.4 review — the operative question the Order leaves unanswered.

**Three non-exhaustive cues in § II foreclose any exhaustiveness reading:** *"such as"* (illustrative); *"financial or other substantial personal benefit"* (disjunctive opens the benefit prong beyond financial); and *"may arise out of, but are not limited to"* (prefatory clause disclaiming exhaustiveness). The unifying concept is *a decision in which personal and institutional interests can diverge*; the four bullets catalog counterparty types, and their silence about *"student"* reflects the policy's organization around conflict structure, not counterparty identity. The catch-all and the non-exhaustive cues do the same work: they cover circumstances the enumerated bullets do not. A faculty member named as a personal defendant in federal litigation, holding evaluative power over the litigation adversary, is precisely the unenumerated circumstance § III ¶ 2 is written to capture — supplying a disclosure obligation (to Frist, the Secretary, or the President) the Order's reading would render surplusage.

**Materiality to the fraud claim.** Blair's representation that TAP 33 *"does not apply"* is, on this textual foundation, a false representation as to the policy's scope; her unilateral resolution (in consultation only with Selcer) bypasses the disclosure-to-designated-reviewer framework § III ¶ 2 mandates. The Order assessed falsity without engaging the policy text that defines falsity. To the extent the Order rests on assumptions about what Blair understood from Plaintiff's October 20 email, those are factual inferences about a non-party's state of mind reserved for the factfinder; at

the pleading stage, Rule 12 requires them to be drawn in Plaintiff's favor. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

**Authority.** TAP 33, Sections II, III ¶ 2 (attached to ECF 34 as Exhibit 1; attached as Exhibit A to this motion for the Court's convenience).

**Reconsideration, not relitigation.** Reconsideration is sought not on a ruling the Order made about § III ¶ 2, but on the Order's failure to reach the clause at all — material policy text block-quoted at page 9 and invoked in the SAC, left unaddressed. *Max's Seafood Café*, 176 F.3d at 677.

## C. Argument 3 — Count IV pleads three reliance architectures; defense contested only the first by misreading the disclaimer; the Court attacked only the third sua sponte; the second — third-party reliance — is uncontested by anyone

**Thesis.** The operative Amended Complaint pleads reliance in three structurally distinct architectures: (1) orthodox first-party reliance (Phase 1 only, pre-July 24, 2:59 PM); (2) third-party reliance (Patterns 1 Phase 2, 2, 3, and proposed Pattern 4 — with senior University officials and designated TAP No. 33 reviewers pleaded as institutional reliers and Plaintiff pleaded as the non-relying damaged party); and (3) coerced reliance (Plaintiff as continuing subject of reliance under institutional compulsion). All three architectures were screened in under 28 U.S.C. § 1915(e)(2)(B) at ECF 14 and have been operative on this docket continuously for seven months. Defendants' opposition (ECF 34 at 8–9) contests only architecture (1), and only by reading PSAC ¶¶ 208 and 421 as fatal to the entire fraud claim — a reading that mistakes the predicate of architecture (2) for an admission against interest. The Order at ECF 45 at 20 attacks only architecture (3), and only sua sponte (*"Plaintiff does not provide any legal support for this proposition"*) on a sub-architecture neither party briefed. Architecture (2) — third-party reliance — has not been contested by anyone, anywhere, on this record. The screening-baseline asymmetry that follows is clear error correctable under *Max's Seafood Café*.[3]

---

[3]

**1. The three architectures, named in the operative pleading.**

- *Orthodox first-party reliance (architecture 1).* Pleaded for Pattern 1 Phase 1 only (Wasilko → Plaintiff, pre-July 24, 2:59 PM), under verbatim section heading *"Plaintiff's Reliance — Total and Reasonable."* Disclaimed for every allegation after July 24, 2:59 PM: AC ¶ 173 (*"This July 24, 2:59 PM Second Demand Letter marks the precise end of Plaintiff's reliance and the beginning of university leadership's reliance"*); AC ¶ 174 (*"Plaintiff was no longer relying on Defendants' expertise or representations about process"*); PSAC ¶ 208 (preserving the disclaimer verbatim in the proposed amendment).

- *Third-party reliance (architecture 2).* Pleaded for every allegation after July 24, 2:59 PM. AC Pattern 1 Phase 2 (verbatim headings *"Phase 2 Target — University Leadership's Reliance"* and *"Senior Officials' Reliance Evidenced by Their Silence"*); AC Pattern 2 (verbatim headings *"Reliance and Causation Through Oversight Removal"* and *"Senior Officials' Reliance Directly Caused by Concealment"*); AC Pattern 3 (Selcer's August 25 falsified meeting summary furnished to Rodemeyer and Blair as institutional recipients). Proposed PSAC Pattern 4 extends the architecture by one defendant — Dean Blair — with Mr. Frist copied as a direct recipient of the October 22 emails. In each Pattern, senior University officials or designated TAP No. 33 reviewers are pleaded as institutional reliers; Plaintiff is pleaded as the non-relying damaged party.

- *Coerced reliance (architecture 3).* Pleaded at PSAC ¶ 345 (the proposition the Order quotes at ECF 45 at 20 and attacks) and at PSAC ¶¶ 78–79 (Selcer's coerced-attendance day), with continuing-engagement-under-compulsion allegations across the post-July-24 timeline. Plaintiff remains the subject of reliance, but engagement is institutionally compelled because non-engagement carries enforcement consequences against Plaintiff: academic sanction, deemed non-compliance, denial of supportive measures, grading exposure to the conflicted

---

Plaintiff preserves disagreement with the Order's asymmetric construction of the October 22 emails — drawing inferences against the non-movant contrary to *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) — for any future proceeding in which it may bear; the grounds in this Argument are independent of that reading.

party. Coerced reliance is structurally distinct from orthodox first-party reliance (architecture 1) because the reliance is non-voluntary, and structurally distinct from third-party reliance (architecture 2) because Plaintiff remains the subject of reliance rather than an institutional third party.

The catalog of reliance allegations supporting each architecture is at the AC Reliance Architecture Catalog, with verbatim pin cites flagged for source-PDF verification before filing.

**2. The § 1915(e)(2)(B) screening baseline covering all three architectures.** As developed in Argument 1's procedural-posture predicate, this Court's October 6, 2025 service direction (ECF 14) is a § 1915(e)(2)(B) determination by operation of the statute: service of an *in forma pauperis* pleading does not occur in the absence of the screening review § 1915(e)(2)(B) makes mandatory, and the statute admits of no third option between dismissal and a plausibility determination. The screening necessarily included all three reliance architectures as they appear in Count IV — every Pattern, every architectural register, every relier subject. Because § 1915(e)(2)(B), Rule 12(b)(6), and Rule 15(a)(2) apply the same plausibility floor, the screening baseline is the doctrinal posture against which any futility analysis of these architectures must be measured — not as res judicata, but as internal consistency. Neither party briefed any of the three architectures' doctrinal underpinnings, and neither party flagged the screening baseline.

**3. The proposed amendment is additive on the screened architecture (architecture 2).** Pattern 4 applies the same architecture as screened Pattern 3 — a credentialed institutional actor (here, Dean Blair) furnishes a false administrative determination to an institutional recipient (here, Mr. Frist, copied as a direct recipient of the October 22, 2:20 PM email) who can be expected to act in reliance on it. The amendment does not introduce a new fraud theory; it extends the screened theory by one defendant.

**4. The Order's reliance framework is structurally nonresponsive.** Take the eleven authorities (catalogued at Prong 4a *supra*) at full face value, as if they exhausted Pennsylvania fraud-reliance law. Plaintiff does not deny that recipient suspicion under § 541 can foreclose justifiable reliance, that reasonable diligence is required in some circumstances, or that voluntary

first-party reliance must be reasonable.  Defendants did not invoke those principles to challenge any reliance Plaintiff pleads (ECF 34 at 8–9 disputes whether reliance occurred at all, not whether any reliance pleaded was justifiable). The screening at ECF 14 did not turn on any of them. The framework is dispositive of nothing because no proposition within it is in dispute; the sua sponte fraud-reliance doctrine the Order assembles answers a question no party put.

     **5.**    **The screening-baseline asymmetry the Order does not address.**    Section 1915(e)(2)(B)(ii) screening, Rule 12(b)(6) dismissal, and Rule 15(a)(2) futility analysis apply the same plausibility standard.  Denying leave on futility grounds therefore requires finding that architecture (2) — third-party reliance — is plausible when applied to Simpson, Wasilko, Sawa, and Selcer (the screened claims) but futile when applied to Blair (the proposed claim). The Order does not identify any feature of Pattern 4 that distinguishes it; does not engage the screening baseline; does not engage architecture (2) at all.  Its reliance work attacks architecture (1) at pages 19–20 and architecture (3) at page 20 (*"Plaintiff does not provide any legal support for this proposition"*). The omission is material:  a futility ruling on Pattern 4 either implicitly reverses the screening determination on Patterns 1 Phase 2, 2, and 3 (which the Order does not purport to do and could not do without notice and briefing) or identifies a Pattern-4-specific feature making it uniquely futile (which the Order does not attempt).

     The nonresponsiveness operates architecture by architecture. Architecture (1) (pre-July 24 first-party reliance): the disclaimer at AC ¶¶ 173–174 / PSAC ¶ 208 moots the recipient-suspicion question § 541 governs — a plaintiff who pleads he stopped relying presents no justifiable-reliance question. Architecture (2) (third-party reliance): § 541's recipient-suspicion rule does not reach the doctrinal terrain; the question is what an institutional third-party relier knew or should have known, not what Plaintiff knew.[4] Architecture (3) (coerced reliance): the operative inquiry is institutional

---

[4]

By drawing the *Restatement (Second) of Torts* into the record at pages 19–21 through § 541, the Order imports the source that supplies the canonical American common-law pedigree for third-party-reliance fraud doctrine.  Pennsylvania has long adopted those Restatement provisions as authoritative.  Plaintiff does not invite the Court to apply that pedigree on this motion (doing so

compulsion, not voluntariness or recipient suspicion; § 541 does not address it. On no architecture does the eleven-authority apparatus do dispositive work the record called for. The Prong 4a process defect alone is sufficient to vacate the page-19–20 reliance findings, without reaching whether § 541 is the right framework for any architecture.

**6. The coerced-reliance gotcha at ECF 45 at 20.** After quoting PSAC ¶ 345's reliance proposition, the Order states: *"Plaintiff does not provide any legal support for this proposition."* ECF 45 at 20.[5]

**7. The non-defeasible point.** The screening-baseline omission on architecture (2) alone is sufficient: the futility conclusion cannot stand alongside the screening determination on the same architecture (2) without explanation, and the Order offers none. The Prong 4a process defect on each of the Order's two reliance moves — adoption of the § 541-anchored framework against architecture (1) at pages 19–20, and adoption of the coerced-reliance *"no legal support"* attack against architecture (3) at page 20 — is independently sufficient under *Max's Seafood Café*. Even

---

would replicate the Prong 4a defect) but notes the architectural fact that the Order's chosen source contains the canonical statement of the architecture the Order leaves unaddressed.

[5]

The proposition is not without legal support. A fraudulent misrepresentation need not be made directly to, or believed by, the plaintiff: *Restatement (Second) of Torts* §§ 531 and 533 — the same Restatement the Order invokes through § 541 — impose liability where the maker has reason to expect the representation's substance to be communicated to a third person and to influence that person's conduct, including a refraining from action. Pennsylvania recognizes third-party reliance fraud at the pleading stage. *Woodward v. Dietrich*, 548 A.2d 301 (Pa. Super. 1988). Plaintiff does not brief that doctrine here — the Order raised it sua sponte after briefing closed — and marks only that the proposition rests on settled Pennsylvania authority, not that the doctrine is now before the Court. PSAC ¶ 345 pleads architecture (3) above: Plaintiff as continuing subject of reliance with respect to Dean Blair's October 22 TAP 33 representations because engagement with the academic process was institutionally compelled. Defendants did not raise coerced-reliance doctrine in ECF 34. The reply did not respond to coerced-reliance doctrine because no challenge required a response. The Court raised the doctrinal challenge sua sponte after the close of briefing. As developed in Argument 1 Prong 4a above, Plaintiff does not engage coerced-reliance doctrine on this motion — to do so would be to perform the briefing the Court denied Plaintiff the opportunity to perform when the issue was raised. The remedy is procedural: vacate the *"no legal support"* finding and afford Plaintiff notice and an opportunity to be heard on the coerced-reliance proposition at PSAC ¶ 345 before any dispositive ruling adverse to the proposition is entered.

if the Court ultimately concludes on reconsideration that the § 541 framework correctly disposes of architecture (1) on first-party voluntary reliance grounds, architecture (2) — third-party reliance — survives that disposition; and the futility ruling on proposed Pattern 4 cannot stand without engaging it.

**Authority.** 28 U.S.C. § 1915(e)(2)(B); *Mitchell v. Horn*, 318 F.3d 523 (3d Cir. 2003); *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669 (3d Cir. 1999); AC ¶¶ 173–174 (first-party voluntary-reliance disclaimer); PSAC ¶ 208 (first-party disclaimer preserved); PSAC ¶¶ 78–79 (Selcer's coerced-attendance day); PSAC ¶ 345 (coerced-reliance proposition); PSAC ¶¶ 337, 342, 344–345 (third-party reliance via Frist on proposed Pattern 4).

**Reconsideration, not relitigation.** Reconsideration is sought not on a ruling the Order made about any of the three reliance architectures, but on the architecture-level structure the Order does not acknowledge: the screening determination at ECF 14 covering all three architectures; the structural parallel between proposed Pattern 4 and screened Patterns 1 Phase 2, 2, and 3 (all sounding in architecture (2), uncontested by anyone); the sua sponte status of the page-20 attack on the coerced-reliance proposition at PSAC ¶ 345 (architecture (3), contested only by chambers and only after the close of briefing); and the limits of the § 541-anchored framework's reach (architecture (1) only, even on its own terms). *Max's Seafood Café*, 176 F.3d at 677.

## D. Argument 4 — Each per-representation rejection performs a meaning-determination at Rule 12(b)(6); *Iqbal* step 2 does not authorize it

**Thesis.** The Order rejects each of the six alleged misrepresentations in Proposed SAC ¶¶ 337 and 342 not by finding that any element of fraud is unpled, but by reading each cited email differently than the SAC reads it and dismissing the SAC's reading. At Rule 12(b)(6), the SAC's reading of a defendant's communications — what the words and acts represented — is a factual allegation that must be credited and from which reasonable inferences must be drawn in the non-movant's favor. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). *Iqbal* permits a court at step two to disregard threadbare recitals of legal elements; it does not authorize a court to choose

between two competing readings of a defendant's words at the pleading stage. Each of the six per-representation closures — *"not a false representation"* (Reps 1, 2, and 3), the absurdity-conversion at page 14 (Rep 4), *"limited definition"* (Rep 5), and *"Dr. Blair did not represent or imply"* (Rep 6) — performs that choice.

**The Rule 9(b) chain.** A properly pled misrepresentation walks four steps: (1) verbatim quotation of the communication (pure factual allegation); (2) the allegation that the words represented X (the content of the representation, required by Rule 9(b) particularity); (3) the allegation that X, if represented, is false (typically by reference to an ascertainable source — policy text, statute, contract); and (4) tie to the misrepresentation element. Strike step 2 as *"personal interpretation"* or *"conclusory as to meaning"* and the chain breaks at the link Rule 9(b) requires. Every one of the six representations in ¶¶ 337 and 342 supplies the body Rule 9(b) requires; the Order's per-representation dispositions operate by deleting step 2 and substituting the Court's reading for the pleader's.

*Threshold — the knowledge finding and the doubling-down (Order at pp. 17–18, 22–24)*

Before reaching per-representation work, the Order resolves a threshold question against the non-movant: whether Dr. Blair could reasonably have read Plaintiff's October 20 email as invoking TAP No. 33. The Order finds the inference *"patently unreasonable based upon a plain four-corners review of both emails"* (ECF 45 at 17), and that finding drives Reps 1, 2, and 3 — if Blair did not have to read the email as invoking TAP 33, her response made no false representations about TAP 33.

The Order's finding does not engage the deductive chain the SAC pleads. The first email's express subject was *"a conflict of interest affecting my required Ph.D. teaching seminar."* Ex. K-1. TAP No. 33 is Duquesne University's institutional Conflict of Interest Policy, so titled in the policy heading itself. The recipient is Dean of the Graduate School of Liberal Arts at the same University. On those three particularized facts, the SAC pleads a reasonable inference: that a University Dean fielding a community member's report using the words *"conflict of interest"* would recognize the

28

University's Conflict of Interest Policy as the relevant institutional framework. That is the inference Rule 12 directs to the non-movant on a Rule 9(b)-particularized pleading.

The honest counterfactual is short, and it applies twice. Even if a Dean fielding the first email could in good faith have failed to recognize a *"conflict of interest"* report as implicating the University's Conflict of Interest Policy, the second email forecloses that good-faith escape. Plaintiff's October 22 9:58 AM reply expressly invoked TAP No. 33 by name, quoted § IV.2's disclosure obligation, cited § IV.4's independent-review framework, requested referral to the policy's designated reviewers, and cc'd Mr. Frist, Reverend McCloskey, President Gormley, and the Office of General Counsel as the persons designated by the policy to receive such referrals. Ex. K-3. Whatever ambiguity attended the first email, the second email put TAP No. 33 explicitly before Dr. Blair.

A Dean responding in good faith to that second email would have routed the matter to § IV.4 or acknowledged she was not the appropriate decision-maker. Blair did neither. She doubled down — denying TAP 33's applicability on two grounds (non-Covered-Party status and *"limited definition"*; both limits Argument 2 shows the policy does not impose, and both outside her institutional authority), asserting total convergence with the conflicted party (§ IV.4's exact bypass), and announcing *"there is no change"* to her earlier directive. Ex. K-5. Her cc to Frist on that response could communicate nothing new — Plaintiff had already copied Frist on the 9:58 AM reply — except Blair's own representation that TAP 33 does not apply; given her lack of § IV.4 authority, the cc could function only as inducement of Frist's reliance. Frist did not intervene. That is the third-party reliance the SAC pleads, supplied by direct documentary record. The form of the doubling-down (no questions, no procedural acknowledgment, finality declared in the same breath as denial, cc to a reviewer whose review is not invoked) is the move an actor on notice makes, not an actor learning of the policy's applicability for the first time.

Rule 9(b) requires particularity, not proof. Plaintiff need not establish — as a factfinder would — that Blair recognized TAP 33; he need only plead the inference reasonably from particularized facts. The Order's *"patently unreasonable"* finding is the inverse of the inference

direction Rule 12 fixes. *Phillips*, 515 F.3d at 233. That conflation of pleading with proof forecloses Reps 1, 2, and 3 before any per-representation work begins.

*The six per-representation closures, mapped*

Each closure substitutes the Court's reading of Blair's words or acts for the SAC's pled reading. The labeled list below maps each Rep to (i) the representation actually made, (ii) the SAC's step-2 reading and falsity anchor, and (iii) the Order's closure — showing in each case that the closure operates by deleting step 2 from the Rule 9(b) chain.

- **Rep 1 (8:35 AM email; ¶¶ 335, 337).** *"[I] did need to consult Dr. Selcer as instructor to secure some additional details. Both Dr. Selcer and I strongly concur that it is appropriate for you to remain enrolled in your required teaching seminar." SAC reading:* consulting the conflicted party satisfied § IV.4. *Falsity:* § IV.4 mandates review *"by the Senior Vice President for Finance and Business or their designee and/or external investigators"* — not by a Dean consulting the person whose conflict was reported. *Order's closure* (p. 18): *"Plaintiff's first alleged false representation is not a false representation,"* re-reading the email as description of what Blair did rather than as a representation that what she did satisfied § IV.4. *"I did need to consult"* is responsive grammar, coherent only as contradiction of an unspoken contrary expectation; the Order's page-17 closure that Plaintiff's belief about Blair's awareness *"will not be credited"* inverts the inference direction Rule 12 fixes. *Phillips*, 515 F.3d at 233.

- **Rep 2 (same sentence; joint determination as authority; ¶ 337).** *SAC reading:* Blair's concurrence with Selcer constituted authority over the conflict. *Falsity:* § IV.4 vests that authority in Mr. Frist or external investigators; a Dean's concurrence with the conflicted party has no authority under the policy. *Order's closure* (p. 18): *"there is no false representation, or implied false representation,"* re-reading *"concur"* as personal opinion because (the Order finds) *"there is no reference, or implied reference, to TAP No. 33"* in either email. A Dean writing on University correspondence infrastructure, in coordinated agreement with the conflicted faculty member, to the policy's named § IV.4 reviewer, announcing finality on the conflicted-party-

grading arrangement, is institutional position-taking, not opinion.  The contrary inference is drawn from no record fact, only from absence of a magic-words disclaimer — a move Rule 12 forbids. *Phillips*, 515 F.3d at 233.

- **Rep 3 (omissions; ¶ 337).** The 8:35 AM email omits any disclosure that § IV.4 was bypassed, that designated reviewers were not consulted, and that the conflicted party was consulted instead. *SAC reading:* against the backdrop of Blair's affirmative process description, the omissions represented that proper TAP 33 procedures had been followed. *Falsity:* they had not. *Order's closure* (pp. 18–19): *"Dr. Blair did not intentionally conceal from Plaintiff that she had violated TAP No. 33 procedures, because TAP No. 33 was not a subject of Plaintiff's email request,"* treating an omission as a non-statement. Pennsylvania concealment law and *Restatement (Second) of Torts* § 551(2)(b) hold the opposite:  once an affirmative partial disclosure is made, a duty arises to avoid the disclosure being misleading by omission. Blair's affirmative description of her process triggered the duty; the omission-as-non-statement closure is legal-rule misapplication, not pleading-deficit finding.  The TRO-record fact (Dr. Selcer's cross-examination admission at ECF 44 at 149 — Blair instructed him to remove her name from the September 3 cc line while preserving informational access via forwarded copy) supplies circumstantial scienter for the inference that the October 22 omissions are deliberate.

- **Rep 4 (2:20 PM email; ¶ 342, ★).**  *"Please be advised that TAP 33 does not apply to this situation. . . [a]s a student, you are not a 'Covered Party' as defined by TAP 33."* Ex. K-5. *SAC reading:* the language represented to Plaintiff and to Frist (copied) that the policy excludes student-initiated reports of faculty conflicts. *Falsity:* anchored in four textual provisions — § IV.3 authorizes *"[a]ny member of the University community"* to report; § II is non-exhaustive (Arg 2); § III ¶ 2 supplies the catch-all (Arg 2); and § I prohibits Covered Parties from permitting interests to *"conflict, or appear to conflict"* with the University's.  *Order's closure* (p. 23): the Order finds that Plaintiff *"recasts these words from Dr. Blair"* — Blair's *"students are not 'Covered Parties'"* — into the different statement that Blair *"stated that 'students cannot report conflicts*

*under TAP No. 33,'"* and concludes *"Plaintiff has not alleged that Dr. Blair uttered the words as Plaintiff alleges; thus, there was no false statement and no sufficient allegation of fact to support Plaintiff's fraud claim."* The closure performs the meaning-determination directly: the SAC alleges Blair's words represented X (TAP 33 excludes student-initiated reports of faculty conflicts); the Order decides those words represented something narrower and dismisses the SAC's reading as Plaintiff's own *"recast."* Either Blair did represent *"does not apply"* (false on the face of three textual provisions) or the Court has decided TAP 33's text means something different from what it says (a merits ruling unavailable at 12(b)(6)). The Order's footnote 7 (p. 23 n.7) extends the closure: because Plaintiff erroneously called himself a Covered Party, Blair *"did not make a false representation that students are not permitted to make TAP No. 33 reports,"* and *"[t]he allegation is unsupported and contrary to the actual text of Dr. Blair's email."* ECF 45 at 23 n.7. The footnote requires the SAC to claim Blair *announced* resolution by utterance. The SAC alleges something more precise: Blair **bypassed** § IV.4 *in act* (consulted the conflicted party, reached her own determination, announced *"there is no change"*). The bypass *is* the resolution. To the extent particulars about Blair's internal review process lie in Duquesne's exclusive knowledge, Rule 9(b) is relaxed accordingly. *In re Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989). The footnote's *"unsupported and contrary to the actual text"* characterization is not an *Iqbal* step-2 finding; it is a finding closer to Rule 11(b)(3)'s fabrication register, which requires Rule 11(c) process.

- **Rep 5 (same email; *"limited definition"*; ¶ 342).** The 2:20 PM email represents that § II's definition excludes a faculty member grading a litigation adversary. *Falsity: "Limited definition"* is textually impossible against § II's *"may arise out of, but are not limited to"* anti-limit canon and § I's independent appearance prong (*cf. Federal Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941)). *Order's closure* (p. 24): Plaintiff's allegation that Blair determined the scenario *"does not constitute a conflict of interest"* is *"an unwarranted inference from the text of her email that will not be credited,"* and so Plaintiff's *"alleged fifth false representation is not, in fact, a false representation."* The closure treats the statement as narrow legal interpretation rather

than factual representation. But for the statement to function it must claim either that students cannot report (§ IV.3 scope) or that the conduct is not what TAP 33 reaches (§§ II/I scope) — both are interpretations of policy text; the words *"in TAP 33"* foreclose any third reading.

- **Rep 6 (compliance theater; ¶¶ 344–345, ★).** The 2:20 PM email cc's Frist — § IV.4's named decision-maker — but does not request his review. Blair instead announces *"there is no change [to Selcer's role]"*. *SAC reading:* three implied representations to Frist — that review had been done, Blair's determination was authoritative, and Frist's independent assessment was unnecessary. Prop. SAC ¶¶ 344–345. *Falsity:* review had not been done, Frist's authority was bypassed, and Blair had no determination authority. *Order's closure* (p. 24): Blair did not represent or imply Frist's review was unnecessary, but stated only her own conclusion that TAP 33 did not apply. The closure performs the meaning-determination directly: the SAC alleges the act represented X (compliance theater); the Order decides it represented Y (personal conclusion). No doctrine authorizes the determination. The act of cc'ing Frist while foreclosing his review *is* the representation, and *"TAP 33 does not apply"* is meaningless except as an interpretation of TAP 33's reporting architecture (§ IV.3), enumeration (§ II), or appearance prong (§ I).

*The recurring closure formulations*

Four formulations recur, each performing a step-2 substitution *Iqbal* does not authorize: (1) the *"facially absurd"* conversion (Reps 4 and 5; Order at p. 23, quoting Plaintiff's own word back at him as the predicate for dismissing the underlying allegations as *"conclusory"*) reframes Plaintiff's factual characterization of falsity as Plaintiff's own legal argument, pulling step 2 out of the Rule 9(b) chain; (2) the *"did not represent or imply"* formulation (Reps 1, 2, and 6; Order at pp. 18, 24) is a strict factual determination at 12(b)(6) about communicative meaning, deciding an interpretive question Plaintiff alleged the other way; (3) the omission-as-non-statement closure (Rep 3; Order at pp. 18–19) treats concealment as requiring an affirmative misstatement, contra *Restatement (Second) of Torts* § 551(2)(b) once a partial disclosure is made; (4) the interpretive-privilege closure (cross-cutting; Order at pp. 17–24, *passim*) treats the Court's reading of Blair's communications as

correct as a matter of law and the SAC's reading as *"unwarranted,"* though no doctrine authorizes a Rule 12(b)(6) court to declare its reading correct over the non-movant's. *Phillips*, 515 F.3d at 233.

**Authority.** *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008); *Restatement (Second) of Torts* § 551; *Federal Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941); TAP No. 33 §§ I, II, III ¶ 2, IV.3, IV.4; Prop. SAC ¶¶ 337, 342, 344–345.

**Remedy.** Vacate the per-representation merits closures — *"not a false representation"* (Reps 1, 2, and 3); the absurdity-conversion at page 14 (Rep 4); *"limited definition"* (Rep 5); and *"Dr. Blair did not represent or imply"* (Rep 6). On reconsideration, accept each pled meaning at step 2 and engage the screening-baseline asymmetry developed in Argument 3 — or, if the Court declines to grant leave inline, do so without making meaning-determinations the trier of fact must make.

**Reconsideration, not relitigation.** Reconsideration is sought not on each representation's doctrinal outcome but on the antecedent procedural question whether *Iqbal* step 2 authorizes a court to choose between two competing readings of a defendant's words at the pleading stage. The non-movant inference rule directs the contrary. *Phillips*, 515 F.3d at 233; *Max's Seafood Café*, 176 F.3d at 677.

## E. Argument 5 — Civil conspiracy survives independently and may not be dismissed with prejudice under this Court's own prior disposition

**Thesis.** The Order at pages 25–26 disposes of the proposed civil conspiracy claim derivatively: because the underlying fraud claim fails, the conspiracy claim fails with it; the conspiracy claim is folded into the futility ruling at pages 26–27. Two grounds independently require reconsideration of that disposition.

**1. Derivative is not coextensive.** Civil conspiracy in Pennsylvania survives if the conspiracy is plausibly linked to *any* underlying tort in the record. The SAC pleads conspiracy

linked to fraud; it also pleads conduct that intersects with other tort theories on which Plaintiff's claims may stand or be repleaded. The Order's automatic-derivation treatment forecloses conspiracy on the falsity rulings on the six fraud representations alone, without considering whether any other plausibly-pled underlying tort survives or could survive on amendment. If any of Arguments 1 through 4 above vacates the falsity dispositions on any of the six representations, the conspiracy claim survives on the surviving fraud predicate. If Argument 3 succeeds and the third-party reliance architecture is properly engaged on remand, the conspiracy claim survives on that predicate. Conspiracy is therefore not a derivative consequence of the per-representation merits work; it is a separately pled claim whose disposition turns on whether *any* underlying tort survives.

2. **Without-prejudice parity from this Court's prior disposition in this very case.** Plaintiff's original Complaint, filed in this very action before this Court prior to the operative Amended Complaint, pleaded civil conspiracy. The civil conspiracy claim was dismissed *without prejudice* at that stage. The same Court, by the same Judge, established the without-prejudice rule for derivative conspiracy in this matter at the original-Complaint stage. The SAC's conspiracy claim cannot be dismissed *with prejudice* now — and cannot be judged futile under *Foman v. Davis*, 371 U.S. 178 (1962) — when the Court has already adjudicated conspiracy in this case and assigned it a without-prejudice disposition on materially indistinguishable derivative grounds. The Order's silent re-characterization of conspiracy as futile at the SAC stage is inconsistent with its own prior disposition of the same claim in the same case.

3. **New evidence under Rule 54(b) — direct testimonial evidence of the agreement element of civil conspiracy.** As developed in § II above, Dr. Selcer testified on cross-examination at ECF 44 at 149: *"Dean Blair had asked me to forward her a copy of the message after sending it to you and not CC her on it."* The testimony is direct testimonial evidence of the agreement element of civil conspiracy under Pennsylvania law: Dean Blair instructing Dr. Selcer on the documentary choreography of the September 3 decision-document — a directive Dr. Selcer alone signed and sent, but which Dean Blair orchestrated to conceal her appearance on the documentary chain while preserving her informational access by forwarded copy — supplies plausible inference of a meeting

35

of the minds between the two. The transcript was docketed on February 10, 2026, after the close of briefing on the Motion for Leave (November 2025) and approximately three months before the Order issued. The new-evidence prong of *Max's Seafood Café*, 176 F.3d at 677, is engaged on its own terms: the testimony was not, and could not have been, before the Court when briefing closed; it bears directly on a core element of the proposed conspiracy claim; and the futility analysis cannot be conducted without it.

**Authority.** *Foman v. Davis*, 371 U.S. 178 (1962); this Court's prior order at the AC stage (ECF 2).

**Remedy.** Vacate the futility ruling on the proposed civil conspiracy claim and, at minimum, restore the without-prejudice posture this Court established at the AC stage. On reconsideration, treat the conspiracy claim as separately viable on any surviving underlying tort and as a candidate for further amendment under *Foman*'s liberal-leave standard if no tort presently survives.

**Reconsideration, not relitigation.** Reconsideration is sought not on the doctrinal substance of civil conspiracy, but on (i) the Order's automatic-derivation reasoning and (ii) its departure from this Court's own prior without-prejudice disposition of the same claim in the same case. *Max's Seafood Café*, 176 F.3d at 677.

## IV. CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that this Court:

(1)  vacate the May 8, 2026 Opinion and Order (ECF 45) under Federal Rule of Civil Procedure 54(b);

(2)  grant Plaintiff's Motion for Leave to File a Second Amended Complaint; and

(3)  accept the proposed Second Amended Complaint as the operative pleading.

In the alternative, Plaintiff respectfully requests that the Court:

(a)  vacate the page-14 adverse-credibility framework that no party briefed and no paragraph-level enumeration supports;

36

(b) vacate the threshold-knowledge finding at ECF 45 pages 17–18 (the determination that no reasonable inference of Dr. Blair's knowledge of TAP No. 33's applicability could be drawn from Plaintiff's October 20 email or from the doubling-down on October 22) and the per-representation merits closures that perform meaning-determinations *Iqbal* step 2 does not authorize; and

(c) restore the without-prejudice posture of the civil conspiracy claim consistent with this Court's prior disposition of the same claim in the same case.

Plaintiff preserves all appeal rights under Rule 54(b) and the final-judgment rule.

Respectfully submitted,

Dated: May 18, 2026

*/s/ David Michael Mullins*

David Michael Mullins

Plaintiff, pro se

Email: amodelcomplainant@gmail.com

37

**CERTIFICATION REGARDING USE OF ARTIFICIAL INTELLIGENCE TOOLS**

I, David Michael Mullins, certify as follows:

**1. Use of AI Tools**

Artificial intelligence tools were used in the research and/or drafting of this filing. The tool used was Claude (Anthropic).

**2. Nature and Scope of Assistance**

AI tools were used to assist with drafting, wording, organization, and editing. During iterative drafting, these tools sometimes suggested phrasing for legal arguments or formulations of legal propositions.

**3. Independent Legal Judgment**

No legal argument, legal proposition, factual assertion, quotation, or citation appears in this filing unless I personally reviewed it and determined that it is accurate, legally sound, and supported by existing law or the record. Any Claude-suggested language was adopted only after my independent evaluation.

**4. Identification of Portions Influenced by AI**

AI tools were used at various stages of the drafting process, including phrasing assistance, structural editing, and stylistic refinement. Specifically, AI tools were used to assist with phrasing and stylistic refinement in the substantive legal analysis portions of this filing, but were not used to generate citations, quotations, legal authorities, or factual assertions, all of which were independently researched, written, and verified by me. Accordingly, AI influence may be present at the level of phrasing throughout the filing, but all substantive content—including legal arguments, authorities,

quotations, and factual representations—reflects my own independent analysis, verification, and judgment.

## 5. Verification of Accuracy

I personally verified the accuracy of all quotations, citations, authorities, and factual statements contained in this filing.

## 6. Responsibility

I understand that I am solely responsible for this filing and for ensuring compliance with Federal Rule of Civil Procedure 11 and the Court's Order.

## 7. Good-Faith Certification

This certification reflects my reasonable, good-faith inquiry under Rule 11. As with any human-drafted filing, inadvertent error is possible despite diligent review, but no such error is the result of reliance on unverified AI output.

Executed this May 18, 2026.

*/s/ David Michael Mullins*

David Michael Mullins

Plaintiff, *pro se*

Email: amodelcomplainant@gmail.com